UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division
www.flsb.uscourts.gov

In re:

VIACAO ITAPEMIRIM, S.A. *et al.*                     Case No.: 18-24871-RAM

    Debtors in Foreign Proceeding.          Chapter 15

_____/

### CAMILO COLA FILHO'S MOTION TO DISMISS
### OR, IN THE ALTERATIVE, FOR ABSTENTION

Camilo Cola Filho ("Mr. Cola Filho"), by undersigned counsel[1] and pursuant to Sections 109, 305, and 1517 of the United States Bankruptcy Code ("Bankruptcy Code"), respectfully requests that the Court dismiss this Chapter 15 proceeding or, in the alternative, abstain from this Chapter 15 proceeding. In support Mr. Cola Filho states as follows:

### I.    PRELIMINARY STATEMENT

The underlying foreign main proceeding[2] is not a liquidation being run by a bankruptcy trustee or liquidation agent, where investigation of and recovery of claims is a central focus of the proceeding. Rather, it is a Court-Supervised Reorganization where, as of May 2019, there has been a Confirmed Brazilian Plan. And that Confirmed Brazilian

---

[1] The filing of this motion is not to be construed as a waiver of any rights, including, without limitation, the right to contest jurisdiction, trial by jury of any issue, or any other rights, claims, actions, defenses, setoffs, or recoupments to which Mr. Cola Filho is or may be entitled under agreements, in law, or in equity, all of which rights, claims, actions, defenses, setoffs, and recoupments expressly are hereby reserved.

[2] The Brazilian Court-Supervised Reorganization was recognized as the foreign main proceeding pursuant to the Court's *Order Granting Recognition of Foreign Main Proceeding* entered on January 2, 2019. *See* ECF No. 8.

Plan fails to provide <u>any</u> basis for the Foreign Representative's rogue Chapter 15 escapades before this Court. As such, this Chapter 15 proceeding must be dismissed.

This Chapter 15 bankruptcy proceeding serves no viable or statutory purpose. The Foreign Representative's previous pretense for this Chapter 15, that he was pursuing "assets owned by the Debtors" and had a "factual basis to believe that the Debtors directly or indirectly have assets and/or claims, in the United States, specifically in Florida," was completely gutted when the Debtors' plan was confirmed, providing no such right of inquiry or potential of recovery. Instead, Alleged Buyers,[3] through the Foreign Representative they individually appointed (instead of an appointment by the Brazilian court), are attempting to use this Chapter 15 to obtain discovery for alleged claims they are pursuing in Brazil against Mr. Colo Filho,[4] all of which are completely unrelated to the rights and obligations under the Confirmed Brazilian Plan.

Indeed, the Foreign Representative is now foreclosed from pursuing any (yet unidentified) assets of the Debtors in the United States because the Debtors' Confirmed Brazilian Plan (defined below) in the Brazilian Court-Supervised Reorganization[5] (i) did not provide for this Chapter 15, (ii) did not provide for the recovery of any litigation claims

---

[3] The "Alleged Buyers" of the Debtors are SSG Incorporação e Assessoria - EIRELI. and CSV Incorporação e Assessoria Empresarial – EIRELI.

[4] Mr. Cola Filho and Alleged Buyers are parties to ongoing disputes in various legal proceedings in Brazil that are extensive and complex (collectively, the "Brazil Litigations"), encompassing, *inter alia*, the contested ownership of the Debtors between Alleged Buyers and Mr. Cola Filho, the bad acts of Alleged Buyers and their agents during the Court-Supervised Reorganization, and the Debtors' pending action against Mr. Cola Filho.

[5] On July 20, 2018, Mr. Cola Filho, along with the other true owners of the Viação Itapemirim S.A., Transportadora Itapemirim S/A, Itapemirim Transportes S.A., Imobiliária Bianca Ltda., Cola Comércio e Distribuidora Ltda., Flecha S.A. Turismo Comércio e Indústria ("Original Debtors"), filed a Brazilian bankruptcy case on behalf of the Original Debtors (the "Brazilian Bankruptcy"). Viação Caiçara Ltda. was subsequently joined in the Brazilian Bankruptcy ("Caiçara", jointly and collectively with the Original Debtors shall be known herein as the "Debtors") to effectuate full administration of the Debtors' assets.

against any party, including recovery of any litigation claims in the United States, and (iii) did not provide a provision for any litigation recoveries to be distributed to the Debtors' creditors. As a result, nowhere in the Confirmed Brazilian Plan did the Brazilian Court retain jurisdiction to allow for the investigation or pursuit of any such claims brought in the United States.

Since the Court-Supervised Reorganization resulted in a confirmed plan that serves as a contractual undertaking, and which does not provide for the investigation or recovery of the claims brought on behalf of the Debtors in the United States or distribution of any recovery therein, this Chapter 15 serves no legitimate purpose and must be dismissed. In the alternative, the Court should abstain from taking any further action in this case.

## II.    OVERRIDING LIMITATIONS OF CHAPTER 15

The intent of Chapter 15 is clear -- a United States bankruptcy court acts "in aid of the [foreign] main proceedings" to avoid "a system of full bankruptcies ... in each state where assets are found." H.R.Rep. No. 109–31(I), at 108 (2005), reprinted in 2005 U.S.C.C.A.N. 88, 171; Chapter 15 provides courts with broad, flexible, and pragmatic rules to fashion relief that is "largely discretionary and turns on subjective factors that embody principals of comity." *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 389 B.R. 325, 333 (S.D.N.Y. 2008) (citing *e.g.*, §§ 1507, 1521, 1525; Model Law art. 7, 21, 25.). To that end, Chapter 15 ancillary cases assert only territorial jurisdiction over a debtor's assets located in the United States and not as discovery tool for non-United States assets. *See* 8 Collier on Bankruptcy ¶ 1502.01[8] ("[C]hapter 15, and the Model Law, intend that ancillary cases be limited to property within the

3

recognizing country."); *In re Barnet*, 737 F.3d 238, 251 (2d Cir. 2013) (explaining that, in light of section 1782, Congress "may have intended to limit the relief provided by chapter 15") *In re Hughes*, 281 B.R. 224, 230 (Bankr. S.D.N.Y. 2002) (noting that "when determining the scope of discovery permissible in a 304 proceeding, section 304 should be read together with [§ 1782]"); *In re Bd. of Dirs. of Hopewell*, 258 B.R. 580, 586 (Bankr. S.D.N.Y. 2001) (noting that "§ 1782 provides a further reason not to distort § 304 and use it as a discovery tool in aid of arbitration").

### III. THE GROUNDS FOR THIS CHAPTER 15 HAVE CEASED TO EXIST, AND THE PURPOSES OF CHAPTER 15 WOULD BE BEST SERVED BY DISMISSAL

Under Section 1517(d), the Court may modify or terminate recognition of the Debtors' Chapter 15 proceeding if the grounds were fully or partially lacking or have ceased to exist. This applies if <u>either</u> one of these elements is met. *See In re Estrategias En Valores*, S.A., 601 B.R. 550, 554 (Bankr. S.D. Fla. 2019) ("[T]he reviewing court that evaluates the presence or absence of <u>either one of those prongs</u> may consider new evidence and it is not limited to considering only the evidence that was or ought to have been available at the time the court granted recognition.") (emphasis added) (quotations omitted); *see also in re British Am. Ins. Co.*, 425 B.R. 884, 906 (Bankr. S.D. Fla. 2010) (if facts change after petition date, Sections 1518(1) and 1517(d) permit the court to modify recognition based on new circumstances); *In re Oi Brasil Holdings Cooperatief U.A.*, 578 B.R. 169, 198 (Bankr. S.D.N.Y. 2017) (Section 1517(d) contemplates the ability to alter a prior recognition determination if one of the two prongs are satisfied).

Likewise, Section 305(a)(2) allows a bankruptcy court to either dismiss a bankruptcy case or abstain if (i) a petition under section 1515 for recognition of a foreign proceeding has been granted and (ii) the purposes of Chapter 15 would be best served

by such dismissal or suspension. *See*, *e.g.*, *In re Gerova Fin. Grp., Ltd.*, 482 B.R. 86, 93–94 (Bankr. S.D.N.Y. 2012) (Section 305(a)(2) permits a chapter 15 case to be dismissed after a foreign proceeding has been recognized if the purpose of chapter 15 – such as the "promotion of cooperation with foreign courts" – would be best served by such dismissal or suspension); *In re RHTC Liquidating Co.*, 424 B.R. 714, 724 (Bankr. W.D. Pa. 2010) (noting that chapter 15 cases can be dismissed under Section 305(a)(2) if one or more of the several purposes of chapter 15 would be served by dismissal).

In this case, the Brazilian Court-Supervised Reorganization was recognized as the foreign main proceeding pursuant to the Court's *Order Granting Recognition of Foreign Main Proceeding* entered on January 2, 2019. *See* ECF# 8. Thus, there can be no dispute that Sections 305(a)(2) and 1517(d) apply here.

This Chapter 15 no longer serves any viable purpose, as its main purpose – to facilitate cooperation between the United States and foreign nations in cross-border insolvency cases – is no longer applicable. *See* 11 U.S.C. § 1501(a)(1). The Confirmed Brazilian Plan in the Court-Supervised Reorganization was confirmed on May 14, 2019. *See Foreign Representative's Notice of Subsequent Information* (ECF#82)*,* Exhibit B; *see also* Confirmed Brazilian Plan, attached as **Exhibit 1.** The Confirmed Brazilian Plan *does not* (i) provide for this Chapter 15, (ii) does not provide for the recovery of any litigation claims, including the recovery of any litigation claims pursued directly or indirectly in the United States through this Chapter 15, and (iii) does not provide for distribution of any recoveries to creditors. Nowhere in the Confirmed Brazilian Plan does it provide for the

Brazilian Bankruptcy Court's continued jurisdiction over the pursuit of any such claims through the Brazilian Bankruptcy or any jurisdiction related to this Chapter 15.[6]

The Foreign Representative claims that Mr. Cola Filho was severely and irreparably harming his "ability to adequately perform the obligations bestowed upon him by the Brazilian court." *See Response to Camilo Cola Filho's Emergency Motion for Protective Order and Motion for Hearing on December 9, 2019, Before 12:00 PM* (ECF#137) at pg. 6, ¶ 28; *see also* pg. 6, ¶ 32 ("The Foreign Representative was tasked by the Brazilian court…") However, the Foreign Representative has <u>not</u> been conferred with or tasked with <u>any</u> powers by the Brazilian court, the Confirmed Brazilian Plan, or the Confirmation Order. As a result, the Foreign Representative, other than claiming such a charge, has failed to provide any documentary proof of the right of such an undertaking. Indeed, besides a brief statement by Mr. Mubarak, acting as *counsel* to the Debtors in Brazil (and not as the Foreign Representative) at the meeting of creditors, there has been no reference or filings related to this Chapter 15 proceeding in any document filed in the Court-Supervised Reorganization. Instead, the Confirmed Brazilian Plan represents that 100% of the existing debts subject to the Court-Supervised Reorganization will be paid with funds coming from (i) the sale of the Debtors' Isolated Production Units (UPI Properties) comprising real estate and, if not possible due to lack of buyers, (ii) sale of isolated production unit to be created especially for purposes of disposal of Debtors' bus lines (UPI Lines).[7]

---

[6] Although there may have been mention to the Debtors' creditors meeting of the Chapter 15, or the potential of pursuing assets in the United Sates, none of this made it into the Confirmed Brazilian Plan. As such, any reference is irrelevant to the relief sought herein.

[7]UPI, UPI Lines and UPI Properties are defined in the Confirmed Brazilian Plan as follows:

The Confirmed Brazilian Plan is a legal contract between the Debtors and their creditors, which allows for the novation of its the existing obligations, in a way that the Debtors are allowed to propose (i) new terms and conditions to pay the debts, as well as (ii) a large number of measures to maximize its assets and cash flow, including external funding, sale of assets/independent productive units or branches, loans, reorganization of the business itself, etc. *See Falência e Recuperação de Empresas*, 10ª ed., Saraivajur, São Paulo, 2019, e-book.[8] Under Brazilian law, as a contract, parties must be clear in

---

1.1.26   "UPI": means the Isolated Production Unit, segregated specifically for Judicial Disposal, as provided for by article 60 of the LRF, including but not limited to: property, improvements, inputs, vehicles, machinery; concessions of lines and any asset used in the operating activities.

1.1.27.  "UPI LINES": means the isolated production unit to be created especially for purposes of disposal, as provided for by article 60 of the LRF, composed of the assets owned by the Companies under Court-Supervised Reorganization, as listed in this plan. The UPI Lines shall be disposed of in such a manner that the buyer thereof shall not succeed the Companies under Court-Supervised Reorganization in any debts.

1.1.28.  "UPI PROPERTIES": means the isolated production unit to be created especially for purposes of disposal, as provided for by article 60 of the LRF, composed of the assets owned by the Companies under Court-Supervised Reorganization, as listed in this plan, by means of one or more corporate transactions. The Remaining UPI shall be disposed of in such a manner that the buyer thereof shall not succeed the Companies under Court-Supervised Reorganization in any debts.

[8] Brazilian Scholar Sérgio Campinho explains that the primary objective of the Reorganization is to approve the Plan proposal by the creditors, whose will is key in the process: "*The judicial reorganization process aims, within the scope thereof, at a single purpose: debtor's and his creditor's approval of a proposal provided by the debtor intended to reorganize the company. The state of economic and financial crisis will reveal to be transient and surmountable by the will of creditors, which will lead to the purpose of the procedure, which is the recovery of the company. The judge's role will be restricted to the verification of the legal provisions applicable to the plan. He is a guardian of its legality. **He is therefore precluded from interfering with its content, which is of exclusive domain of the parties.**" (Liquidation and Reorganization, 10th ed., Saraivajur, São Paulo, 2019, p. 33/34).

A Brazilian court has already declared that the reorganization plan, approved by the creditors, **is a contract**. Therefore, the judge of the case is not allowed to rule upon its economic content or best methods to pay the obligations. The debtor and creditors are free to agree upon the methods of generation of assets and payments, if they are legal as stated in (REsp 1631762/SP, Judge NANCY ANDRIGHI, THIRD CHAMBER, ruled on 06/19/2018, Published 06/25/2018):

"**_The reorganization plan_**, approved at the meeting by the creditor's will under the terms required by the governing law, **_has a clear contractual nature_**. As a consequence, **_the competent court is not allowed to interfere with the specifics of the economic content of the agreement between debtor and creditors_**."

relation to their obligations and duties. Brazilian law does not allow for the preservation of an obligation not disclosed in detail to the parties, or subject to mental reservation (something a party wanted but did not state expressly and in detail in the contract). In this sense, according to article 110 of the Brazilian Civil Code: "The statement of intention (representation) subsists even if the declarant has made a mental reservation not to want what he manifested, unless the recipient had knowledge."[9]

To state the obvious, the foreign main proceeding in Brazil is a reorganization, and not a liquidation. The distinction under Brazilian law is even more significant then here. Brazilian Insolvency Act (Law 11.101/2005) provides rules for both Reorganization and Liquidation. Article 76 is located within the section exclusively dedicated to Liquidation. It provides that the Liquidation Court will be indivisible and competent to rule upon any and all action involving assets, interests and businesses of the liquidated company:

Article 76. The liquidation court is indivisible and competent to rule upon all actions regarding assets, interests and businesses of the liquidated party, with exception of labor claims, tax claims and claims not governed by this Law in which the liquidated party appears as plaintiff or co-plaintiff.

Sole Paragraph. All actions, including the exceptions provided in the main provision of this article, shall proceed with the bankruptcy trustee, which shall be summoned to represent the bankrupt estate, under penalty of nullity of the proceeding.

---

[9] According to NESTOR DUARTE, full professor at the University of Sao Paulo and Court of Appeal Judge in Sao Paulo, the parties' express declaration

*"Declaration of intent is essential to carry out legal transactions, however, intent and declaration are not necessarily coincident. **Certainty of legal affairs, however, demands that there be efficacy in what has been declared and not in what has been possibly desired, but not expressly declared**. Therefore, whatever has been undeclared/mentally reserved, in general, is disregarded.* (DUARTE, Nestor. Commented Civil Code: doctrine and jurisprudence, Organized by Min. Cezar Peluso, 7ª ed., Manole, São Paulo, 2013)

*See also* Eduardo Espínola*: "It does not matter, therefore, whether the declarant has expressed his will on the basis of mental reserve or reticence, he will still be bound by the legal effects deriving from his statement."* (Espinola, Eduardo, *Parte Geral – Dos Factos Jurídicos*, de Paulo Lacerda, Rio de Janeiro: Jacintho Ribeiro dos Santos, 1923, p. 182-186) (emphasis added).

This provision, however, does not apply to Reorganization cases. According to the Brazilian Superior Court, claims filed by the Debtors under Reorganization against third parties are not subject to the Reorganization Court (Resp 1236664/SP, Judge JOÃO OTÁVIO DE NORONHA, THIRD CHAMBER, ruled on 11/11/2014, Published on 11/18/2014). Specifically, "the actions in which the company under reorganization, as claimant and creditor, seeks to collect its claims against third parties are not covered by the indivisibility and universality of the liquidation court, and the party must comply with the rules of existing legal and constitutional jurisdiction." As a result, any claims to be pursued against Mr. Cola Filho will not take place under the jurisdiction of the Brazilian Reorganization Court overseeing the Court-Supervised Reorganization, but rather under the jurisdiction of  the Brazil general civil courts.

The Court-Supervised Reorganization has now resulted in the Brazilian Confirmed Plan that simply has nothing to do with nor provides for any relief with respect to this Chapter 15. The Brazilian court did not appoint nor has it conferred any powers upon the Foreign Representative, did not provide for the litigation of any claims against any parties, and did not include any provision for the distribution of litigation recoveries to creditors. In fact, the Confirmed Brazilian Plan provides for the Debtors' creditors to be paid in full from the sale of specifically identified assets. Accordingly, the grounds for this Chapter 15 have ceased to exist, and the case should be dismissed pursuant to Section 1517(d).

For similar reasons, this case should be dismissed (or the Court should abstain) under Section 305(a)(2) so that the Brazilian Confirmed Plan can be enforced according to Brazilian law and without conflicting results in the United States. Doing so facilitates the core purpose of Chapter 15 – cooperation with a foreign nation's laws and orders.

In fact, all purposes of Chapter 15 as set forth in Section 1501 would best be served by a dismissal of this case:

i.     **1501(a)(1) – cooperation with a foreign country**: This case should be dismissed so that the Confirmed Brazilian Plan can be enforced by the court that confirmed it in Brazil. To ignore the Confirmed Brazilian Plan – thereby allowing Alleged Buyers, through the Debtors, to continue to investigate and pursue claims that cannot be addressed in the Brazilian Court-Supervised Reorganization – would directly conflict with Chapter 15's purpose and run afoul of the policy of cooperating with foreign nations. The Brazilian Court overseeing the Court-Ordered Reorganization is in the best position to determine whether Alleged Buyers through their hand-picked Foreign Representative is attempting to manipulate the system for their own personal agenda under the guise of the Brazilian reorganization process.

ii.     **1501(a)(2) – greater legal certainty for trade and investment**: Dismissing this case would accomplish this goal because the Confirmed Brazilian Plan would not be at risk for any conflicting decision from this Court, which allows for greater certainty for creditors and investors in the Debtors' continued operations.

iii.     **1501(a)(3) – fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor**: The best interests of all parties involved would be served by dismissing this case, so that there are no orders or decisions that conflict with the Confirmed Brazilian Plan, which is now the law in Brazil with regard to the Debtors' assets, liabilities and relationships. Further, there is no administration of the Debtors within the territorial United States. The fair and efficient administration of the Brazilian Court-

Supervised Reorganization has concluded, without any mention of the investigation or pursuit of assets or causes of action in the United States.

Indeed, the Foreign Representative essentially admits that the sole purpose of this Chapter 15 is to obtain discovery to use in Brazil. *See Foreign Representative's Response to Mr. Cola Filho's Motion for Protective Order* (ECF #137) at pg. 5 ("the documents and testimony obtained herein are intended to be used in Brazil") and pg. 7 ("Discovery obtained in this proceeding is sent to Brazil for use there").[10] As the Foreign Representative has admitted that this Chapter 15 proceeding is for a litigation discovery purpose in Brazil and not an insolvency purpose, it is axiomatic that this Chapter 15 proceeding must be dismissed.

iv.      **1501(a)(4) – protection and maximization of the value of the debtor's assets**: The Debtors do not have any assets in the United States and have consistently failed to identify any assets in the United States. All of their assets are in Brazil, so the protection and maximization of the Debtors' assets would best be served by dismissing this case so that the Confirmed Brazilian Plan can be enforced in Brazil. Further, all of the parties are in Brazil, including Mr. Cola Filho. And as admitted by the Foreign Representative, "any documents and testimony obtained [through the Chapter 15] is intended to be used in *Brazil.*"

---

[10] The fact that the parties were in dispute over translations of documents to be used in the deposition of a Brazilian resident, which testimony is to be used in Brazilian litigation concerning parties, allegations, evidence and witnesses all located in Brazil, all of which has ***nothing*** to do with the recovery of any assets in the territorial United States, further supports dismissal of this case.

v.       **1501(a)(5) – facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment**: The Debtors' financial troubles – if any – are being and have been addressed by the Confirmed Brazilian Plan.[11] The Confirmed Brazilian Plan does not account, whatsoever, for this Chapter 15 or the investigation or litigation of any causes of action emanating out of the bankruptcy. Further, the Confirmed Brazilian Plan proposes to pay creditors in full, without a single reference to a Chapter 15 proceeding or the investigation of litigation claims in the United States. Facilitating and enforcing that Confirmed Brazilian Plan, as approved by Debtors' creditors, is therefore in the best interests of the Debtors and their creditors.

Further, the claims being investigated by the Foreign Representative purportedly on behalf of the Debtors' creditors against Mr. Cola Filho are already being litigated in the various ongoing lawsuits in Brazil. Since the Confirmed Brazilian Plan does not provide for the distribution of any recoveries from claims or causes of action, including claims litigated in the United States or Brazil or against Mr. Cola Filho, all of the Debtors' claims— to the extent they remain at all--must be litigated in Brazilian courts other that the Court overseeing the Court-Supervised Reorganization. Allowing these same claims to be investigated here through the guise of Chapter 15 runs afoul of the purpose of Chapter

---

[11] The causes declared by the Debtors as the triggers of their financial distress and that led the Court-Supervised Reorganization are stated on clause 2.2 of the Confirmed Brazilian Plan, as follows:

2.2. Reasons for the Court-Supervised Reorganization. The crisis of the Companies under Court-Supervised Reorganization, in summary, results from the consequences of the serious economic-financial crisis that has affected Brazil in recent years, increasing operating costs, decreasing financings terms, increasing fees, etc. This is in addition to lack of definitions and bureaucratization of regulations by the Brazilian Road Transportation Agency (ANTT), both in relation to concessions, permits, authorization, de-regularization, and in relation to operating rules for Road Transport companies, and finally, the high cost of maintenance and replacement of the assets of the Itapemirim Group, affected daily by the deterioration of the highways used by their buses.

Interestingly, even as of the filing of this motion, the Debtors make no reference in the Confirmed Brazilian Plan to any wrongdoing of Mr. Cola Filho causing the financial distress of the Debtors.

15 and has the potential of causing conflicting results. Indeed, any claim the Debtors - or Alleged Buyers--may have against Mr. Cola Filho would be an ordinary commercial claim, with no connection to the Court-Supervised Reorganization rendering this Chapter 15 completely superfluous and improper. In other words, should the Debtors' representatives prevail in the commercial courts in Brazil against Mr. Cola Filho, any related recoveries would inure to the benefit of the Debtors' and their equity holders, and not their creditors. Dismissing this case would not harm the Debtors in the slightest as they are still free to pursue their claims against Mr. Cola Filho in the country where all parties are located and which has sole jurisdiction– Brazil. Thus, for all of these reasons this case should be dismissed under Sections 1517(d) and 305(a)(2).

The Foreign Representative will likely make two arguments in an effort to rebut the dismissal of this Chapter 15.  One, as mentioned above, is that this Chapter 15 was discussed during the creditors meeting leading up to approval of the Confirmed Brazilian Plan, and that those discussion somehow expands the parties' rights under the Confirmed Brazilian Plan, including the right to proceed with this Chapter 15 case. This argument fails because the operative document serving as the contractual undertaking – the Confirmed Brazilian Plan – makes no mention of this Chapter 15. The fact that this Chapter 15 may have been mentioned <u>before</u> the Brazilian Plan was confirmed by Court Order is meaningless.

Second, the Foreign Representative will likely cite to *Zhejiang Topoint Photovoltaic Co. v. Zhi Chen (In re Zhejiang Topoint Photovoltaic Co.)*, 600 B.R. 312 (Bankr. D.N.J. 2019), which denied dismissal of a chapter 15 even though the foreign main proceeding had been closed. The Court there reasoned that the foreign court – like in a United States

chapter 11 case – retained jurisdiction after confirmation of the plan in order to enforce the terms thereof, and therefore the foreign bankruptcy continued to qualify as a "Foreign Main Proceeding." *Id.* at 319-320. However, *Zhi Chen* does not apply here. There is no dispute that the Brazilian Bankruptcy Court retains jurisdiction to enforce the terms of the Confirmed Brazilian Plan. Indeed, Mr. Cola Filho seeks that exact result through this motion. The difference between this case and *Zhi Chen* is that the Confirmed Brazilian Plan does not provide for the investigation of the claims that Alleged Buyers through the Personal Representative seek to investigate through this Chapter 15 case or the distribution to creditors of any related recoveries. On the other hand, in *Zhi Chen*, the Court explained that assets collected through the Chapter 15 would be distributed in the foreign main proceeding. *Id.* at 320. Therefore, the fact that the Brazilian Bankruptcy Case may technically remain "open" is irrelevant for purposes of dismissal.

## IV. DEBTORS DO NOT SATISFY THE REQUIREMENTS OF 11 U.S.C. § 109(A)

Further, the Court should dismiss this case because Debtors do not meet the requirements of 11 U.S.C. § 109(a) ("Section 109(a)"), and venue is not proper in the Southern District of Florida.[12] Section 109(a) provides: "Notwithstanding any other provision of this section, only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor under this title." Debtors claim Section 109(a) is satisfied here because they have assets in the United States in the form of a retainer on deposit with the Foreign Representative's counsel.[13]

---

[12] A Chapter 15 case may only be commenced in a district where the proposed debtor has a principal place of business, in which there is an action pending against the debtor, or in which venue is consistent with the interests of justice and the convenience of the parties. 28 U.S.C. § 1410.

[13] The Foreign Representative alleges in the Motion that it has $1,497 in a Sequor Law's trust account but does not indicate where this money came from. Thereby, leading to the inescapable conclusion that it was funded solely to attempt to manufacture Section 109(a) compliance.

The Second Circuit Court of Appeals has held that a Chapter 15 debtor must meet the requirements of Section 109(a). *In re Barnet*, 737 F.3d 238, 247 (2d Cir. 2013). Still, Mr. Cola Filho is aware of the Court's order in *In re MMX Sudeste Mineracao S.A.*, Case No.: 17-16113-RAM (Bankr. S.D. Fla. Aug. 11, 2017), *appeal dismissed*, No. 17-24308-Civ, 2018 U.S. Dist. LEXIS 56239, at *2 (S.D. Fla. Apr. 2, 2018), which (i) declined to apply *Barnet's* holding that Section 109(a) must be satisfied in a Chapter 15 and, (ii) finding that even if *Barnet* were to apply, an unused retainer advance constitutes "property" in the United States under Section 109(a). Mr. Cola Filho is also aware of other non-binding case law reaching similar results.

Mr. Cola Filho respectfully submits, however, that these cases were wrongly decided as they allow foreign representatives to manufacture jurisdiction and venue in any district they choose simply by depositing funds there, regardless of a debtor's connection—or lack thereof—to that district. This line of cases encourages forum shopping by foreign representatives, allowing the filing of Chapter 15 petitions in districts that are potentially disadvantageous to creditors and other interested parties, like in this case where Debtors have absolutely no connection to the Southern District of Florida.

Additionally, these cases leave no room to determine whether the actual source of the retainer was paid with Debtors' own funds (or any funds to which the Debtors may have a claim or interest), if it was paid from a non-debtor, or it was transferred from a foreign bankrupt estate to manufacture property of the estate in this district. *See In re Poymanov*, 2017 WL 3268144, at *4 (Bankr. S.D.N.Y. July 31, 2017) (petitioner met his burden of proving that the foreign *debtor* had property in the United States where the retainer was funded by repayment of debt owed to the debtor that the foreign

representative collected on the debtor's behalf). Here, the Foreign Representative has made no allegation or showing that any of the Debtors have a place of business, assets, financial accounts or any other type of real or personal property located within this District or even the United States. Therefore, even if the retainer is on deposit with counsel, that retainer likely was not funded with Debtors' funds or any source of funds to which the Debtors have a claim of interest. At the very least, the Court should determine the source of the retainer.

Therefore, for these reasons Mr. Cola Filho respectfully submits that the Court should reexamine its holding in *In re MMX* and determine that the case was wrongly decided. Section 109(a) should apply in a Chapter 15 case in order to prevent a foreign representative from manufacturing jurisdiction and venue in any district simply by depositing funds there. Further, the Court should hold that Section 109(a) cannot be satisfied merely by depositing a retainer from non-Debtor funds when the Debtor does not otherwise have any place of business or property in the United States. Finally, venue in this district is not proper under 28 U.S.C. § 1410 because the Debtors have no place of business or assets located in the Southern District of Florida, there are no pending actions against the Debtors here, and there is no plausible advancement of the interests of justice or convenience of the parties.

## V.    ALLEGED BUYERS ARE BAD FAITH ACTORS AND FILED THIS BANKRUPTCY IN BAD FAITH

Under Eleventh Circuit law a bankruptcy case can be dismissed "for cause" if it was filed in bad faith. *See*, *e.g.*, *Gen. Trading v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1501 (11th Cir. 1997) ("debtor's lack of 'good faith' may constitute cause for dismissal"); *In re Phx. Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988) (factors that

evidence bad faith include, but are not limited to, "an intent to abuse the judicial process");
*In re Balboa St. Beach Club, Inc.*, 319 B.R. 736, 740 (Bankr. S.D. Fla. 2005) (courts
decide motions to dismiss for bad faith "on a case by case basis.").

Here, Alleged Buyers, through their hand-picked Personal Representative, filed
this case in bad faith for the sole purpose of obtaining discovery for their ongoing non-
bankruptcy related claims against Mr. Cola Filho in Brazil.[14] The Foreign Representative
and Alleged Buyers' bad faith pursuit of discovery has persisted even though the
Confirmed Brazilian Plan – which does not provide for the recovery of or distribution of
any of the claims Debtors pursue here – has already been entered and there are no
assets of the Debtors in the United States.   In this regard, a prosecutor in one of the
Brazilian proceedings has listed a number of wrongdoings by Alleged Buyers. *See*
Prosecutor Motion, attached as **Exhibit 2** and incorporated herein by reference. Among
the wrongdoings, the Brazilian prosecutor has found that:

i.       The purported acquisition of Debtors by Alleged Buyers was "filled with
improprieties, including criminal ones" (Prosecutor Motion at pg. 2);

ii.       "Concerning share control - mistrusted by [Mr. Cola Filho and other true
owners of Debtors] - the [Alleged Buyers] would be acting in conflict with the plan, causing
damage to creditors and aiming to dissipate the equity. For example, acquiring aircraft,
the [Debtors'] main activity is the transportation of passenger by buses; besides being a
huge expenditure from the economic point of view, is not in line with the corporate
objectives of the company under recovery, corroborating the misuse of assets in the
restructuring of the company" (*Id.* at 3);

---

[14] Congress enacted 28 U.S.C. § 1782 to facilitate cross border discovery. Chapter 15 should not be used
for the same purpose without meeting the threshold requirements.

iii.      Officer of Alleged Buyers "without formally integrating the corporate structure of these companies, directs those companies with full management powers, behind the scenes, but yet benefiting from the receipt of proceeds" (*Id.* at 3);

iv.      "[D]ata brought forth so far has shown considerable conflict between those involved, with the dissemination of fraudulent practices and perhaps criminal offenses to the detriment of the restructuring and to the group of creditors" (*Id.* at 4);

v.      "In addition, law firms that are not involved and have no link with the case, are also being remunerated with monies from the recovering companies for services provided to the physical individuals of [Alleged Buyers]; These payments are not found in the recovery journal and are not included in the monthly reports sent to the court by the judicial trustee" (*Id.* at 4); Recommending "the appointment of a suitable unbiased manager to the corporate structure" (*Id.* at 5);

vi.      While noting that this is not "prima facie, motive for the dismissal of the appointed court administrator, it is hard not to acknowledge that such evidence conveys doubts about the honesty and impartiality of the supervisory task regarding a potential scenario of conflict of interest between the parties involved;" and

vii.      The prosecutor further notes that the Brazilian court has summoned EXM, Mubarak, and Alleged Buyers, but "no answers have been provided, detail to deliberate in favor of the injunction for maintaining the Group's activity."

In short, the Brazilian Prosecutor Motion shows the extent of Alleged Buyers' bad faith. Therefore, this case should also be dismissed on the grounds that it was filed in bad faith.

18

## VI.    CONCLUSION

The Court should dismiss this case, or in the alternative abstain, for the reasons set forth herein. In summary, the Confirmed Brazilian Plan does not provide for the investigation or recovery of any of the claims Alleged Buyers, through the Foreign Representative, are pursuing in this case. Therefore, the grounds for this Chapter 15 have ceased to exist, it would be in the best interests of all stakeholders for this case to be dismissed, and dismissal would serve the purposes of Chapter 15. Also, Debtors do not satisfy the requirements of Section 109(a) because they have no assets in the United States except for a retainer with Foreign Representative's counsel, which does not and should not constitute an asset located in the United States for purposes of Section 109(a). Finally, this case was filed in bad faith and must be dismissed accordingly.

**WHEREFORE**, Camilo Cola Filho respectfully requests that the Court: (i) grant the motion; (ii) dismiss this case; (iii) or, in the alternative, abstain; (iv) plus grant such further and other relief as the Court deems just and proper.

Respectfully submitted this 23rd day of December, 2019,

> **DUNN LAW, P.A.**
> 66 West Flagler Street, Suite 400
> Miami, Florida 33130
> Email: barry.turner@dunnlawpa.com
>
> Tel: (786) 433-3866
> Fax: (786) 260-0269
> By:    */s/ Barry S. Turner*
> Barry S. Turner, Esq.
> Florida Bar No. 85535
>
> and

19

**NELSON MULLINS BROAD AND CASSEL**

One Biscayne Tower, 21st Floor

2 S. Biscayne Boulevard

Miami, Florida 33131

Telephone:   305.373.9449

Fax:   305.373.9443

Email: gary.freedman@nelsonmullins.com

By:      /s/ Gary M. Freedman

        Gary M. Freedman

        Florida Bar No. 727260

***Counsel for Camilo Cola Filho***

## CERTIFICATE OF SERVICE

I CERTIFY that a true and correct copy of the foregoing was served via Notice of Electronic Filing (CM/ECF) on this 23rd day of December 2019, upon all registered users in this case.

By:      /s/ Gary M. Freedman

        Gary M. Freedman, Esq.

# EXHIBIT 1-A

fls. 44511

ADITIVO AO PLANO DE RECUPERAÇÃO JUDICIAL APRESENTADO PELAS SOCIEDADES VIAÇÃO ITAPEMIRIM S.A; TRANSPORTADORA ITAPEMIRIM S/A; ITA – ITAPEMIRIM TRANSPORTES S/A; IMOBILIARIA BIANCA LTDA.; COLA COMERCIAL E DISTRIBUIDORA LTDA.; FLECHA S/A – TURISMO COMÉRCIO E INDÚSTRIA; E VIAÇÃO CAIÇARA LTDA.

*Todas em Recuperação Judicial, processo em curso perante a 1ª Vara de Falências e Recuperações Judiciais da Comarca de São Paulo, nos autos de nº 0060326-87.2018.8.26.0100.*

(1) VIAÇÃO ITAPEMIRIM S.A – EM RECUPERAÇÃO JUDICIAL (doravante denominada "Viação"), pessoa jurídica de direito privado, inscrita no CNPJ/MF sob o nº 27.175.975/0001-07, com sede na Rua Gelu Vervolet dos Santos, nº 500, 12º andar, sala 1207, Edifício Omni Towers Office, Jardim Camburi, Vitória/ES, CEP. 29090-100; (2) TRANSPORTADORA ITAPEMIRIM S/A. – EM RECUPERAÇÃO JUDICIAL (doravante denominada "Transportadora"), pessoa jurídica de direito privado, inscrita no CNPJ/MF sob o nº 33.271.511/0001-05, com sede à Rodovia Governador Mario Covas, s/n., BR 101-KM 15, sala 02, Parque Industrial, Viana/ES, CEP. 29136-552; (3) ITA – ITAPEMIRIM TRANSPORTES S/A – EM RECUPERAÇÃO JUDICIAL (doravante denominada "Transportes"), pessoa jurídica de direito privado, inscrita no CNPJ/MF sob o nº 34.537.845/0001-32, com sede na Rodovia Governador Mario Covas, s/n., BR 101-KM 15, sala 03, Parque Industrial, Viana/ES, CEP 29136-552; (4) IMOBILIÁRIA BIANCA LTDA – EM RECUPERAÇÃO JUDICIAL (doravante denominada "Imobiliária"), pessoa jurídica de direito privado, inscrita no CNPJ/MF sob o nº 31.814.965/0001-41, com sede na Rua Gelu Vervloet dos Santos, n. 500, 12º andar, sala 1206, Edifício Omni Towers Office, Jardim Camburi, Vitória/ES, CEP. 29090-100; (5) COLA COMERCIAL E DISTRIBUIDORA LTDA – EM RECUPERAÇÃO JUDICIAL (doravante denominada "Distribuidora"), pessoa jurídica de direito privado, inscrita no CNPJ/MF sob o nº 31.719.032/0001-75, com sede na Rodovia Governador Mario Covas, s/n., BR 101-KM 15, sala 04, Parque Industrial, Viana/ES, CEP 29136-552; (6) FLEXA S/A – TURISMO COMÉRCIO E INDÚSTRIA – EM RECUPERAÇÃO JUDICIAL (doravante denominada "Turismo"), pessoa jurídica de direito privado, inscrita no CNPJ/MF sob o nº 27.075.753/0001-12, com sede na Rodovia Governador Mario Covas, s/n., BR 101-KM 15, Parque Industrial, Viana/ES, CEP 29136-552; e (7) VIAÇÃO CAIÇARA LTDA – EM RECUPERAÇÃO JUDICIAL (doravante denominada "Caiçara"), pessoa jurídica de direito privado, inscrita no CNPJ/MF sob o nº [--], com sede na [--], em conjunto denominadas, as "Recuperandas" ou "Grupo Itapemirim"), apresentam este Aditivo ao Plano de Recuperação Judicial ("Plano"), para aprovação da Assembleia Geral de Credores e homologação judicial, nos termos dos arts. 45 e 58 da Lei nº 11.101/2005 ("LRF"):

(i) Considerando que a última versão do Plano de Recuperação Judicial, apresentada no dia 09.04.2019, foi objeto de observações por credores que, por sua vez, apontaram a necessidade de realização de alterações, foi elaborado este Aditivo ao Plano de Recuperação Judicial com os ajustes para apreciação;

(ii) Considerando as Recuperandas têm enfrentado dificuldades econômicas, mercadológicas e financeiras;

(iii) Considerando que, em 07 de março de 2016, em resposta a tais dificuldades, as Recuperandas ajuizaram um pedido de recuperação judicial, nos termos da LRF, na Comarca de Vitória, Estado do Espírito



Este documento é cópia do original, assinado digitalmente por JULIANA LEITE PEDIGONE e Tribunal de Justiça do Estado de São Paulo, protocolado em 22/04/2019 às 23:27 , sob o número WJMJ19405559362
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0060326-87.2018.8.26.0100 e código 6CAB0D0.

Santo, sob o n.º 0006983-85.2016.8.08.0024 (doravante denominado "Processo Original")

(iv) Considerando que, em 17 de maio de 2016, as Recuperandas apresentaram um plano de recuperação judicial [às fls. 4358 a 4400 do Processo Original]; em 06 de junho de 2016 apresentaram um aditivo do plano de recuperação judicial [às fls. 5208 a 5215 do Processo Original]; e, em 20 de março de 2018, as Recuperandas apresentaram modificativo ao plano de recuperação judicial [às fls. 27576 a 27641 do Processo Original] adequando a proposta anteriormente apresentada;

(v) Considerando que, por decisão do M.M. Juiz da Comarca de Vitória, Estado do Espírito Santo, a competência fora declinada para a Comarca da Capital, Estado de São Paulo, que por sua vez, determinou a substituição do Administrador Judicial, a recondução das controladoras na gestão das Recuperandas e a apresentação de Novo Plano de Recuperação Judicial.

(vi) Considerando que o Juízo da Primeira Vara de Falências e Recuperações Judiciais do Foro Central de São Paulo determinou que as Recuperandas incluíssem como meios de recuperação os instrumentos previstos nos incisos II, III, IV e V, todos do artigo 50 da Lei 11.101/2005, determinação esta que foi observada pelas Recuperandas nos itens 3.1 e 5.2.3 conforme se verificará abaixo.

Assim, por todo exposto é este Novo Plano apresentado em caráter modificativo aos demais anteriormente protocolizados, passando, para tanto, a vigorar pelas condições ora propostas, cumprindo, rigorosamente, os requisitos contidos no art. 53 da LRF, eis que: pormenoriza os meios de recuperação das Recuperandas; é viável sob o ponto de vista econômico; e é acompanhado do respectivo laudo econômico-financeiro e de avaliação dos bens e ativos das Recuperandas.

Desta forma, por força deste Novo Plano, as Recuperandas buscam superar sua crise econômico-financeira e reestruturar seus negócios com o objetivo de (i) preservar e adequar as suas atividades empresariais; (ii) manter-se como fonte de geração de riquezas, tributos e empregos, além de (iii) renegociar o pagamento de seus Credores; submetendo este Novo Plano à aprovação da AGC e à homologação judicial, sob os seguintes termos:

## CAPÍTULO I – INTRODUÇÃO

1. INTERPRETAÇÃO E DEFINIÇÕES

1.1. <u>Regras de Interpretação</u>. Os termos e as expressões abaixo, sempre que utilizados neste Novo Plano de Recuperação Judicial, terão os significados que lhes são atribuídos neste item. As definições serão aplicáveis no singular e no plural, no masculino ou feminino, sem alteração do significado.

1.1.1. "<u>Administrador Judicial</u>": administrador judicial nomeado pelo Juízo da Recuperação, nos termos do Capítulo II, Seção III, da LRF, assim entendido como EXAME AUDITORES INDEPENDENTES LTDA., CNPJ 04.938.537/0001-58, representada por Eduardo Scarpellini, CRC/SP 214.931-07, RG 19.601.500-5, ou qualquer pessoa que nos termos da LRF venha a sucedê-lo ou substituí-lo.

2

Este documento é cópia do original, assinado digitalmente por JULIANA LEITE PEDIGONE e Tribunal de Justiça do Estado de São Paulo, protocolado em 22/04/2019 às 23:27 , sob o número WJMJ19405559362
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0060326-87.2018.8.26.0100 e código 6CAB0D0.

fls. 44513

1.1.2.   "AGC": significa a Assembleia Geral de Credores nos termos do Capítulo II, Seção IV, da LRF.

1.1.3.   "Créditos": todos os Créditos Trabalhistas, Créditos com Garantia Real, Créditos Quirografários, Créditos ME e EPP e Créditos Extraconcursais Aderentes, assim como as correspondentes obrigações existentes na Data do Pedido, que estejam sujeitos à Recuperação Judicial nos termos da LRF, conforme relacionados na Lista de Credores.

1.1.4.   "Créditos com Garantia Real": são os Créditos detidos pelos Credores com Garantia Real, assegurados por direitos reais de garantia (tais como penhor ou hipoteca), nos termos do art. 41, II, da LRF, conforme listados na Lista de Credores.

1.1.5.   "Créditos Extraconcursais Aderentes": são os Créditos detidos pelos Credores Extraconcursais Aderentes.

1.1.6.   "Créditos ME e EPP": são os créditos detidos por Credores constituídos como microempresa ou empresa de pequeno porte, nos termos do art. 41, IV, da LRF.

1.1.7.   "Créditos Quirografários": são os créditos que sejam quirografários, com privilégio geral, especialmente privilegiados e subordinados, nos termos do art. 41, III, e 83. VI, da LRF, conforme listados na Lista de Credores.

1.1.8.   "Créditos Trabalhistas": são os créditos derivados da legislação do trabalho ou decorrentes de acidente de trabalho, nos termos do art. 41, I, da LRF, conforme listados na Lista de Credores.

1.1.9.   "Credores": são os Credores Trabalhistas, Credores com Garantia Real, Credores Quirografários, Credores ME e EPP e Credores Extraconcursais Aderentes, os quais se sujeitam aos efeitos da Recuperação Judicial, nos termos do art. 49, caput, da LRF.

1.1.10.  "Credores com Garantia Real": são os credores detentores de Créditos com Garantia Real, nos termos do art. 41, II, da LRF.

1.1.11.  "Credores Extraconcursais Aderentes": Credores detentores de créditos que não se sujeitam à Recuperação Judicial, na forma do art. 49, caput, §§3º e 4º da LRF, mas que adiram aos termos deste Novo Plano, sem que isso configure aceitação ou acordo ou reconhecimento, por parte das Recuperandas e/ou dos Credores com relação aos argumentos e teses discutidos nas respectivas divergências ou impugnações.

1.1.12.  "Credores ME e EPP": são os credores detentores de Créditos ME e EP, nos termos do art. 41, IV, da LRF.

1.1.13.  "Credores Quirografários": são os credores detentores de Créditos Quirografários, nos termos do art. 41, III, da LRF.

1.1.14.  "Credores Trabalhistas": são os credores detentores de Créditos Trabalhistas, nos termos do art. 41, I, da LRF.

Este documento é cópia do original, assinado digitalmente por JULIANA LEITE PEDIGONE e Tribunal de Justiça do Estado de São Paulo, protocolado em 22/04/2019 às 23:27 , sob o número WJMJ19405559362. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0060326-87.2018.8.26.0100 e código 6CAB0D0.

3

fls. 44514

**1.1.15.** "Dia Útil": é qualquer dia que não seja sábado, domingo ou qualquer outro dia em que as instituições bancárias no Estado de São Paulo não funcionem ou estejam autorizadas a não funcionar.

**1.1.16.** "Dívida Reestruturada": significa a dívida total das Recuperandas, devidamente equalizada após aplicada as condições e pagamentos previstos neste Novo Plano e *a posteriori* homologação judicial.

**1.1.17.** "Encerramento da Recuperação Judicial": significa a data em que a Recuperação Judicial for definitivamente arquivada, após o trânsito em julgado da sentença de encerramento da Recuperação Judicial, na forma do art. 63 da LRF.

**1.1.18.** "Homologação do Plano": é a data da publicação da decisão judicial proferida pelo Juízo da Recuperação Judicial que homologar este Novo Plano nos termos do art. 45 ou 58, *caput* e §1º, da LRF, conforme o caso.

**1.1.19.** "Juízo da Recuperação": é o juízo da 01ª Vara de Falências e Recuperações Judiciais da Comarca de São Paulo, Estado de São Paulo.

**1.1.20.** "Lista de Credores": é a lista divulgada pelo Administrador Judicial nos autos da Recuperação Judicial, após consolidação de informações e decisões acerca das respectivas impugnações e habilitações de créditos.

**1.1.21.** "LRF": é a Lei nº 11.101, de 9 de fevereiro de 2005, conforme alterada.

**1.1.22.** "Novo Plano": é o presente plano de recuperação judicial do Grupo Itapemirim, apresentado em respeito à decisão proferida pelo M.M. Juízo Universal em 18 de setembro de 2018 às fls.33703.

**1.1.23.** "Prazos": Todos os prazos estabelecidos neste Novo Plano serão contados em dias corridos, salvo se expressamente estabelecido que serão contados em Dias Úteis.

**1.1.24.** "Recuperação Judicial": significa o processo de recuperação judicial nº 0060326-87.2018.8.26.0100 em curso perante o Juízo da Recuperação.

**1.1.25.** "Recuperandas": são as sociedades, VIAÇÃO ITAPEMIRIM S.A; TRANSPORTADORA ITAPEMIRIM S/A; ITA – ITAPEMIRIM TRANSPORTES S/A; IMOBILIARIA BIANCA LTDA.; COLA COMERCIAL E DISTRIBUIDORA LTDA.; FLECHA S/A – TURISMO COMÉRCIO E INDÚSTRIA; E VIAÇÃO CAIÇARA LTDA, todas qualificadas nos autos da Recuperação Judicial.

**1.1.26.** "UPI": significa a Unidade Produtiva Isolada, segregada especificamente para Alienação Judicial, nos termos do art. 60 da LRF, incluindo, mas não se limitando a: imóvel, benfeitorias, implementos, veículos, maquinários; concessões de linhas e qualquer ativo utilizado nas atividades operacionais.

**1.1.27.** "UPI LINHAS ": significa a unidade produtiva isolada que será criada especialmente para fins de alienação, nos termos do art. 60 da LRF, e constituída pelos ativos de propriedade das Recuperandas, conforme relacionados neste plano. A UPI Linhas deverá ser alienada sem que o adquirente suceda às Recuperandas em quaisquer dívidas.



4

Este documento é cópia do original, assinado digitalmente por JULIANA LEITE PEDIGONE e Tribunal de Justiça do Estado de São Paulo, protocolado em 22/04/2019 as 23:27 , sob o número WJMJ19405559362. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0060326-87.2018.8.26.0100 e código 6CAB0D0.

JUCESP 1993 Portuguese - English São Paulo - SP Brazil Sworn Translator and Commercial Interpreter

fls. 44515

**1.1.28.** "UPI IMÓVEIS": significa a unidade produtiva isolada que será criada especialmente para fins de alienação, nos termos do art. 60 da LRF, e constituída pelos ativos de propriedade das Recuperandas, conforme relacionados neste plano, por meio de uma ou mais operações societárias. A UPI Remanescente deverá ser alienada sem que o adquirente suceda às Recuperandas em quaisquer dívidas.

**CAPÍTULO II – OBJETIVO DO PLANO**

**2.**     OBJETIVO DO PLANO

**2.1.**     Objetivo. Diante das demasiadas nuances que envolvem esta Recuperação Judicial e ainda do elevado grau de dificuldade em torno da busca pela Dívida Reestruturada este Novo Plano prevê a realização de medidas que objetivam a Reestruturação do Grupo Itapemirim, dispondo para tanto de meios de recuperação judicial previstos em Lei para pagamento dos Credores, Geração de fluxo de caixa operacional, capital de giro e recursos necessários para a continuidade das atividades das Recuperandas.

**2.2.**     Razões da Recuperação Judicial. A crise das Recuperandas, em suma, decorre do reflexo da grave crise econômica-financeira que atingiu o Brasil nos últimos anos, elevando custos operacionais, diminuição de prazos de financiamentos, aumento de taxas, etc. Somado a isso, a indefinições e burocratizações de regulamentos pela ANTT, tanto em relação à concessões, permissões, autorização, desregularização, como em relação as regras de operação para empresas de Transportes Rodoviários e, por fim, o elevado custo de manutenção e reposição dos bens do Grupo Itapemirim que sofrem impactos diários devido a degradação das rodovias percorridas pelos ônibus das Recuperandas.

**2.3.**     Viabilidade Econômica do Plano. Em cumprimento ao disposto no inciso II do art. 53 da LRF, em atenção a decisão proferida pelo Juiz Universal para apresentação de Novo Plano e alicerçadas pelo princípio da boa-fé objetiva, as Recuperandas apresentam um *Business Plan* ["Laudo de Viabilidade Econômica"] atualizado, o qual passa a integrar este Novo Plano.

**2.4.**     Avaliação de Ativos das Recuperandas. Em cumprimento ao disposto no inciso III do art. 53 da LRF, em atenção a decisão proferida pelo Juiz Universal para apresentação de Novo Plano e alicerçadas pelo princípio da boa-fé objetiva, as Recuperandas mantém o "Laudo de Avaliação de Ativos" que se encontra nos autos e fará parte integrante deste novo plano.

**2.5.**

**CAPÍTULO III – MEDIDAS DE RECUPERAÇÃO**

**3.**     MEDIDAS DE RECUPERAÇÃO

Este documento é cópia do original, assinado digitalmente por JULIANA LEITE PEDIGONE e Tribunal de Justiça do Estado de São Paulo, protocolado em 22/04/2019 às 23:27 , sob o número WJMJ19405559362. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0060326-87.2018.8.26.0100 e código 6CAB0D0.

5

**3.1** Como solução mais eficiente para a equalização e liquidação do passivo das Recuperandas, o presente PRJ prevê: (i) a reorganização administrativa das Recuperandas com uma Gestão Profissional e Estruturação do Conselho de Administração; (ii) a reestruturação do passivo das Recuperandas; (iii) levantamento de recursos mediante estruturação de UPIs dos Imóveis das Recuperandas e/ou suas Linhas Operacionais;

**4.**    REESTRUTURAÇÃO

**Operações de Reorganização Societária.** Desde que não impliquem na inviabilidade deste Novo Plano, e em atenção à decisão proferida às folhas 33.703/33710, o Grupo Itapemirim poderá realizar, nos termos da legislação brasileira vigente à época, assistida pelo Administrador Judicial - enquanto em Recuperação Judicial e, a qualquer tempo - encerrada a Recuperação Judicial, quaisquer operações de reorganização societária, tais como: (i) cisão, incorporação, fusão e transformação (artigo 50,II, da LRF); (ii) criar ou participar de Sociedade de Propósito Específico; (iii) mudança do seu objeto social ou qualquer outra alteração societária (artigo 50, III, da LRF); (iv) associar-se a investidores que venham possibilitar ou incrementar as suas atividades, através de medidas que resultem na cessão onerosa parcial ou total do controle societário (artigo 50, III, da LRF); (v) do aumento de seu capital social, inclusive pela troca de obrigações por *equity*, desde que não impliquem na inviabilidade deste Novo Plano;

**4.1.**    **Obtenção de Novos Recursos.** As Recuperandas poderão buscar novos recursos, por meio da celebração de financiamentos, através de contrato de credor financiador, durante o cumprimento deste Novo Plano, de modo a melhor estruturar os mecanismos de recuperação previstos.

**(i)**    Serão considerados "financiadores" todos aqueles Credores que mantiveram e mantiverem o fornecimento e aquisição de produtos, materiais e/ou serviços de forma continuada, novas linhas de créditos e/ou liberação de novos recursos, ou, ainda, autorizar a liberação de ativos financeiros que decorram de venda de imóveis garantidos por hipoteca e alienação fiduciária e/ou outra modalidade, nos termos da seguinte regra única e aplicável a todos os Credores que assim optarem, limitando às necessidades operacionais da empresa.

**REGRA** – Os Credores que concederam ou concederem ao Grupo Itapemirim na proporção mínima equivalente de 30% dos seus créditos sujeitos a recuperação judicial limitado a R$ 10.000.000,00 (dez milhões de reais) por credor, poderão efetuar negociações com as recuperandas, as quais deverão receber seus créditos de forma diferenciada, desde que não implique em tratamento diferenciado entre os credores financiadores.

A previsão de pagamentos preferenciais é uma faculdade concedida a todos os credores para recebimento de seus créditos nos termos do regramento acima, aplicando-se, portanto, de forma igualitária a todos os credores. Ela se justifica uma vez que a celebração de novos contratos para a aquisição de produtos e/ou serviços, aditivados ou alterados, de um lado, conforme o caso, a concessão de novas linhas de financiamentos ou liberação de garantia de outro, são medidas necessárias para preservar o valor da empresa Grupo Itapemirim de modo a maximizar os valores a serem distribuídos entre os demais credores. Esses pagamentos preferenciais têm fundamento no art. 67, parágrafo único da LRF, na medida em que tais credores são colaborativos e continuarão

6

Este documento é cópia do original, assinado digitalmente por JULIANA LEITE PEDIGONE e Tribunal de Justiça do Estado de Sao Paulo, protocolado em 22/04/2019 as 23:27 , sob o número WJMJ19405559362 Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0060326-87.2018.8.26.0100 e código 6CAB0D0.

fls. 44517

fornecendo produtos e/ou serviços e/ou concedendo novas linhas de créditos e/ou renunciando garantias, o que lhes asseguraria preferência no recebimento de seus Créditos na hipótese de decretação de falência.

**4.2.** **Concessão de prazos para pagamento.** As Recuperandas poderão obter prazos e condições especiais para pagamento das obrigações vencidas ou vincendas, desde que extraconcursais, buscando sempre as melhores condições, tanto para a reestruturação das empresas quanto para os Credores.

**5.** MANUTENÇÃO DAS ATIVIDADES

**5.1.** **Manutenção das Atividades.** Sujeito às limitações previstas em lei, as Recuperandas resguardam-se o direito e a faculdade de desenvolver suas atividades e de realizar todos os atos consistentes com seu objeto social, dentro do curso normal dos seus negócios, inclusive no que tange à renovação, pagamento ou contratação de novos negócios, desde que em condições comerciais normais de mercado, sem a necessidade de prévia autorização da AGC ou do Juízo da Recuperação.

**5.1.1.** **Oportunidades de negócios destinado a readequação de suas atividades.** Considerando a sua estrutura atual, bem como as expectativas presentes e futuras, que deverão advir da reestruturação econômica e financeira que este PRJ propõe, as Recuperandas poderão abrir ou encerrar filiais, adquirir e/ou alienar bens móveis e imóveis, abertura de novas linhas de Créditos para seus clientes.

**5.1.2.** **Políticas comerciais.** O Grupo Itapemirim esta aprimorando suas práticas comerciais, alinhado, inclusive, com os trabalhos em desenvolvimento para sua reestruturação operacional, com objetivo de readequar suas práticas e políticas comerciais, delineando, mas não se limitando à: (i) reavaliação e reestruturação de operações/traslados e contratos firmados, visando equalizar e consolidar negócios existentes e projetar negócios futuros, alicerçados em equilíbrio funcional e boas práticas de gestão.

**5.1.3.** **Reestruturação Operacional.** O Grupo Itapemirim, veem, insistentemente, procurando aprimorar toda estrutura operacional, implantando sistemas, aperfeiçoando controles de atividade, reorganizando setores e custos; Também na esteira da determinação judicial de folhas 33.703/33710, manterá, ainda, a figura do profissional do mercado como *"CEO – Chief Executive Officer"* para ocupar o cargo de Diretor Executivo (artigo 50, IV e V, da LRF), ajustando, para tanto, nos estatutos e contratos sociais para garantir a formalização de estrutura robusta de Governança Coorporativa, que deterá regras e procedimentos instaurados por renomado escritório com expertise em *compliance,* contendo ainda atribuições específicas e normas procedimentais e comportamentais que consistirão em medidas imperativas contemporâneas destinadas ao fortalecimento da credibilidade da empresa, consolidação da segurança das operações e adequação às obrigatoriedades de integridade oriundas de normas nacionais e estrangeiras, o qual servirá como alicerce ao Conselho de Administração.

**5.1.4.** Compromete-se, ainda, a indicar 03 (três) empresas de auditoria independente que serão apresentadas nos autos facultando a manifestação dos credores para concordância ou não, no prazo máximo de 90 (noventa) dias.

7

Este documento é cópia do original, assinado digitalmente por JULIANA LEITE PEDIGONE e Tribunal de Justiça do Estado de São Paulo, protocolado em 22/04/2019 às 23:27 , sob o número WJMJ19405559362 Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0060326-87.2018.8.26.0100 e código 6CAB0D0.

fls. 44518

**Conselho de Administração:** O Conselho de administração será formado pelos controladores podendo serem admitidos até dois membros a critério das Recuperandas, fazendo jus à remuneração conforme índice do mercado, para cada membro.

**5.2.** **Alienação de ativos e/ou Arrendamento.** As Recuperandas poderão: (i) Alienar os bens do seu ativo, previamente relacionados no Laudo de Avaliação de Bens e Ativos na forma prevista no art. 60 c/c 142 da LRF, que não sejam objetos de garantia real, ou, ainda que sejam objetos de garantia real, desde que, haja a expressa concordância do credor, respeitando os preceitos do art. 50, §1º da LRF; e/ou (ii) Locar ou arrendar bens do seu ativo, se livres e desembaraçados, poderá ainda, onerar bens inclusive por meio de renovação de contratos já existentes buscando sempre adequar às necessidades do negócio, a reestruturação das empresas e, o cumprimento deste PRJ; e/ou (iii) Se necessária à sua reorganização econômico-financeira, poderão ainda, serem vertidos para uma Sociedade de Propósito Específica (SPE), bens ou qualquer de suas Unidades Produtivas Isoladas (UPI's) que não sejam objeto de garantia real ou, se objeto de garantia real, com expressa concordância do respectivo credor, observando o disposto no art. 60 c/c 142, da LRF; e/ou (iv) havendo motivos justificados, requerimento fundamentado e, ainda, <u>autorização judicial do M.M. Juízo Universal</u>, o Grupo Itapemirim poderá alienar de forma excepcional, por outra modalidade, consoante ao art. 144 da LRF, respeitando para tanto, a anuência dos credores titulares dos bens objetos de garantia real, consoante ao §1º do art. 50 da LRF. Para efeitos de clareza desta cláusula, o instituto do arrendamento ou aluguel de linhas não se aplicará.

**5.2.1.** **Venda e Renovação.** Tendo em vista a atividade preponderante das Recuperandas ser Transportes de Pessoas Intermunicipais e Interestaduais, os ativos auferem um desgaste natural, havendo assim a necessidade de serem renovados e modernizados frequentemente. Portanto, a venda e renovação de frotas das Recuperandas, apesar de integrar o ativo imobilizado das Recuperandas, carece de prevenção e agilidade, para que não sejam considerados menos competitivos e obsoletos perante o mercado, agravando ainda mais a reestruturação econômico-financeira da empresa. Desta forma, as Recuperandas poderão e, envidarão esforços, para viabilizar a venda e renovação de seus ativos obsoletos, conforme critério contábil, conforme as regras descritas na Cláusula 4.3., buscando sempre maximizar seus resultados, atrair novos contratos e, consequente, cumprir com todas as suas obrigações previstas neste PRJ e/ou adquirir novos ativos imobilizados ou ainda insumos de produção.



**5.2.2.** **Constituição das UPI's.** As Recuperandas organizarão a criação das UPI's, podendo constituir uma ou mais sociedades de propósito específico ("<u>SPE</u>"), com observância dos requisitos regulatórios aplicáveis, organizadas sob a forma de sociedade por ações ou sociedade limitada, especificamente para serem individualmente ou conjuntamente alienadas a critério das Recuperandas, sem que o adquirente suceda às Recuperandas em quaisquer dívidas, contingências e obrigações, nos termos dos artigos 60 e 142 da LRF. Desta forma, serão vertidos às UPI's os ativos relacionados conforme abaixo:

Este documento é cópia do original, assinado digitalmente por JULIANA LEITE PEDIGONE e Tribunal de Justiça do Estado de São Paulo, protocolado em 22/04/2019 às 23:27, sob o número WJM.J19405559362. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0060326-87.2018.8.26.0100 e código 6CAB0D0.

fls. 44519

A. **UPI Linhas:** Poderá ser composta pelas linhas descritas abaixo, bem como pelos respectivos guichês, pontos de vendas e salas VIP, os ônibus que fazem a operação das referidas linhas, bem como, tudo quanto compreender a parte de manutenção de oficina mecânica operacional, tais como, chave de fenda, cabines de pintura, etc:

Brasília x Belo Horizonte / Brasília x Porto Alegre / Campinas x Porto Alegre / Juiz de Fora x Florianópolis / Jundiaí x Curitiba / Rio de Janeiro x Anápolis / Rio de Janeiro x Brasília / Rio de Janeiro x Curitiba / Rio de Janeiro x Florianópolis / Rio de Janeiro x Porto Alegre / São Paulo x Curitiba / São Paulo x Porto Alegre / São Paulo x Rio de Janeiro / Volta Redonda x Curitiba / Aracaju x Belém / Arcoverde x São Paulo / Belo Horizonte x Natal / Campina Grande x Rio de Janeiro / Campina Grande x São Paulo / Caruaru x Brasília / Feira de Santana x Recife / Fortaleza x Belém / Fortaleza x Salvador / Fortaleza x São Paulo / Guarabira x Rio de Janeiro / Guarabira x São Paulo / Juazeiro do Norte x São Paulo / Patos x Rio de Janeiro / Recife x Curitiba / Recife x Goiânia / Rio de Janeiro x Alagoa Grande / Rio de Janeiro x Aracaju / Rio de Janeiro x Belém / Rio de Janeiro x Fortaleza / Rio de Janeiro x IPU / Rio de Janeiro x IPU II / Rio de Janeiro x Parnaíba / Rio de Janeiro x Salvador / Rio de Janeiro x São Luís / Salvador x Belém / Salvador x Recife / São Paulo x Belém / São Paulo x Canindé / São Paulo x Floriano / São Paulo x Parnaíba / São Paulo x Pesqueira / São Paulo x Picos / São Paulo x São Luís / São Paulo x Teresina / São Paulo x Timbaúba / Serra Talhada x São Paulo / Santos x Ipatinga / São José dos Campos x Itaobim / São José dos Campos x Teófilo Otoni / São Paulo x Caratinga / São Paulo x Cataguases / São Paulo x Governador Valadares / São Paulo x Ipatinga / São Paulo x Mantena / São Paulo x Muriaé / São Paulo x Nanuque / São Paulo x Teófilo Otoni / Campinas x Campos / Campos x Belo Horizonte / São João da Barra x Belo Horizonte / São Paulo x Campos / Timbaúba x Rio de Janeiro.

Um exemplo de outras combinações que poderão ser utilizadas, sem prejuízo da formação de outras combinações:

**UPI Linhas I: Pode** ser composta pelas linhas descritas abaixo, bem como pelos respectivos guichês, pontos de vendas e salas VIP e os ônibus que fazem a operação das referidas linhas:

Jundiaí x Curitiba/ Rio de Janeiro x Curitiba / Rio de Janeiro x Florianópolis / Rio de Janeiro x Porto Alegre / São Paulo x Curitiba / São Paulo x Porto Alegre / São Paulo x Rio de Janeiro / Volta Redonda x Curitiba/ São Paulo x Cataguases / São Paulo x Governador Valadares / São Paulo x Ipatinga / São Paulo x Mantena / São Paulo x Muriaé / São Paulo x Nanuque / São Paulo x Teófilo Otoni/ Campinas x Campos/ Campinas x Porto Alegre /Juiz de Fora x Florianópolis / Santos x Ipatinga /São José dos Campos x Teófilo Otoni / São Paulo x Caratinga /São Paulo x Campos

**UPI Linhas II: Pode** ser composta pelas linhas descritas abaixo, bem como pelos respectivos guichês, pontos de vendas e salas VIP e os ônibus que fazem a operação das referidas linhas:

Brasília x Belo Horizonte / Brasília x Porto Alegre / Rio de Janeiro x Anápolis / Rio de Janeiro x Brasília / Patos x Rio de Janeiro / Campos x Belo Horizonte / São João da Barra x Belo Horizonte Timbaúba x Rio de Janeiro.

**UPI Linhas III: Pode** ser composta pelas linhas descritas abaixo, bem como pelos respectivos guichês, pontos de vendas e salas VIP e os ônibus que fazem a operação das referidas linhas:

Aracaju x Belém/ Arcoverde x São Paulo / Belo Horizonte x Natal / Campina Grande x Rio de Janeiro /

9

Este documento é cópia do original, assinado digitalmente por JULIANA LEITE PEDIGONE e Tribunal de Justiça do Estado de São Paulo, protocolado em 22/04/2019 às 23:27 , sob o número WJMJ19405559362. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0060326-87.2018.8.26.0100 e código 6CAB0D0.

fls. 44520

Campina Grande x São Paulo/ Caruaru x Brasília / Feira de Santana x Recife / Fortaleza x Belém / Fortaleza x Salvador / Fortaleza x São Paulo / Guarabira x Rio de Janeiro / Guarabira x São Paulo / Juazeiro do Norte x São Paulo/ Recife x Curitiba / Recife x Goiânia / Rio de Janeiro x Alagoa Grande / Rio de Janeiro x Aracaju / Rio de Janeiro x Belém / Rio de Janeiro x Fortaleza / Rio de Janeiro x IPU / Rio de Janeiro x IPU II / Rio de Janeiro x Parnaíba / Rio de Janeiro x Salvador / Rio de Janeiro x São Luís / Salvador x Belém / Salvador x Recife / São Paulo x Belém / São Paulo x Canindé / São Paulo x Floriano / São Paulo x Parnaíba / São Paulo x Pesqueira / São Paulo x Picos / São Paulo x São Luís / São Paulo x Teresina / São Paulo x Timbaúba / Serra Talhada x São Paulo/ São José dos Campos x Itaobim /

B. **UPI de linhas remanescentes**: Poderão ser compostas pelas linhas descritas abaixo, bem como pelos respectivos guichês, pontos de veda e salas VIP e os ônibus que fazem a operação das referidas linhas:

Afonso Cláudio x Rio de Janeiro / Afonso Cláudio x São Paulo / Alegre x Rio de Janeiro / Cachoeiro do Itapemirim x Campos / Cachoeiro do Itapemirim x Campos (visa) / Cachoeiro do Itapemirim x Niterói / Cachoeiro do Itapemirim x Rio de Janeiro / Cachoeiro do Itapemirim x São Paulo / Castelo x Rio de Janeiro / Guarapari x Belo Horizonte / Guarapari x Ouro Preto / Guarapari x Rio de Janeiro / Iúna x Rio de Janeiro / Iúna x São Paulo / Marataízes x Rio de Janeiro / Muqui x Campos / Serra - Nova Almeida x Belo Horizonte / Vitória x Niterói / Vitória x Rio de Janeiro / Vitória x São José dos Campos / Vitória x São Paulo.

C. **UPI imóveis**: Poderão ser alienados todos os imóveis das Recuperandas que estão descritos no laudo de avaliação de fls. 42459/42723, devendo ser alienados individualmente a critério das Recuperandas.

**5.3.** <u>Processos Competitivos</u>. Os processos competitivos para alienação da UPI's serão conduzidos individual ou conjuntamente mediante a realização de certames, a critério das Recuperandas, por meio de leilão ou pregão, cujos termos e condições constarão dos respectivos editais, nos termos dos arts. 141 e 142 da LRF, os quais deverão ocorrer no prazo máximo de até 1 (um) ano da Homologação do Plano, incluído nesse prazo o tempo necessário para realização de eventual auditoria à critério dos interessados ("<u>Certames</u>").

**5.4.** <u>Propostas para aquisição das UPI's</u>. As propostas para aquisição das UPI's *(i)* deverão prever necessariamente pagamento em moeda corrente nacional, ressalvada a utilização de créditos conforme cláusula 5.5.(ii); ii) as propostas serão condicionadas às aprovações junto aos órgãos reguladores aplicáveis, especialmente ANTT e CADE; *(iii)* terão como condição para sua validade, análise e aceitação pelo juízo, Recuperandas e Credores, a liberação ou substituição das garantias pessoais, reais, fiduciárias e de qualquer outra natureza, prestadas pelo Grupo Itapemirim ou por quaisquer sócios, acionistas, diretores ou administradores das sociedades que compõem o Grupo Itapemirim; *(iv)* deverão observar o valor mínimo de cada UPI, a ser indicado nos respectivos editais e definido com base em laudo de avaliação elaborado e juntado nos autos às fls. 42459/42723 ("<u>Valor Mínimo</u>").

**5.5.** <u>Procedimentos dos Certames UPI's LINHAS</u>. O critério para a ordem de alienação das UPI's LINHAS será definido pelas Recuperandas, e para tal deverão ser observados os seguintes procedimentos para realização dos Certames:

(i)     Apenas poderão participar dos Certames Credores ou terceiros interessados, pessoas jurídicas com comprovada capacidade financeira de compra e idoneidade negocial, mediante

10

Este documento é cópia do original, assinado digitalmente por JULIANA LEITE PEDIGONE e Tribunal de Justica do Estado de Sao Paulo, protocolado em 22/04/2019 às 23:27, sob o número WJM.19405559362. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0060326-87.2018.8.26.0100 e código 6CAB0D0.



fls. 44521

o depósito de caução do valor de R$ 1.500.000,00 (um milhão e quinhentos mil reais), necessários para a avaliação creditícia e cumprimento das normas regulatórias aplicáveis;

(ii)    Os Credores interessados em participar do Certame poderão utilizar seu crédito (concursal ou extraconcursal) como moeda de pagamento do preço, desde que limitado a 15% (quinze) por cento do valor correspondente a avaliação da respectiva UPI mencionada no item 5.2.2.

(iii)    Os interessados deverão habilitar-se por meio de petição protocolada nos autos da Recuperação Judicial, informando seu interesse em oferecer eventual proposta fechada para aquisição, no prazo de até 30 (trinta) dias após a publicação de edital de cada Certame judicial, expressamente declarando-se ciente de que incorrerá em multa e indenização em caso de inadimplemento de suas obrigações com relação à proposta por ele apresentada;

(iv)    Nos dias, horários e locais previamente marcados pelo Administrador Judicial e referendados pelo Juízo da Recuperação, e ainda, após ampla publicidade em anúncios e jornal de grande circulação dos editais de Certames com antecedência mínima de 30 (trinta) dias, nos termos do §1ª do artigo 142 da LRF, serão realizados os Certames, podendo comparecer interessados em apresentar propostas fechadas e terceiros, que poderão retificar para majoração de sua proposta no momento da abertura;

(v)    Após as entregas das propostas, em datas a serem definidas nos editais, o Administrador Judicial promoverá a abertura de todas as propostas recebidas, protocolando-as nos autos da Recuperação Judicial no prazo de até 24 (vinte e quatro) horas contados das respectivas datas de entrega.

**5.6.    Procedimentos dos Certames UPI's IMÓVEIS.** A regra para a alienação dos IMÓVEIS observará o disposto no artigo 142, III, da LRF, ou seja, a alienação será feita por meio de LEILÃO, POR LANCES ORAIS, podendo ser realizada de forma fracionada, considerando a melhor forma de aceite no mercado:

(i)    O primeiro pregão da UPI IMÓVEIS deverá ocorrer dentro do prazo de 30 (trinta) dias a contar da publicação da decisão que homologar a aprovação deste PRJ;

(ii)    Os Credores interessados em participar do Certame poderão utilizar seu crédito, desde que limitado a 10% (dez) por cento do valor correspondente a avaliação das UPI's mencionadas no caput desta cláusula.

**5.7.    Proposta Vencedora.** Será considerada vencedora de cada Certame a proposta que corresponder ao maior preço total ofertado, observadas as condições estabelecidas nas cláusulas acima e desde que o valor não seja vil.

11

Este documento é cópia do original, assinado digitalmente por JULIANA LEITE PEDIGONE e Tribunal de Justiça do Estado de São Paulo, protocolado em 22/04/2019 às 23:27 , sob o número WJMJ19405559362. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0060326-87.2018.8.26.0100 e código 6CAB0D0.



fls. 44522

**5.7.1.** A proposta declarada vencedora em cada Certame deverá ser homologada pelo Juízo da Recuperação, que declarará o vencedor livre de quaisquer ônus, contingências e/ou sucessão de quaisquer obrigações do Grupo Itapemirim, incluindo, mas não se limitando, àquelas de natureza tributária, previdenciária, ambiental e trabalhista, nos termos dos artigos 60 e 142 da LRF.

**5.7.2.** O Grupo Itapemirim, a partir da homologação dos resultados dos Certames e até a efetiva transferência dos bens e direitos aos respectivos vencedores:

(i)      Assumirá integral responsabilidade pela posse e guarda dos bens que serão transferidos às UPI's, conforme o caso; e

(ii)     Permitirá aos vencedores dos Certames que fiscalizem as atividades, os bens e os direitos das UPI's, conforme o caso.

**5.8.** <u>Recursos Obtidos com a Alienação das UPI's de Imóveis e/ou Linhas:</u>

**5.8.1** A totalidade dos recursos obtidos com a alienação das UPI's será destinada para uma *Escrow Account* que será criada e utilizada para quitação dos débitos junto aos credores e cujo extrato contendo toda sua movimentação deverá ser apresentado nos autos da Recuperação Judicial a cada 15 (quinze) dias até o Encerramento da Recuperação; e, após o Encerramento da Recuperação, até o dia 15 (quinze) de cada mês, deverá ser publicado no website das Recuperandas, até o dia em que todas as UPIs tenham sido alienadas e não haja mais dinheiro disponível na Escrow Account, nem dinheiro a ser nela depositado.

**5.8.1.1**  <u>Para efeito do disposto acima, os recursos obtidos com a alienação das UPIs Linhas depositados na conta escrow somente serão liberados para utilização pelas Recuperandas e/ou pagamento direto aos credores quando das devidas aprovações pelos órgãos reguladores (ANTT e CADE) quanto à transferência de mercado aos adquirentes arrematantes de referidas UPIs. Na hipótese de não aprovação pelos referidos órgãos reguladores, não se performará a alienação e os recursos respectivos serão imediatamente devolvidos ao adquirente arrematante.</u>

**5.8.2** Os recursos obtidos com a alienação das UPI's, ressalvado o disposto nas cláusulas 5.10 e 5.11, qualquer que seja a ordem de venda, individual ou conjuntamente, será utilizada pelo Grupo Itapemirim da seguinte forma:



(i)      80% (oitenta por cento) do valor de alienação de cada UPI será utilizado, prioritariamente, para o pagamento das rescisões dos contratos de trabalho oriundos das linhas compostas em cada UPI, e após a quitação de referidos valores o saldo remanescente será utilizado para pagamento *pró rata* dos Credores remanescentes, que receberão seus créditos na forma da Lei (em até 12 meses), e ;

(ii)     20% (vinte por cento) do valor de alienação de cada UPI será destinado à quitação das despesas

Este documento é cópia do original, assinado digitalmente por JULIANA LEITE PEDIGONE e Tribunal de Justiça do Estado de São Paulo, protocolado em 22/04/2019 às 23:27 , sob o número WJMJ19405559362
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0060326-87.2018.8.26.0100 e código 6CAB0D0.

fls. 44523



com os respectivos leilões e o saldo remanescente, se houver, será destinado à empresa para recomposição de seu Capital de Giro.

**5.8.3**  A liberação de eventuais garantias reais e/ou fiduciárias sobre os bens que compõem a UPI's Imóveis [se houver], mediante a concordância expressa e escrita pelo Credor detentor da respectiva garantia em instrumento apartado, a ser firmado no momento da efetiva venda do bem objeto da garantia, sendo obrigação do Credor firmar referido termo desde que em estrita consonância com as disposições deste Plano.

**5.9**  Operacionalização de Ativos. O Grupo Itapemirim poderá operacionalizar todos os bens e ativos que serão vertidos às UPI's até a efetiva alienação dessas nos termos do Novo Plano, inclusive, mas sem se limitar, por meio da celebração de arrendamentos, de modo a incrementar a geração de seu fluxo de caixa.

**5.10**  **Propostas em Andamento:** As Recuperandas já receberam propostas de aquisição de imóveis, conforme noticiado no curso do processo de Recuperação Judicial e, portanto, visando dar celeridade à obtenção de recursos para pagamento dos credores, as primeiras UPI´S IMÓVEIS que serão operacionalizadas dentro do prazo de 30 (trinta) dias serão as seguintes:

(i)  **UPI IMÓVEL ATUBA CURITIBA-PR**, COMPOSTO DAS MATRÍCULAS Nº 52.024 e 54.282 JUNTO AO CARTÓRIO DE REGISTRO DE IMÓVEIS DE CURITIBA-PR;

(ii)  **UPI IMÓVEL POSTO FLECHA VIANA-ES**, COMPOSTO PELAS MATRÍCULAS Nº 45.854, 45.878 e 45.879 JUNTO AO CARTÓRIO DE REGISTRO DE IMÓVEIS DE VIANA-ES;

**5.11**  Tendo em vista que uma das formas para levantamento dos recursos para pagamento dos credores é a alienação de imóveis e, diante da existência de Credores com Garantia Real, os valores obtidos com a alienação das primeiras UPI´S mencionadas no item 5.10. acima serão destinados da seguinte forma:

(i)  80% (oitenta por cento) do valor de alienação de cada UPI será utilizado, prioritariamente, para o pagamento dos credores pertencentes à Classe II (Credores com Garantia Real), e;

(ii)  20% (vinte por cento) do valor de alienação de cada UPI será destinado à quitação das despesas com os respectivos certames e o saldo remanescente, se houver, será destinado às Recuperandas para recomposição de seu Capital de Giro.

5.11.1.  O disposto na cláusula 5.10 somente se aplicará aos credores detentores de títulos denominados "notes" que (a) tenham procedido perante o Administrador Judicial ao processo de individualização dos respectivos créditos, conforme procedimento estipulado pelo Administrador Judicial; e, cumulativamente, (b) tenham obedecido à cláusula 12.1.

**5.12**  Os valores obtidos com a venda das demais UPI´S serão rateados proporcionalmente entre os CREDORES, conforme discriminado nas cláusulas seguintes, ficando expresso que somente os valores obtidos com a venda dos imóveis mencionados na cláusula 5.11 será destinado para pagamento exclusivo dos credores com garantia real.

13

Este documento é cópia do original, assinado digitalmente por JULIANA LEITE PEDIGONE e Tribunal de Justiça do Estado de São Paulo, protocolado em 22/04/2019 às 23:27 , sob o número WJMJ19405559362 Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0060326-87.2018.8.26.0100 e código 6CAB0D0.

fls. 44524

**CAPÍTULO IV – PAGAMENTO DOS CREDORES**

**6     NOVAÇÃO**

**6.9     Novação.** Nos termos do art. 59 da LRF, todos os Créditos de Credores são novados na forma deste Novo Plano.

**7     PAGAMENTO DOS CREDORES TRABALHISTAS**

**7.1** Os Credores Trabalhistas receberão o pagamento de seus Créditos Trabalhistas em até 12 (doze) meses, após a Homologação do Novo Plano ou da definitiva habilitação do respectivo crédito, caso seja feita posteriormente à Homologação do Novo Plano, acrescidos da correção mensal calculada pela Taxa Referencial -TR [divulgada pelo Banco Central do Brasil – BACEN), acrescido de juros de 3% (três por cento) ao ano.

**7.2** Os créditos decorrentes de natureza estritamente salarial, vencidos nos 3 meses anteriores ao pedido de recuperação judicial serão pagos em até 30 (trinta) dias até o limite de 5 (cinco) salários mínimos por trabalhador.

**7.3** Os pagamentos realizados na forma estabelecida nesta Cláusula acarretarão a quitação plena, irrevogável e irretratável dos Créditos Trabalhistas.

**8     PAGAMENTO DOS CREDORES COM GARANTIA REAL**

**8.1. Pagamento dos Credores com Garantia Real.** Os Credores com Garantia Real farão jus ao recebimento do valor constante na Lista de Credores vigente na época do pagamento, **ou seja, sem a aplicação de qualquer deságio**, conforme o presente Novo Plano, acrescidos da correção mensal calculada pela Taxa Referencial -TR [divulgada pelo Banco Central do Brasil – BACEN), acrescido de juros de 3% (três por cento) ao ano.

**8.2.** Os Créditos com Garantia Real, descontados eventuais valores pagos à título de Pagamento Complementar Garantia Real, serão pagos integralmente com os recursos decorrentes da alienação das UPI's.

**8.3.** Conforme consta na cláusula 5.11. acima, parte dos Créditos com Garantia Real serão pagas com os valores obtidos com a venda das UPI'S IMÓVEIS ATUBA E VIANA. Após, caso ao longo do período de 12 meses propostos neste PRJ, os recursos angariados com a operacionalização das UPI's não sejam suficientes para quitação integral dos débitos junto aos credores, a partir do 13º mês o saldo remanescente será liquidado pela empresa em 80 parcelas mensais e iguais corrigidas mensalmente pela Taxa Referencial -TR [divulgada pelo Banco Central do Brasil – BACEN) e acrescido de juros de 3% (três por cento) ao ano.

**8.3.1.** As Recuperandas, mesmo após os primeiros 12 (doze) meses após a homologação da aprovação do PRJ,

14

Este documento é cópia do original, assinado digitalmente por JULIANA LEITE PEDIGONE e Tribunal de Justiça do Estado de São Paulo, protocolado em 22/04/2019 às 23:27 , sob o número WJMJ19405559362. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0060326-87.2018.8.26.0100 e código 6CAB0D0.

fls. 44525

continuarão a arrecadar recursos por meio da alienação das UPI'S LINHAS e IMÓVEIS para fazer frente ao pagamento de seus credores.

**8.4.** Os pagamentos realizados na forma estabelecida nesta Cláusula acarretarão a quitação plena, irrevogável e irretratável dos Créditos com Garantia Real.

**9.    Pagamento dos Credores Quirografários**

**9.1. Pagamento dos Credores Quirografários:** Credores Quirografários farão jus ao recebimento do valor constante na Lista de Credores vigente na época do pagamento , **ou seja, sem a aplicação de qualquer deságio,** conforme o presente Novo Plano, acrescidos da correção mensal calculada pela Taxa Referencial -TR [divulgada pelo Banco Central do Brasil – BACEN), acrescido de juros de 3% (três por cento) ao ano.

**9.2.**    O montante correspondente a 100% (cem por cento) do valor dos créditos quirografários serão amortizados com os recursos decorrentes da venda das UPI's, nos termos das cláusula acima, até que sejam efetivamente quitados.

**9.3.**    Caso ao longo do período de 12 meses propostos neste PRJ, os recursos  angariados com a operacionalização das UPI's não sejam suficientes para quitação integral dos débitos junto aos credores, a partir do 13º mês o saldo remanescente será liquidado pela empresa em 80 parcelas mensais e iguais corrigidas mensalmente pela Taxa Referencial -TR [divulgada pelo Banco Central do Brasil – BACEN) e , acrescido de juros de 3% (três por cento) ao ano.

**9.3.1.**    A venda das UPI'S irá continuar As Recuperandas, mesmo após os primeiros 12 (doze) meses após a homologação da aprovação do PRJ, continuarão a arrecadar recursos por meio da alienação das UPI'S LINHAS e IMÓVEIS para fazer frente ao pagamento de seus credores.

**9.4.**    Os pagamentos realizados na forma estabelecida nesta Cláusula acarretarão a quitação plena, irrevogável e irretratável dos Créditos Quirografários.

**10.    Pagamento dos Credores ME e EPP**

**10.1.    Pagamento dos Créditos ME e EPP**. **:** Credores ME e EPP farão jus ao recebimento do valor nominal dos créditos novados, **ou seja, sem a aplicação de qualquer deságio,** conforme o presente Novo Plano, acrescidos da correção mensal calculada pela Taxa Referencial -TR [divulgada pelo Banco Central do Brasil – BACEN), acrescido de juros de 3% (três por cento) ao ano.

**10.2.**    O montante correspondente a 100% (cem por cento) do valor de face de cada Crédito ME e EPP será amortizado com os recursos decorrentes da operacionalização das UPI's, nos termos das cláusulas acima.

15

Este documento é cópia do original, assinado digitalmente por JULIANA LEITE PEDIGONE e Tribunal de Justica do Estado de Sao Paulo, protocolado em 22/04/2019 às 23:27 , sob o número WJMJ19405559362. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0060326-87.2018.8.26.0100 e código 6CAB0D0.



fls. 44526

**10.3.** Caso ao longo do período de 12 meses propostos neste PRJ, os recursos angariados com a operacionalização das UPI's não sejam suficientes para quitação integral dos débitos junto aos credores, a partir do 13º mês o saldo remanescente será liquidado pela empresa em 80 parcelas mensais e iguais corrigidas mensalmente pela Taxa Referencial -TR (divulgada pelo Banco Central do Brasil – BACEN) e , acrescido de juros de 3% (três por cento) ao ano.

**10.3.1.** As Recuperandas, mesmo após os primeiros 12 (doze) meses após a homologação da aprovação do PRJ, continuarão a arrecadar recursos por meio da alienação das UPI'S LINHAS e IMÓVEIS para fazer frente ao pagamento de seus credores.

**10.4.** Os pagamentos realizados na forma estabelecida nesta Cláusula acarretarão a quitação plena, irrevogável e irretratável dos Créditos ME e EPP.

**10.5.** Todos os pagamentos efetuados a título de antecipação deverão ser descontados dos valores a serem efetivamente pagos aos credores.

## 11. CREDORES PARCEIROS

**11.1** Serão considerados Credores Parceiros aqueles Credores que colaborarem com a Recuperação Judicial do Grupo Itapemirim mediante: *(i)* a concessão de financiamentos, liberação de novas operações de crédito e/ou abertura de linhas de crédito no curso do processo de recuperação judicial na proporção mínima de 30% do valor do crédito arrolado no quadro geral de credores, ou seja, para enquadramento nesta condição cada credor parceiro deverá liberar no mínimo o equivalente a 30% do valor de seu crédito sujeito aos efeitos da recuperação judicial limitado a R$ 10.000.000,00 (dez milhões de reais) por credor; *(ii)* a manutenção e/ou a renovação dos contratos celebrados com as Recuperandas em condições iguais às atualmente em vigor ou mais vantajosas para as Recuperandas, pelo prazo mínimo de 5 (cinco) anos; ou *(iii)* a liberação de garantias reais ou fiduciárias sobre móveis ou imóveis de propriedade do Grupo Itapemirim.

**11.2** Os Credores Parceiros que fomentarem a atividade empresarial do Grupo Itapemirim, nos termos da cláusula acima, poderão efetuar negociações com as Recuperandas que deverão obedecer aos seguintes limites para fins de pagamento dos seus Créditos sujeitos a recuperação judicial:



(i)     Deságio: Pagamento integral ou parcial do Crédito Parceiro, conforme acordado com cada um dos Credores Parceiros, a ser firmado em instrumento específico;

(i)     Carência: até 24 (vinte e quatro) meses, contados a partir da Homologação do Novo Plano ou da liberação dos recursos na condição de credor colaborador, em termos a serem ajustados entre as

16

Este documento é cópia do original, assinado digitalmente por JULIANA LEITE PEDIGONE e Tribunal de Justiça do Estado de São Paulo, protocolado em 22/04/2019 às 23:27 , sob o número WJM119405559362 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0060326-87.2018.8.26.0100 e código 6CAB0D0.

fls. 44527

partes em instrumento específico.

(ii)    Pagamento: Pagamento em até 15 (quinze) anos, após o período de carência.

11.2.1    Os pagamentos das operações sujeitas a recuperação judicial realizados na forma estabelecida nesta cláusula acarretarão a quitação plena, irrevogável e irretratável dos Créditos Parceiros.

11.2.2    Os credores que após a distribuição do pedido de recuperação judicial, que se deu em 07/03/2016 e que tenham liberado novos recursos as recuperandas, ou mantido o fornecimento de serviços e contratos ou ainda tenham liberado garantias em favor das empresas e observado o disposto no item 11.1 no presente plano, mantem suas condições inalteradas e são ratificados como credores parceiros na recuperação judicial, inclusive com a manutenção da condição de pagamento de seus créditos sujeitos a recuperação judicial.

11.2.3    Para enquadramento na condição de credores parceiros os credores interessados deverão atender ao menos uma das previsões dos itens (i), (ii) e (iii) da cláusula 11.1 do presente plano, que não são cumulativas,

11.2.4    Em caso de venda de ativos das companhias, os credores parceiros manterão a forma de pagamento prevista na cláusula 11.2 deste plano e de forma complementar farão jus a seu percentual equivalente sobre a divisão de recursos obtidos com a alienação de todo e qualquer ativo sobre cada classe de credores, inclusive UPI's.

## 12    DISPOSIÇÕES COMUNS AO PAGAMENTO DOS CREDORES

12.1    Forma de Pagamento. Os valores devidos aos Credores, nos termos deste Novo Plano, serão pagos mediante transferência direta de recursos, por meio de documento de ordem de crédito (DOC) ou de transferência eletrônica disponível (TED), em conta de cada um dos credores a ser informada individualmente pelos credores, através do e-mail: pagamentosrj@itapemirimcorp.com.br, indicando nome da pessoa física ou jurídica credora e dados da conta bancária dela, podendo esse e-mail ser enviado pelo advogado informado nos autos da Recuperação Judicial.

12.1.1    Caso o Credor não envie o e-mail a que se refere a cláusula 12.1 no prazo de 15 (quinze) dias corridos contados da Homologação Judicial, não será contemplado pelos rateios com o produto de alienações de UPIs a que se referem as cláusulas 5.10 e 5.11.

12.2    Os documentos da efetiva transferência de recursos servirão como comprovante de quitação dos respectivos valores efetivamente pagos pelas Recuperandas, outorgando, portanto, os Credores, a mais ampla, rasa e irrevogável quitação em relação aos valores então pagos.



12.3    Os pagamentos que não forem realizados em razão de os Credores não terem informado suas contas bancárias não serão considerados como descumprimento do Novo Plano. Não haverá a incidência de juros ou

17

Este documento é cópia do original, assinado digitalmente por JULIANA LEITE PEDIGONE e Tribunal de Justiça do Estado de Sao Paulo, protocolado em 22/04/2019 às 23:27 , sob o número WJMJ19405559362. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0060326-87.2018.8.26.0100 e código 6CAB0D0.



fls. 44528

encargos moratórios se os pagamentos não tiverem sido realizados em razão de os Credores não terem informado suas contas bancárias.

**12.4    Percentuais do Fluxo de Pagamentos**. No caso de divergência ou impugnação de Credor cujo julgamento ocorra após a Homologação do Novo Plano e que venha a alterar o percentual devido a determinado Credor, tal divergência ou impugnação apenas surtirá efeitos para fins deste Novo Plano a partir da data do trânsito em julgado de mencionada decisão, permanecendo íntegros e intactos quaisquer pagamentos efetuados anteriormente com base nos percentuais antigos.

**12.5    Valores**. Os valores considerados para o pagamento dos créditos, cálculos de desconto e demais regras de novação, são os constantes da Lista de Credores. Sobre esses valores não incidirão juros, correção monetária, multas e penas contratuais, salvo pelos encargos previstos neste Novo Plano.

**12.6    Alocação dos Valores**. As projeções de pagamento aqui previstas foram baseadas nos Créditos constantes da Lista de Credores juntada nos autos desta Recuperação Judicial pelas Recuperandas. Qualquer diferença entre a Lista de Credores e o quadro-geral de credores final nos termos do artigo 18 da LRF acarretará a alteração dos percentuais do pagamento no valor total que será distribuído entre os Credores de cada classe. No caso de divergência ou impugnação de Credor cujo julgamento ocorra após a Homologação do Novo Plano e que alterar o percentual devido a determinado Credor, tal novo percentual apenas surtirá efeitos para fins deste Novo Plano a partir da data do trânsito em julgado de mencionada decisão, permanecendo íntegros e intactos quaisquer pagamentos efetuados anteriormente com base nos percentuais antigos. Em nenhuma circunstância haverá a majoração *(i)* do fluxo de pagamentos e *(ii)* do valor total a ser distribuído entre os Credores.

**12.7    Compensação**. As Recuperandas poderão pagar quaisquer Créditos ou Credores, conforme aplicável e à seu critério, por meio da compensação de (i) créditos de qualquer natureza que tenha contra os Credores; e (ii) Créditos devidos pelos Credores, conforme aplicável, na forma como modificados por este Novo Plano. Neste caso, a compensação extinguirá ambas as obrigações até o limite do valor efetivamente compensado. A não realização da compensação ora prevista não acarretará a renúncia ou a liberação pelas Recuperandas de quaisquer créditos que possa ter contra tais Credores.

**12.8    Quitação.** Os pagamentos e distribuições realizadas na forma estabelecida neste Novo Plano acarretarão a quitação plena, irrevogável e irretratável de todos os Créditos novados de acordo com o Novo Plano, de qualquer tipo e natureza, contra as Recuperandas, inclusive juros, correção monetária, penalidades, multas e indenizações, quando aplicáveis. Com a ocorrência da quitação, os Credores serão considerados como tendo quitado, liberado e/ou renunciado todos e quaisquer Créditos, e não mais poderão reclamá-los contra as Recuperandas.

**12.9    Pagamento Inicial.** As Recuperandas efetuarão, à título de adiantamento de pagamento, a todos os Credores o valor de até R$ 1.500,00 (um mil e quinhentos reais) por Credor, respeitado o saldo de cada um dos Credores. Para tanto os credores deverão os termos da cláusula 13.1, informando as contas bancárias.

Este documento é cópia do original, assinado digitalmente por JULIANA LEITE PEDIGONE e Tribunal de Justica do Estado de Sao Paulo, protocolado em 22/04/2019 as 23:27 , sob o número WUMJ19405559362 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0060326-87.2018.8.26.0100 e código 6CAB0D0.



fls. 44529

**12.10    Parcelamento de Débitos Tributários**. As Recuperandas poderão buscar obter, após a Homologação do Novo Plano, a concessão, seja por via judicial ou administrativa, de parcelamento das dívidas tributárias. Caso se mostre inviável adesão das Recuperandas em programas de parcelamento que estejam disponíveis de forma administrativa, elas poderão se valer de ação judicial para obter um melhor parcelamento por conta do regime de recuperação judicial a que estão submetidas.

## CAPÍTULO V – PÓS-HOMOLOGAÇÃO

**13    EFEITOS DO NOVO PLANO**

**13.1    Vinculação do Novo Plano**. A partir da Homologação do Novo Plano, as disposições do Novo Plano vinculam as Recuperandas e os Credores, bem como seus respectivos cessionários e sucessores.

**13.2    Conflito com Disposições Contratuais**. Na hipótese de haver conflito entre as disposições deste Novo Plano e aquelas previstas nos contratos celebrados com quaisquer Credores, em relação a quaisquer obrigações das Recuperandas, seja de dar, de fazer ou de não fazer, as disposições contidas neste Novo Plano deverão prevalecer.

**13.3    Manutenção das Previsões do Plano**. Na hipótese de qualquer termo ou disposição do Plano ser total ou parcialmente considerada inválida, nula ou ineficaz pelo Juízo da Recuperação, a validade e eficácia das demais disposições não serão afetadas, assim como não será afetado nenhum pagamento realizado com base no termo ou disposição que venha a ser total ou parcialmente considerada inválida, nula ou ineficaz pelo Juízo da Recuperação, bem como qualquer negócio jurídico perfeito e acabado realizado em cumprimento do PRJ, tais como as alienações das UPI's linhas e imóveis.

**14    MODIFICAÇÃO DO NOVO PLANO**

**14.1    Modificação do Novo Plano na AGC**. Aditamentos, emendas, alterações ou modificações ao Novo Plano podem ser propostas pelas Recuperandas a qualquer momento após a sua Homologação, desde que *(i)* tais aditamentos, emendas, alterações ou modificações sejam submetidas à votação da AGC convocada para tal fim; e *(ii)* sejam aprovadas pelas Recuperandas e aprovadas pelo quórum mínimo da LRF.



## CAPÍTULO VI – DISPOSIÇÕES COMUNS

**15    DISPOSIÇÕES GERAIS**

19

Este documento é cópia do original, assinado digitalmente por JULIANA LEITE PEDIGONE e Tribunal de Justiça do Estado de São Paulo, protocolado em 22/04/2019 às 23:27 , sob o número WJMJ19405559362 Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0060326-87.2018.8.26.0100 e código 6CAB0D0.

**15.1** <u>Anexos</u>. Todos os anexos a este Novo Plano são a ele incorporados e constituem parte integrante. Na hipótese de haver qualquer inconsistência entre este Novo Plano e qualquer anexo, o Novo Plano prevalecerá.

**15.2** <u>Liberação de Garantias</u>. As eventuais garantias reais e fidejussórias prestadas por terceiros com relação aos Créditos, nos termos do art. 49, §1º, LRF, estarão liberadas com o respectivo pagamento integral do Crédito pertinente, nos termos deste Novo Plano.

**16** CESSÕES

**16.1** <u>Cessão de Créditos</u>. Os Credores poderão ceder seus Créditos a outros Credores ou a terceiros, e a cessão produzirá efeitos desde que *(i)* as Recuperandas e o Juízo da Recuperação sejam informados; e *(ii)* os cessionários recebam e confirmem o recebimento de uma cópia deste Novo Plano, reconhecendo que o crédito cedido estará sujeito às suas disposições mediante a Homologação do Novo Plano.

**16.2** <u>Cessão das Obrigações</u>. Com exceção das hipóteses expressamente previstas neste Novo Plano, as Recuperandas não poderão ceder quaisquer obrigações oriundas deste Plano sem o prévio consentimento da maioria simples dos Créditos presentes em AGC.

**17** LEI E FORO

**17.1** <u>Lei Aplicável</u>. Os direitos, deveres e obrigações decorrentes deste Novo Plano deverão ser regidos, interpretados e executados de acordo com as leis vigentes na República Federativa do Brasil, ainda que haja Créditos originados sob a regência de leis de outra jurisdição e sem que quaisquer regras ou princípios de direito internacional privado sejam aplicadas.

**17.2** <u>Foro</u>. Todas as controvérsias ou disputas que surgirem ou estiverem relacionadas a este Novo Plano serão resolvidas pelo Juízo da Recuperação.

São Paulo (SP), 16 de abril de 2019.

Nome: Camila de Souza Valdivia
CPF: 322.730.208-05

Nome: Cloriei Alva De Jesus
CPF: 15.979.333-6

20

fls. 44531



Este documento é cópia do original, assinado digitalmente por JULIANA LEITE PEDIGONE e Tribunal de Justiça do Estado de São Paulo, protocolado em 22/04/2019 às 23:27, sob o número WJMJ19405559362
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0060326-87.2018.8.26.0100 e código 6CAB0D0.

**ADITIVO AO PLANO DE RECUPERAÇÃO JUDICIAL APRESENTADO PELAS SOCIEDADES VIAÇÃO ITAPEMIRIM S.A; TRANSPORTADORA ITAPEMIRIM S/A; ITA – ITAPEMIRIM TRANSPORTES S/A; IMOBILIARIA BIANCA LTDA.; COLA COMERCIAL E DISTRIBUIDORA LTDA.; FLECHA S/A – TURISMO COMÉRCIO E INDÚSTRIA; E VIAÇÃO CAIÇARA LTDA.**

Relação de Anexos
**Anexo 01**: Laudo de Viabilidade Econômica;
**Anexo 02**: Laudo Econômico-Financeiro e de Avaliação dos Bens e Ativos;





*(Página integrante do Aditivo ao Plano de Recuperação Judicial do Grupo Itapemirim apresentado em 16 de março de 2019)*

21

# EXHIBIT 1-B

**REPÚBLICA FEDERATIVA DO BRASIL**
**IRACEMA ANNA NERY**
Tradutora Pública Juramentada e Intérprete Comercial
Rua Aimberé, 1928/21 – São Paulo/SP – Brasil – CEP 01258-020
Telefone: 3865-2790 / Fax: 3868-4842 / e-mail: annanery@uol.com.br
**IDIOMA INGLÊS**
Matriculada na Junta Comercial do Estado de São Paulo sob nº 1033
RG nº 4.454.113-2 – CPF/MF nº 053.575.518-04 – CCM nº 2.341.023-0



| **Translation No. 11314** | **Book No. 161** | **Page No. 239** |
|---|---|---|

*I, the undersigned, a Public Sworn Translator and Commercial Interpreter, hereby certify and attest that a document written in Portuguese was presented to me, which I translate into English as follows:*

[pages 44511 to 44531]

# AMENDMENT TO THE COURT-SUPERVISED REORGANIZATION PLAN SUBMITTED BY THE COMPANIES VIAÇÃO ITAPEMIRIM S.A; TRANSPORTADORA ITAPEMIRIM S/A; ITA - ITAPEMIRIM TRANSPORTES S/A; IMOBILIÁRIA BIANCA LTDA.; COLA COMERCIAL E DISTRIBUIDORA LTDA.; FLECHA S/A - TURISMO COMÉRCIO E INDÚSTRIA; AND VIAÇÃO CAIÇARA LTDA.

*All of them in Court-Supervised Reorganization, case pending before the 1st Lower Court of Bankruptcies and Court-Supervised Reorganizations of the Judicial District of São Paulo, record No. 0060326-87.2018.8.26.0100.*

**(1) VIAÇÃO ITAPEMIRIM S.A. – IN COURT-SUPERVISED REORGANIZATION** (hereinafter referred to as "Viação"), a legal entity of private law enrolled with the National Corporate Taxpayers Register of the Ministry of Finance (CNPJ/MF) under No. 27.175.975/0001-07, with principal place of business at Rua Gelu Vervolet dos Santos, 500, 12th floor, suite 1207, Edifício Omni Towers Office, Jardim Camburí, in the City of Vitória, State of Espírito Santo, CEP (postal code) 29090-100; **(2) TRANSPORTADORA ITAPEMIRIM S/A – IN COURT-SUPERVISED REORGANIZATION** (hereinafter referred to as "Transportadora"), a legal entity of private law enrolled with the CNPJ/MF under No. 33.271.511/0001-05, with principal place of business at Rodovia Governador Mario Covas, no number, BR 101-KM 15, suite 02, Parque Industrial, in the City of Viana, State of Espírito Santo, CEP 29136-552; **(3) ITA - ITAPEMIRIM TRANSPORTES S/A – IN COURT-SUPERVISED REORGANIZATION** (hereinafter referred to as "Transportes"), a legal entity of private law enrolled with the CNPJ/MF under No. 34.537.845/0001-32, with principal place of business at Rodovia Governador Mario Covas, no number, BR 101-KM 15, suite 03, Parque Industrial, in the City of Viana, State of Espírito Santo, CEP 29136-552; **(4) IMOBILIÁRIA BIANCA LTDA. – IN COURT-SUPERVISED REORGANIZATION** (hereinafter referred to as "Imobiliária"), a legal entity of private law enrolled with the CNPJ/MF under No. 31.814.965/0001-41, with principal place of business at Rua Gelu Vervloet dos Santos, 500, 12th floor, suite 1206, Edifício Omni Towers Office, Jardim Camburi, in the City of Vitória, State of Espírito Santo, CEP 29090-100; **(5) COLA COMERCIAL E DISTRIBUIDORA LTDA. – IN COURT-SUPERVISED REORGANIZATION** (hereinafter referred to as "Distribuidora"), a legal entity of private law enrolled with the CNPJ/MF under No. 31.719.032/0001-75, with principal place of business at Rodovia Governador Mario Covas, no number, BR 101-KM 15, suite 04, Parque Industrial, in the City of Viana, State of Espírito Santo, CEP 29136-552; **(6) FLEXA S/A – TURISMO COMÉRCIO E INDÚSTRIA – IN COURT-SUPERVISED REORGANIZATION** (hereinafter referred to as "Turismo"), a legal entity of private law enrolled with the CNPJ/MF under No. 27.075.753/0001-12, with principal place of business at Rodovia Governador Mario Covas, no number, BR 101- KM 15, Parque Industrial, in the City of Viana, State of Espírito Santo, CEP 29136-552; and **(7) VIAÇÃO CAIÇARA LTDA. – IN COURT-SUPERVISED REORGANIZATION** (hereinafter referred to as "Caiçara"), a legal entity of private law enrolled with the CNPJ/MF under No. [--], with principal place of business at [--], hereinafter jointly referred to as "Companies under Court-Supervised Reorganization" or "Itapemirim Group"), hereby submit this Amendment to the Court-Supervised Reorganization Plan ("Plan"), for approval by the Claim Holders' Meeting and court approval, as provided for by articles 45 and 58 of Law 11.101/2005 ("Reorganization and Bankruptcy Law (LRF)"):

(i)    WHEREAS the most recent version of the Court-Supervised Reorganization Plan, submitted on April 9, 2019, was the subject of notes by claim holders who, in turn, pointed out the need

**REPÚBLICA FEDERATIVA DO BRASIL**
**IRACEMA ANNA NERY**
Tradutora Pública Juramentada e Intérprete Comercial
Rua Aimberé, 1928/21 – São Paulo/SP – Brasil – CEP 01258-020
Telefone: 3865-2790 / Fax: 3868-4842 / e-mail: annanery@uol.com.br
**IDIOMA INGLÊS**
Matriculada na Junta Comercial do Estado de São Paulo sob nº 1033
RG nº 4.454.113-2 – CPF/MF nº 053.575.518-04 – CCM nº 2.341.023-0



| Translation No. 11314 | Book No. 161 | Page No. 240 |
|---|---|---|

for amendments, this Amendment to the Court-Supervised Reorganization Plan was prepared with adjustments for analysis;

(ii)   WHEREAS the Companies under Court-Supervised Reorganization have faced economic, market and financial difficulties;

(iii)   WHEREAS on March 7, 2016, in response to said difficulties, the Companies under Court-Supervised Reorganization filed for court-supervised reorganization under the LRF in the Judicial District of Vitória, State of Espírito Santo, under No. 0006983-85.2016.8.08.0024 (hereinafter referred to as "Original Proceeding")

(iv)   WHEREAS on May 17, 2016, the Companies under Court-Supervised Reorganization submitted a court-supervised reorganization plan [on pages 4358 to 4400 of the Original Proceeding]; on June 6, 2016 they submitted an amendment to the Court-Supervised Reorganization Plan [on pages 5208 to 5215 of the Original Proceeding]; and on March 20, 2018 the Companies under Court-Supervised Reorganization submitted a modification to the court-supervised reorganization plan [on pages 27576 to 27641 of the Original Proceeding] adapting the previously submitted proposal;

(v)   WHEREAS, by decision of the Hon. Judge of the Judicial District of Vitória, State of Espírito Santo, the jurisdiction was rejected for the Judicial District of the Capital City of the State of São Paulo which, in turn, ordered the replacement of the Trustee, the reinstatement of the controlling shareholders in the management of the Companies under Court-Supervised Reorganization, and the submission of a New Court-Supervised Reorganization Plan.

(vi)   WHEREAS the judge of the First Lower Court of Bankruptcies and Court-Supervised Reorganizations of the Central Courts of São Paulo ordered the Companies under Court-Supervised Reorganization to include, as reorganization means, the instruments established in items II, III, IV and V of article 50 of Law 11.101/2005, an order which was complied with by the Companies under Court-Supervised Reorganization in items 3.1 and 5.2.3, as shown below.

Accordingly, in view of the foregoing, this is the New Plan submitted as a modification to the other, previously submitted plans and for this purpose, the conditions hereby proposed shall be hereinafter in effect, in strict compliance with the requirements set forth in article 53 of the LRF, considering that: it describes in detail the reorganization means of the Companies under Court-Supervised Reorganization; it is feasible from an economic viewpoint; and it is submitted together with the corresponding Economic-Financial Report and Appraisal of Goods and Assets of the Companies under Court-Supervised Reorganization.

As a result, by means of this New Plan, the Companies under Court-Supervised Reorganization seek to overcome their economic-financial crisis and to restructure their business for the purpose of (i) preserving and adapting their business activities, (ii) continuing to generate wealth, taxes and employment, and (iii) renegotiating the payment of their Claim Holders, by submitting this New Plan to the Claim Holders' Meeting (AGC) for their approval and court approval, in the following terms.

# CHAPTER I – INTRODUCTION

## 1.   CONSTRUAL AND DEFINITIONS

**1.1**   <u>**Rules of Construal.**</u> The terms and expressions below, whenever used in this new Court-Supervised Reorganization Plan, shall have the meanings attributed to them in this item. The definitions shall be applicable in singular and plural, male and female form, without any change to their meaning.

**REPÚBLICA FEDERATIVA DO BRASIL**
**IRACEMA ANNA NERY**
Tradutora Pública Juramentada e Intérprete Comercial
Rua Aimberé, 1928/21 – São Paulo/SP – Brasil – CEP 01258-020
Telefone: 3865-2790 / Fax: 3868-4842 / e-mail: annanery@uol.com.br
**IDIOMA INGLÊS**
Matriculada na Junta Comercial do Estado de São Paulo sob nº 1033
RG nº 4.454.113-2 – CPF/MF nº 053.575.518-04 – CCM nº 2.341.023-0

**Translation No. 11314**          **Book No. 161**          **Page No. 241**



1.1.1    "Trustee": Trustee appointed by the Reorganization Court, as provided for by Chapter II, Section III of the LRF, namely EXAME AUDITORES INDEPENDENTES LTDA., enrolled with the CNPJ under No. 04.938.537/0001-58, represented by Eduardo Scarpellini, enrolled with the Regional Board of Accountants/State of São Paulo (CRC/SP) under No. 214.931-07, bearer of identity card (RG) No 19.601.500-5, or any person who may succeed or replace him under the terms of LRF.

1.1.2.   "AGC": means the Claim Holders' Meeting, as provided for by Chapter II, Section IV of the LRF.

1.1.3.   "Claims": all Labor Claims, Secured Claims, Unsecured Claims, ME (Micro) and EPP (Small Business) Claims, and Adhering First-Priority Claims, and the corresponding obligations that exist on the Filing Date, which are subject to the Court-Supervised Reorganization under the LRF, as listed in the List of Claim Holders.

1.1.4    "Secured Claims": means Claims held by Claim Holders with Secured Claims, guaranteed by security interests (such as pledge or mortgage), as provided for by article 41, II, of the LRF, as listed in the List of Claim Holders.

1.1.5.   "Adhering First-Priority Claims": means the Claims held by Adhering First-Priority Claim Holders.

1.1.6.   "ME (Micro) and EPP (Small Business) Claims": means the claims held by Claim Holders organized as micro-company or small company, as provided for by article 41, IV, of the LRF.

1.1.7.   "Unsecured Claims": means claims that are unsecured, with general privilege, especially privileged and subordinated claims, as provided for by article 41, III, and article 83, VI of the LRF, as listed in the List of Claim Holders.

1.1.8.   "Labor Claims": are claims arising out of labor law or out of any occupational accident, as provided for by article 41, I, of the LRF, as listed in the List of Claim Holders.

1.1.9.   "Claim Holders": means Labor Claim Holders, Claim Holders with Secured Claims, Unsecured Claim Holders, ME and EPP Claim Holders, and Adhering First-Priority Claim Holders, which are subject to the effects of the Court-Supervised Reorganization, as provided for by article 49, main provision of the LRF.

1.1.10.  "Claim Holders with Secured Claims": are Claim Holders holding Secured Claims, as provided for by article 41, II, of the LRF.

1.1.11.  "Adhering First-Priority Claim Holders": Claim Holders holding claims not subject to the Court-Supervised Reorganization, as provided for by article 49, main provision, paragraphs 3 and 4 of the LRF, but which adhered to the terms of this New Plan, not characterizing acceptance of, consent to or acknowledgement of the arguments and theories discussed in the respective discrepancies or objections by the Companies under Court-Supervised Reorganization and/or Claim Holders.

1.1.12.  "ME and EPP Claim Holders": means Claim Holders holding ME (Micro) and EP (Small Business) Claims, as provided for by article 41, IV, of the LRF.

1.1.13.  "Unsecured Claim Holders": means claim holders holding Unsecured Claims, as provided for by article 41, III, of the LRF.

1.1.14.  "Labor Claim Holders": means Claim Holders holding Labor Claims, as provided for by article 41, I, of the LRF.

**REPÚBLICA FEDERATIVA DO BRASIL**
**IRACEMA ANNA NERY**
Tradutora Pública Juramentada e Intérprete Comercial
Rua Aimberê, 1928/21 – São Paulo/SP – Brasil – CEP 01258-020
Telefone: 3865-2790 / Fax: 3868-4842 / e-mail: annanery@uol.com.br
**IDIOMA INGLÊS**
Matriculada na Junta Comercial do Estado de São Paulo sob nº 1033
RG nº 4.454.113-2 – CPF/MF nº 053.575.518-04 – CCM nº 2.341.023-0



| Translation No. 11314 | Book No. 161 | Page No. 242 |
|---|---|---|

---

1.1.15. "Business Day": means any day other than Saturday, Sunday or any other day when the banking institutions in the State of São Paulo are not open or authorized to not open for business.

1.1.16. "Restructured Debt": means the total debt of the Companies under Court-Supervised Reorganization, duly balanced after application of the conditions and payments established in this New Plan and subsequent court approval.

1.1.17. "End of the Court-Supervised Reorganization": means the date when the Court-Supervised Reorganization is definitively shelved, after final and non-appealable judgment of the Court-Supervised Reorganization, as provided for by article 63 of the LRF.

1.1.18. "Plan Approval": means the date of publication of the court decision rendered by the Reorganization Court approving this New Plan, as provided for by article 45 or 58, main provision and paragraph 15 of the LRF, as the case may be.

1.1.19. "Reorganization Court": means the 1st Lower Court of Bankruptcies and Court-Supervised Reorganizations of the Judicial District of São Paulo, State of São Paulo.

1.1.20. "List of Claim Holders": means the list disclosed by the Trustee in the record of the Court-Supervised Reorganization, after consolidation of all information and decisions on the corresponding objections and proofs of claims.

1.1.21. "LRF" means Law 11.101 of February 9, 2005, as amended.

1.1.22. "New Plan": means this Court-Supervised Reorganization Plan of the Itapemirim Group, submitted in response to the decision rendered by the Court with exclusive jurisdiction over these claims on September 18, 2018 on page 33703.

1.1.23. "Terms": All terms established in this New Plan shall be counted in calendar days, unless expressly established that they shall be counted in Business Days.

1.1.24. "Court-Supervised Reorganization": means court-supervised reorganization proceeding No. 0060326-87.2018.8.26.0100, pending before the Reorganization Court.

1.1.25. "Companies under Court-Supervised Reorganization": means the companies VIAÇÃO ITAPEMIRIM S.A.; TRANSPORTADORA ITAPEMIRIM S/A; ITA - ITAPEMIRIM TRANSPORTES S/A; IMOBILIÁRIA BIANCA LTDA.; COLA COMERCIAL E DISTRIBUIDORA LTDA.; FLECHA S/A - TURISMO COMÉRCIO E INDÚSTRIA; and VIAÇÃO CAIÇARA LTDA., all of them identified in the record of the Court-Supervised Reorganization.

1.1.26. "UPI": means the Isolated Production Unit, segregated specifically for Judicial Disposal, as provided for by article 60 of the LRF, including but not limited to: property, improvements, inputs, vehicles, machinery; concessions of lines and any asset used in the operating activities.

1.1.27. "UPI LINES": means the isolated production unit to be created especially for purposes of disposal, as provided for by article 60 of the LRF, composed of the assets owned by the Companies under Court-Supervised Reorganization, as listed in this plan. The UPI Lines shall be disposed of in such a manner that the buyer thereof shall not succeed the Companies under Court-Supervised Reorganization in any debts.

1.1.28. "UPI PROPERTIES": means the isolated production unit to be created especially for purposes of disposal, as provided for by article 60 of the LRF, composed of the assets owned by the Companies under Court-Supervised Reorganization, as listed in this plan, by means of one or more corporate transactions. The Remaining UPI shall be disposed of in such a

**REPÚBLICA FEDERATIVA DO BRASIL**
**IRACEMA ANNA NERY**
Tradutora Pública Juramentada e Intérprete Comercial
Rua Aimberé, 1928/21 – São Paulo/SP – Brasil – CEP 01258-020
Telefone: 3865-2790 / Fax: 3868-4842 / e-mail: annanery@uol.com.br
**IDIOMA INGLÊS**
Matriculada na Junta Comercial do Estado de São Paulo sob nº 1033
RG nº 4.454.113-2 – CPF/MF nº 053.575.518-04 – CCM nº 2.341.023-0



| Translation No. 11314 | Book No. 161 | Page No. 243 |
| --- | --- | --- |

manner that the buyer thereof shall not succeed the Companies under Court-Supervised Reorganization in any debts.

# CHAPTER II – PURPOSE OF THE PLAN

## 2.    PURPOSE OF THE PLAN

**2.1.    Purpose.** In view of the significant number of nuances involving this Court-Supervised Reorganization and the high level of difficulty involving the search for the Restructured Debt, this New Plan provides for the adoption of measures aiming at Restructuring of the Itapemirim Group, and for that reason it uses means of court-supervised reorganization provided for by law for paying Claim Holders, generating operating cash flow, working capital and funds required for the Companies under Court-Supervised Reorganization to continue their activities.

**2.2.    Reasons for the Court-Supervised Reorganization.** The crisis of the Companies under Court-Supervised Reorganization, in summary, results from the consequences of the serious economic-financial crisis that has affected Brazil in recent years, increasing operating costs, decreasing financings terms, increasing fees, etc. This is in addition to lack of definitions and bureaucratization of regulations by the Brazilian Road Transportation Agency (ANTT), both in relation to concessions, permits, authorization, de-regularization, and in relation to operating rules for Road Transport companies, and finally, the high cost of maintenance and replacement of the assets of the Itapemirim Group, affected daily by the deterioration of the highways used by their buses.

**2.3.    Economic Feasibility of the Plan.** In compliance with the provisions in item II of article 53 of the LRF, in response to the decision rendered by the Judge of the Court with exclusive jurisdiction over these claims for submission of a New Plan and based on the principle of objective good faith, the Companies under Court-Supervised Reorganization hereby submit an updated Business Plan ["Economic Feasibility Report"], which is an integral part of this New Plan.

**2.4.    Valuation of Assets of the Companies under Court-Supervised Reorganization.** In compliance with the provisions in item III of article 53 of the LRF, in response to the decision rendered by the Judge of the Court with exclusive jurisdiction over these claims for submission of a New Plan and based on the principle of objective good faith, the Companies under Court-Supervised Reorganization maintain the "Asset Valuation Report" contained in the record, which shall be made an integral part of this New Plan.

**2.5.**

# CHAPTER III – REORGANIZATION MEASURES

## 3.    REORGANIZATION MEASURES

**3.1**    As a more efficient solution for balancing and settlement of the liabilities of the Companies under Court-Supervised Reorganization, this PRJ provides for: (i) administrative reorganization of the Companies under Court-Supervised Reorganization with Professional Management and Structuring of the Board of Directors; (ii) restructuring of the liabilities of the Companies under Court-Supervised Reorganization; (iii) raising funds by means of structuring of UPIs of the Properties of the Companies under Court-Supervised Reorganization and/or their Operating Lines;

## 4.    RESTRUCTURING

**Corporate Restructuring Transactions.** To the extent that they do not result in the unfeasibility of this New Plan, and in compliance with the decision rendered on pages 33.703/33710, the Itapemirim Group may carry out, under the Brazilian law in effect at the time, with the support of the Trustee – while in Court-Supervised Reorganization and at any time – after the end of the Court-Supervised




**REPÚBLICA FEDERATIVA DO BRASIL**
**IRACEMA ANNA NERY**
Tradutora Pública Juramentada e Intérprete Comercial
Rua Aimberê, 1928/21 – São Paulo/SP – Brasil – CEP 01258-020
Telefone: 3865-2790 / Fax: 3868-4842 / e-mail: annanery@uol.com.br
**IDIOMA INGLÊS**
Matriculada na Junta Comercial do Estado de São Paulo sob nº 1033
RG nº 4.454.113-2 – CPF/MF nº 053.575.518-04 – CCM nº 2.341.023-0

| Translation No. 11314 | Book No. 161 | Page No. 244 |

Reorganization, any corporate restructuring transactions, such as: (i) spin-off, merger, consolidation and conversion (article 50, II of the LRF); (ii) organizing or joining a Special Purpose Entity; (iii) change of its business purpose or any other corporate change (article 50, III of the LRF, (iv) becoming associated with investors who may enable or increase its activities, by means of measures resulting in assignment for consideration, wholly or in part, of equity control (article 50, III of the LRF); (v) capital increase, including by exchanging obligations for equity, to the extent that this does not result in this New Plan becoming unfeasible;

**4.1.    Obtaining New Funds.** The Companies under Court-Supervised Reorganization may seek new funds by entering into financings, by means of funder claim holder agreement, during compliance with this New Plan, in such a manner as to better structure the established reorganization mechanisms.

**(i)**    "Lenders" means all Claim Holders who maintained and maintain the supply and purchase of products, materials and/or services on a continuous basis, new credit facilities and/or release of new funds, or that authorize the release of financial assets resulting from the sale of properties guaranteed by mortgage and fiduciary sale and/or any other modality, under the following single rule, applicable to all Claim Holders choosing to do so, limited to the operating needs of the company.

**RULE** – Claim Holders who have granted or may grant to Itapemirim Group in the minimum proportion equivalent to 30% of their claims subject to court-supervised reorganization, limited to ten million Reais (R$10,000,000.00) per claim holder, may negotiate with the Companies under Court-Supervised Reorganization, which shall receive their claims on a differentiated basis, provided that it shall not imply differentiated treatment between lenders who are claim holders.

The provision of priority payments is a prerogative granted to all claim holders for receipt of their claims in accordance with the rule above, and therefore it applies equally to all claim holders. It is justified because the execution of new agreements for the purchase of products and/or services, amended or modified, on the one part, as the case may be, the granting of new credit facilities, or the release of guarantee, on the other part, are measures required to protect the value of Itapemirim Group companies in order to maximize the amounts to be distributed among the other claim holders. These priority payments have grounds in article 67, sole paragraph of the LRF, to the extent that said claim holders are collaborative and will continue to supply products and/or services and/or grant new credit facilities and/or waive guarantees, which would ensure priority to them in the receipt of their Claims in the event of adjudication of bankruptcy.

**4.2.    Granting of payment terms.** The Companies under Court-Supervised Reorganization may obtain special payment terms and conditions of the matured or unmatured obligations, provided that they are first-priority, seeking the best conditions at all times for both the restructuring of the companies and the Claim Holders.

**5.    CONTINUANCE OF ACTIVITIES**

**5.1.    Continuance of Activities.** Subject to the limitations established by law, the Companies under Court-Supervised Reorganization reserve the right and the prerogative of carrying out their activities and performing all acts that consist of their business purpose, in the normal course of their business, including in relation to the renewal, payment or engagement of new business, provided this is under normal market commercial conditions, without the need for prior authorization from the AGC or the Reorganization Court.

**5.1.1.    Business opportunities intended for re-adaptation of their activities.** Considering its current structure, and present and future expectations, which may arise out of the economic and financial restructuring proposed by this PRJ, the Companies under Court-Supervised

**REPÚBLICA FEDERATIVA DO BRASIL**
**IRACEMA ANNA NERY**
Tradutora Pública Juramentada e Intérprete Comercial
Rua Aimberé, 1928/21 – São Paulo/SP – Brasil – CEP 01258-020
Telefone: 3865-2790 / Fax: 3868-4842 / e-mail: annanery@uol.com.br
**IDIOMA INGLÊS**
Matriculada na Junta Comercial do Estado de São Paulo sob nº 1033
RG nº 4.454.113-2 – CPF/MF nº 053.575.518-04 – CCM nº 2.341.023-0

**Translation No. 11314**          **Book No. 161**          **Page No. 245**

Reorganization may open or close branches, purchase and/or dispose of current and fixed assets, opening new credit facilities for their customers.

5.1.2.    **Business policies.** Itapemirim Group is improving its business practices, aligned with the works under development for its operational restructuring, for the purpose of re-adapting its business practices and policies, by outlining, but not limiting itself to, the following: (i) revaluation and restructuring of operations/transportations and agreements executed, aiming at balancing and consolidating existing business and future business, based on functional balance and good management practices.

5.1.3.    **Operational Restructuring.** The Itapemirim Group has insistently sought to improve its entire operating structure, by implementing systems, improving activity controls, reorganizing sectors and costs; Also following the court order on pages 33.703/33710, the Itapemirim Group shall also keep the market professional as "CEO – Chief Executive Officer" to hold the position of Chief Executive Officer (article 50, IV and V of the LRF), and for that purpose it shall amend the articles of association and incorporation to ensure the formalization of a strong Corporate Governance structure, which shall have rules and procedures implemented by a well-known firm with expertise in compliance, and which shall also contain specific duties and procedural and behavior rules which shall consist of contemporary mandatory measures intended to strength the company credibility, consolidate security of the operations and adapt to the requirements of integrity arising from Brazilian and foreign rules, which shall serve as a basis for the Board of Directors.

5.1.4.    The Itapemirim Group also undertakes to appoint three (03) independent audit firms which shall be included in the record, for consent by the claim holders, or otherwise, within ninety (90) days.

   **Board of Directors:** The Board of Directors shall be composed of the controlling shareholders, and up to two members may be admitted at the discretion of the Companies under Court-Supervised Reorganization, who shall be entitled to compensation in accordance with the market rate, for each member.

5.2.    **Disposal and/or Leasing of assets.** The Companies under Court-Supervised Reorganization may (i) Dispose of their assets previously listed in the Properties and Assets Valuation Report, as provided for by article 60 combined with article 142 of the LRF, which are not subject to secured claims, or which are the subject of secured claims, provided this is with the express consent of the claim holder, in compliance with the provisions of article 50, paragraph 1 of the LRF; and/or (ii) Lease or let their assets, to the extent that they are free and clear, and encumber assets, including by means of renewal of existing agreements, seeking at all times to adapt themselves to the business needs, the restructuring of the companies, and compliance with this PRJ; and/or (iii) If required for their economic-financial reorganization, assets or any of their Isolated Production Units (UPI's) which are not the subject of secured claims may be transferred to a Special Purpose Entity (SPE), or if they are the subject of secured claims, with the express consent of the respective claim holder, with due regard for the provisions in article 60 combined with article 142 of the LRF; and/or (iv) if there are justified reasons, substantiated requirement, and <u>court order of the Court with exclusive jurisdiction over these claims</u>, the Itapemirim Group may dispose, on an exceptional basis, by any other modality, in accordance with article 144 of the LRF, with due regard for the consent of the claim holders holding the assets subject-matter of secured claims, as provided for by paragraph 1 of article 50 of the LRF. For purposes of clarity of this section, the legal procedure of leasing or lease of lines shall not apply.

5.2.1    **Sale and Renewal.** Considering that the main activity of the Companies under Court-Supervised Reorganization is Intercity and Interstate Transport of Persons, the assets suffer

**REPÚBLICA FEDERATIVA DO BRASIL**
**IRACEMA ANNA NERY**
Tradutora Pública Juramentada e Intérprete Comercial
Rua Aimberê, 1928/21 – São Paulo/SP – Brasil – CEP 01258-020
Telefone: 3865-2790 / Fax: 3868-4842 / e-mail: annanery@uol.com.br
**IDIOMA INGLÊS**
Matriculada na Junta Comercial do Estado de São Paulo sob nº 1033
RG nº 4.454.113-2 – CPF/MF nº 053.575.518-04 – CCM nº 2.341.023-0



| Translation No. 11314 | Book No. 161 | Page No. 246 |
| --- | --- | --- |

natural wear and tear and, therefore, frequently need to be renovated and modernized. Therefore, the sale and renewal of the fleets of the Companies under Court-Supervised Reorganization, although they form part of the fixed assets of the Companies under Court-Supervised Reorganization, require prevention and agility, so as to avoid being deemed less competitive and obsolete in the market, thus further impairing the economic-financial restructuring of the company. Accordingly, the Companies under Court-Supervised Reorganization may, and will, make every effort to enable the sale and renewal of their obsolete assets, in accordance with accounting criterion, according to the rules described in Section 4.3., seeking at all times to maximize their profits, attract new agreements, and consequently discharge all their obligations established in this PRJ and/or purchase new fixed assets or production inputs.

5.2.2.   **Organization of the UPIs.** The Companies under Court-Supervised Reorganization shall organize the creation of the UPI's, and may organize one or more special purpose entities ("SPE"), in compliance with the applicable regulatory requirements, organized as joint-stock companies or limited-liability companies, specifically to be individually or jointly disposed of, at the discretion of the Companies under Court-Supervised Reorganization, in which case the buyer thereof shall not succeed the Companies under Court-Supervised Reorganization in any debts, contingencies and obligations, as provided for by articles 60 and 142 of the LRF. Accordingly, the assets listed below shall be transferred to the UPIs:

A.   **UPI Lines:** May be composed of the lines described below, and by the corresponding ticket desks, points of sales, and VIP lounges, the buses running on said lines, and everything included in the maintaining an operating mechanical workshop, such as screwdrivers, painting booths, etc.:

Brasília x Belo Horizonte / Brasília x Porto Alegre / Campinas x Porto Alegre / Juiz de Fora x Florianópolis / Jundiaí x Curitiba / Rio de Janeiro x Anápolis / Rio de Janeiro x Brasília / Rio de Janeiro x Curitiba / Rio de Janeiro x Florianópolis / Rio de Janeiro x Porto Alegre / São Paulo x Curitiba / São Paulo x Porto Alegre / São Paulo x Rio de Janeiro / Volta Redonda x Curitiba / Aracaju x Belém / Arcoverde x São Paulo / Belo Horizonte x Natal / Campina Grande x Rio de Janeiro / Campina Grande x São Paulo / Caruaru x Brasília / Feira de Santana x Recife / Fortaleza x Belém / Fortaleza x Salvador / Fortaleza x São Paulo / Guarabira x Rio de Janeiro / Guarabira x São Paulo / Juazeiro do Norte x São Paulo / Patos x Rio de Janeiro / Recife x Curitiba / Recife x Goiânia / Rio de Janeiro x Alagoa Grande / Rio de Janeiro x Aracaju / Rio de Janeiro x Belém / Rio de Janeiro x Fortaleza / Rio de Janeiro x IPU / Rio de Janeiro x IPU II / Rio de Janeiro x Parnaíba / Rio de Janeiro x Salvador / Rio de Janeiro x São Luís / Salvador x Belém / Salvador x Recife / São Paulo x Belém / São Paulo x Canindé / São Paulo x Floriano / São Paulo x Parnaíba / São Paulo x Pesqueira / São Paulo x Picos / São Paulo x São Luís / São Paulo x Teresina / São Paulo x Timbaúba / Serra Talhada x São Paulo / Santos x Ipatinga / São José dos Campos x Itaobim / São José dos Campos x Teófilo Otoni / São Paulo x Caratinga / São Paulo x Cataguases / São Paulo x Governador Valadares / São Paulo x Ipatinga / São Paulo x Mantena / São Paulo x Muriaé / São Paulo x Nanuque / São Paulo x Teófilo Otoni / Campinas x Campos / Campos x Belo Horizonte / São João da Barra x Belo Horizonte / São Paulo x Campos / Timbaúba x Rio de Janeiro.

An example of other combinations that may be used, without prejudice to the creation of other combinations:

**UPI Lines I:** May be composed of the lines described below, and the corresponding ticket desks, points of sales and VIP lounges, and the buses that run on said lines:

**REPÚBLICA FEDERATIVA DO BRASIL**
**IRACEMA ANNA NERY**
Tradutora Pública Juramentada e Intérprete Comercial
Rua Aimberé, 1928/21 – São Paulo/SP – Brasil – CEP 01258-020
Telefone: 3865-2790 / Fax: 3868-4842 / e-mail: annanery@uol.com.br
**IDIOMA INGLÊS**
Matriculada na Junta Comercial do Estado de São Paulo sob nº 1033
RG nº 4.454.113-2 – CPF/MF nº 053.575.518-04 – CCM nº 2.341.023-0

**Translation No. 11314**          **Book No. 161**          **Page No. 247**

Jundiaí x Curitiba/ Rio de Janeiro x Curitiba / Rio de Janeiro x Florianópolis / Rio de Janeiro x Porto Alegre / São Paulo x Curitiba / São Paulo x Porto Alegre / São Paulo x Rio de Janeiro / Volta Redonda x Curitiba/ São Paulo x Cataguases / São Paulo x Governador Valadares / São Paulo x Ipatinga / São Paulo x Mantena /São Paulo x Muriaé/São Paulo x Nanuque/São Paulo x Teófilo Otoni/ Campinas x Campos/ Campinas x Porto Alegre /Juiz de Fora x Florianópolis / Santos x Ipatinga /São José dos Campos x Teófilo Otoni / São Paulo x Caratinga /São Paulo x Campos

**UPI Lines II: May** be composed of the lines described below, and the corresponding ticket desks, points of sales and VIP lounges, and the buses that run on said lines:

Brasília x Belo Horizonte / Brasília x Porto Alegre / Rio de Janeiro x Anápolis / Rio de Janeiro x Brasília / Patos x Rio de Janeiro / Campos x Belo Horizonte / São João da Barra x Belo Horizonte Timbaúba x Rio de Janeiro.

**UPI Lines III: May** be composed of the lines described below, and the corresponding ticket desks, points of sales and VIP lounges, and the buses that run on said lines:

Aracaju x Belém/ Arcoverde x São Paulo / Belo Horizonte x Natal / Campina Grande x Rio de Janeiro / Campina Grande x São Paulo/ Caruaru x Brasília / Feira de Santana x Recife / Fortaleza x Belém / Fortaleza x Salvador / Fortaleza x São Paulo / Guarabira x Rio de Janeiro / Guarabira x São Paulo / Juazeiro do Norte x São Paulo/ Recife x Curitiba / Recife x Goiânia / Rio de Janeiro x Alagoa Grande / Rio de Janeiro x Aracaju / Rio de Janeiro x Belém / Rio de Janeiro x Fortaleza / Rio de Janeiro x IPU / Rio de Janeiro x IPU II / Rio de Janeiro x Parnaíba / Rio de Janeiro x Salvador / Rio de Janeiro x São Luís / Salvador x Belém / Salvador x Recife / São Paulo x Belém / São Paulo x Canindé / São Paulo x Floriano / São Paulo x Parnaíba / São Paulo x Pesqueira / São Paulo x Picos / São Paulo x São Luís / São Paulo x Teresina / São Paulo x Timbaúba / Serra Talhada x São Paulo/ São José dos Campos x Itaobim /

B.   **Remaining UPI lines:** May be composed of the lines described below, and the corresponding ticket desks, points of sales and VIP lounges, and the buses that run on said lines:

Afonso Cláudio x Rio de Janeiro / Afonso Cláudio x São Paulo / Alegre x Rio de Janeiro / Cachoeiro do Itapemirim x Campos / Cachoeiro do Itapemirim x Campos (visa) / Cachoeiro do Itapemirim x Niterói / Cachoeiro do Itapemirim x Rio de Janeiro / Cachoeiro do Itapemirim x São Paulo / Castelo x Rio de Janeiro / Guarapari x Belo Horizonte / Guarapari x Ouro Preto / Guarapari x Rio de Janeiro / Iúna x Rio de Janeiro / Iúna x São Paulo / Marataízes x Rio de Janeiro / Muqui x Campos / Serra - Nova Almeida x Belo Horizonte / Vitória x Niterói / Vitória x Rio de Janeiro / Vitória x São José dos Campos / Vitória x São Paulo.

C.   **UPI properties:** All properties of the Companies under Court-Supervised Reorganization described in the valuation report on pages 42459/42723 must be disposed of individually, at the discretion of the Companies under Court-Supervised Reorganization.

**5.3.**   **Bidding.** The bidding for disposal of the UPIs shall be conducted individually or jointly, through bidding processes, at the discretion of the Companies under Court-Supervised Reorganization, by means of auction or public sale, the terms and conditions of which shall be stated in the corresponding invitations to bid, as provided for by articles 141 and 142 of the LRF, to be held within one (1) year as from Approval of the Plan, including the time required to carry out any audit at the discretion of the interested parties ("Bidding Processes").

**REPÚBLICA FEDERATIVA DO BRASIL**
**IRACEMA ANNA NERY**
Tradutora Pública Juramentada e Intérprete Comercial
Rua Aimberé, 1928/21 – São Paulo/SP – Brasil – CEP 01258-020
Telefone: 3865-2790 / Fax: 3868-4842 / e-mail: annanery@uol.com.br
**IDIOMA INGLÊS**
Matriculada na Junta Comercial do Estado de São Paulo sob nº 1033
RG nº 4.454.113-2 – CPF/MF nº 053.575.518-04 – CCM nº 2.341.023-0



| **Translation No. 11314** | **Book No. 161** | **Page No. 248** |

**5.4.** **Proposals for purchase of the UPIs.** The proposals for purchase of the UPIs *(i)* must establish payment in Brazilian currency, except for the use of credits in accordance with section 5.5.(ii); *(ii)* shall depend on approvals from the applicable regulatory bodies, especially the ANTT and the Administrative Council for Economic Defense (CADE); *(iii)* shall be conditional, for validity, on analysis and acceptance by the court, the Companies under Court-Supervised Reorganization and the Claim Holders, the release or replacement of personal, property, fiduciary and any other guarantees provided by the Itapemirim Group or by any members, shareholders, officers or managers of the companies that comprise Itapemirim Group; *(iv)* shall observe the minimum amount for each UPI, to be indicated in the respective invitations to bid and defined based on a valuation report prepared and included in the record on pages 42459/42723 ("Minimum Amount").

**5.5.** **Procedures of the Bidding Processes for the UPI LINES.** The criterion for the order of disposal of the UPI LINES shall be defined by the Companies under Court-Supervised Reorganization and, for that purpose, shall consider the following procedures for holding the Bidding Processes:

    **(i)**    Only Claim Holders or interested third parties, legal entities with proven financial ability to make the purchase and business trustworthiness may take part in the Bidding Processes, upon deposit of a security in the amount of one million, five hundred thousand Reais (R$1,500,000.00), required for credit evaluation in compliance with the applicable regulatory rules;

    **(ii)**    Claim Holders interested in taking part in the Bidding Process may use their claim (pre-bankruptcy or first-priority) as currency for payment of the price, provided this is limited to fifteen (15%) percent of the amount corresponding to the valuation of the corresponding UPI indicated in item 5.2.2.

    **(iii)**    The interested parties shall be qualified by means of a petition filed in the record of the Court-Supervised Reorganization, informing their interest in submitting a closed proposal for purchase, within thirty (30) days as from publication of the invitation to bid of each Judicial Bidding Process, expressly acknowledging that they shall be subject to fine and indemnity in the event of default on their obligations in relation to the proposal submitted;

    **(iv)**    On the days, times and places previously set by the Trustee and ratified by the Reorganization Court, and after broad disclosure, in announcements and newspaper of large distribution, of the invitations to bid in the bidding processes at least thirty (30) days in advance, as provided for by paragraph 1 of article 142 of the LRF, the Bidding Processes shall be held, which may be attended by parties interested in submitting closed proposals and third parties, which may rectify their proposal by increasing it upon opening thereof;

    **(v)**    After delivery of the proposals, on dates to be defined in the invitations to bid, the Trustee shall open all proposals received, and file them in the record of the Court-Supervised Reorganization within twenty-four (24) hours from the respective delivery dates.

**5.6.** **Bidding Process Procedures for the UPIs PROPERTIES.** The rule for disposal of the PROPERTIES shall comply with the provisions of article 142, III of the LRF, i.e., the disposal shall be made by means of AUCTION, THROUGH ORAL BIDS, and may be carried out in fractions, considering the best method of acceptance in the market:

    **(i)**    The first public sale of UPI PROPERTIES shall take place within thirty (30) days as from publication of the decision ratifying the approval of this PRJ.

**REPÚBLICA FEDERATIVA DO BRASIL**
**IRACEMA ANNA NERY**
Tradutora Pública Juramentada e Intérprete Comercial
Rua Aimberé, 1928/21 – São Paulo/SP – Brasil – CEP 01258-020
Telefone: 3865-2790 / Fax: 3868-4842 / e-mail: annanery@uol.com.br
**IDIOMA INGLÊS**
Matriculada na Junta Comercial do Estado de São Paulo sob nº 1033
RG nº 4.454.113-2 – CPF/MF nº 053.575.518-04 – CCM nº 2.341.023-0



Translation No. 11314          Book No. 161          Page No. 249

**(ii)**     Claim Holders interested in taking part in the Bidding Process may use their claim, provided this is limited to ten percent (10%) of the amount corresponding to the valuation of the UPIs indicated in the main provision hereof.

**5.7.**     **Winning Bid.** The winning bid in each Bidding Process will be that which corresponds to the highest total price proposed, with due regard for the conditions established in the sections above and provided that the amount is not insignificant.

**5.7.1.**     The proposal declared the winning bid at each Bidding Process shall be approved by the Reorganization Court, which shall declare the winner free of any liens, contingencies and/or succession of any obligations of Itapemirim Group, including but not limited to those of a tax, social security, environmental and labor nature, as provided for by articles 60 and 142 of the LRF.

**5.7.2.**     The Itapemirim Group, as from approval of the results of the Bidding Processes and until actual transfer of the assets and rights to the respective winners:

**(i)**     Shall have full liability for the possession and safeguard of the assets to be transferred to the UPIs, as the case may be; and

**(ii)**     Shall enable the winners of the Bidding Processes to inspect the activities, assets and rights of the UPIs, as the case may be.

**5.8.**     **Funds obtained from the disposal of the UPI property and/or line:**

**5.8.1**     All the funds obtained from the disposal of the UPIs will be placed in an escrow account, which will be opened and used for settling debts with claim holders and the statement from which, containing all transactions, must be submitted to the Court-Supervised Reorganization record every fifteen (15) days until Completion of the Reorganization; and, following Completion of the Reorganization, it must be published on the website of the Companies under Court-Supervised Reorganization by the fifteenth (15) of each month, until all UPIs have been disposed of and there are no amounts left in the escrow account or amounts to be deposited in it.

**5.8.1.1 For the purposes of the provision above, funds obtained from the disposal of the UPI Lines deposited in the escrow account will only be made available for use by the Companies under Court-Supervised Reorganization and/or direct payment to claim holders once the due approvals by the regulatory agencies (ANTT and CAPE) regarding the market transfer to the acquirers bidding for such UPIs have been given. In the event the aforementioned regulatory agencies do not grant their approval, the disposal will not take place, and the corresponding funds will be promptly returned to the bidder.**

**5.8.2**     Any funds obtained from the disposal of the UPIs, observing the provisions in Sections 5.10 and 5.11 below, no matter the order in which they are individually or jointly sold, will be used by Itapemirim Group as follows:

**(i)**     Eighty percent (80%) of the amount of the disposal of each UPI will be used with priority for payment of any terminations of employment agreements from the lines forming each UPI and, once the aforementioned amounts are settled, the remaining balance will be used for proportional payment to the remaining Claim Holders, who will received their claims pursuant to the Law (in up to 12 months); and

**(ii)**     Twenty percent (20%) of the amount of the disposal of each UPI will be allocated to settling expenses from the corresponding auctions, and the remaining balance, if any, will be allocated to the company for the recovery of its Working Capital.

**REPÚBLICA FEDERATIVA DO BRASIL**
**IRACEMA ANNA NERY**
Tradutora Pública Juramentada e Intérprete Comercial
Rua Aimberê, 1928/21 – São Paulo/SP – Brasil – CEP 01258-020
Telefone: 3865-2790 / Fax: 3868-4842 / e-mail: annanery@uol.com.br
**IDIOMA INGLÊS**
Matriculada na Junta Comercial do Estado de São Paulo sob nº 1033
RG nº 4.454.113-2 – CPF/MF nº 053.575.518-04 – CCM nº 2.341.023-0

| Translation No. 11314 | Book No. 161 | Page No. 250 |
|---|---|---|

5.8.3    The release of any security interest and/or fiduciary guarantee on the assets that form the UPI Property (if any), by means of express written agreement by the Claim Holder holding the corresponding guarantee in a separate instrument, to be signed at the moment of the actual sale of the asset that is the subject matter of the guarantee, and Claim Holder must sign such term, as long as it complies strictly with the provisions of this Plan.

**5.9**    **Use of Assets.** Itapemirim Group may operate all the properties and assets that will be converted into the UPIs up until their effective disposal pursuant to the provisions of the New Plan, including, but not limited to, by executing leases, so as to increase cash flow generation.

**5.10**    **Bids in Progress:** The Companies under Court-Supervised Reorganization have already received bids for properties, as notified during the Court-Supervised Reorganization proceeding. Therefore, in order to expedite the obtainment of funds to pay claim holders, the first UPI PROPERTY that will be in usable within thirty (30) days will be the following:

(i)    **UPI PROPERTY ATUBA CURITIBA-PR**, COMPRISING REGISTRATIONS No. 52,024 AND 54,282 AT THE REAL ESTATE REGISTRY OFFICE OF CURITIBA, PARANÁ;

(ii)    **UPI PROPERTY FLECHA VIANA, ESPÍRITO SANTO STATION**, COMPRISING REGISTRATIONS No. 45,854, 45,878 AND 45,879 AT THE REAL ESTATE REGISTRY OFFICE OF VIANA, ESPÍRITO SANTO.

**5.11**    Considering that one of the ways to raise funds to pay claim holders is through the disposal of properties and, in view of the existence of Claim Holders with Secured Claims, the amounts obtained from the disposal of the first UPIs mentioned in item 5.10 above will be allocated as follows:

(i)    Eighty percent (80%) of the amount from the disposal of each UPI will be used with priority for the payment of any claim holders belonging to Class II (Claim Holders with Secured Claims), and

(ii)    Twenty percent (20%) of the amount from the disposal of each UPI will be allocated to settling expenses from the corresponding bidding processes, and the remaining balance, if any, will be allocated to the Companies under Court-Supervised Reorganization for the recovery of their Working Capital.

5.11.1.    The provision in section 5.10 will only apply to any claim holders holding notes who (a) have individualized their claims before the Trustee, according to the procedure established by the Trustee; and (b) have also complied with Section 12.1 below.

**5.12**    Any amounts obtained from the sale of the other UPIs will be apportioned among the CLAIM HOLDERS, as indicated in the Sections below, and it is expressly determined that only amounts obtained from the sale of the properties mentioned in Section 5.11 above will be allocated to the exclusive payment of claim holders with secured claims.

## CHAPTER IV - PAYMENT TO CLAIM HOLDERS

## 6    NOVATION

**6.9**    **Novation.** Pursuant to Article 59 of the LRF, all Claims of Claim Holders will be novated in accordance with this New Plan.

## 7    PAYMENT TO LABOR CLAIM HOLDERS

**7.1**    Claim Holders will receive payment for their Labor Claims within twelve (12) months of Approval of the New Plan or the definitive proof of the respective claim, should this occur after

**REPÚBLICA FEDERATIVA DO BRASIL**
**IRACEMA ANNA NERY**
Tradutora Pública Juramentada e Intérprete Comercial
Rua Aimberé, 1928/21 – São Paulo/SP – Brasil – CEP 01258-020
Telefone: 3865-2790 / Fax: 3868-4842 / e-mail: annanery@uol.com.br
**IDIOMA INGLÊS**
Matriculada na Junta Comercial do Estado de São Paulo sob nº 1033
RG nº 4.454.113-2 – CPF/MF nº 053.575.518-04 – CCM nº 2.341.023-0

**Translation No. 11314**          **Book No. 161**          **Page No. 251**

Approval of the New Plan, plus the monthly adjustment calculated using the Reference Rate – TR (published by the Brazilian Central Bank – BACEN) plus three percent (3%) annual interest.

**7.2**      Any claims resulting strictly from salaries which become due in the 3 months prior to the court-supervised reorganization request will be paid within thirty (30) days up to the limit of five (5) times the minimum wage per worker.

**7.3**      Any payments made pursuant to the provisions in this Section will result in the full, irrevocable and inalienable release of the Labor Claims.

## 8      PAYMENT TO CLAIM HOLDERS WITH SECURED CLAIMS

**8.1.**      **Payment to Claim Holders with Secured Claims.** Claim Holders with Secured Claims will be entitled to receive the amount indicated in the List of Claim Holders in effect at the time of the payment, **in other words, without applying any discount**, in accordance with this New Plan, plus the monthly adjustment calculated using the Reference Rate – TR (published by the Brazilian Central Bank – BACEN) plus three percent (3%) annual interest.

**8.2.**      Any Secured Claims, minus any amounts that may have been paid as Secured Complementary Payment, will be paid in full with funds from the disposal of the UPIs.

**8.3.**      As indicated in Section 5.11 above, part of the Secured Claims will be paid using amounts obtained from the sale of the ATUBA and VIANA REAL UPI PROPERTY. If the funds raised during the 12-month period proposed in this Court-Supervised Reorganization Plan with the operation of the UPIs are not enough to settle the debts to claim holders in full, starting in the 13th month the remaining balance will be paid by the company in 80 equal monthly installments, adjusted monthly using the Reference Rate – TR (published by the Brazilian Central Bank – BACEN) plus three percent (3%) annual interest.

**8.3.1.**      Even after the first twelve (12) months following the approval of the Court-Supervised Reorganization Plan, the Companies under Court-Supervised Reorganization will continue raising funds by disposing of the UPI LINES and PROPERTIES to enable payment to their claim holders.

**8.4.**      Any payments made pursuant to the provisions in this Section will result in the full, irrevocable and inalienable release of the Secured Claims.

## 9.      PAYMENT TO UNSECURED CLAIM HOLDERS

**9.1.**      **Payment to Unsecured Claim Holders:** Unsecured Claim Holders will be entitled to receive the amount indicated in the List of Claim Holders  in effect at the time of the payment, **in other words, without applying any discounts**, in accordance with this New Plan, plus the monthly adjustment calculated using the Reference Rate – TR (published by the Brazilian Central Bank – BACEN) plus three percent (3%) annual interest.

**9.2.**      The amount corresponding to one hundred percent (100%) of the unsecured claims will be amortized using funds resulting from the sale of the UPIs, pursuant to the provisions in the section above, until they are fully settled.

**9.3.**      If the funds raised during the 12-month period proposed in this Court-Supervised Reorganization Plan with the operation of the UPIs are not enough to settle the debts to claim holders in full, starting from the 13th month the remaining balance will be paid by the company in 80 equal monthly installments, adjusted monthly using the Reference Rate – TR (published by the Brazilian Central Bank – BACEN) plus three percent (3%) annual interest.

**REPÚBLICA FEDERATIVA DO BRASIL**
**IRACEMA ANNA NERY**
Tradutora Pública Juramentada e Intérprete Comercial
Rua Aimberê, 1928/21 – São Paulo/SP – Brasil – CEP 01258-020
Telefone: 3865-2790 / Fax: 3868-4842 / e-mail: annanery@uol.com.br
**IDIOMA INGLÊS**
Matriculada na Junta Comercial do Estado de São Paulo sob nº 1033
RG nº 4.454.113-2 – CPF/MF nº 053.575.518-04 – CCM nº 2.341.023-0



**Translation No. 11314**          **Book No. 161**          **Page No. 252**

9.3.1.  The sale of the UPIs will continue, and even after the first twelve (12) months following approval of the Court-Supervised Reorganization Plan, the Companies under Court-Supervised Reorganization will continue raising funds by disposing of the UPI LINE and PROPERTY to enable payments to their claim holders.

9.4.  Any payments made pursuant to the provisions in this Section will result in the full, irrevocable and inalienable release of the Unsecured Claims.

## 10.  PAYMENT TO ME and EPP (MICRO AND SMALL BUSINESS) CLAIM HOLDERS

10.1.  <u>**Payment of Micro and Small Business Claims:**</u> Micro and Small Business Claim Holders will be entitled to receive the nominal amount of novated claims, **in other words, without applying any discounts**, in accordance with this New Plan, plus the monthly adjustment calculated using the Reference Rate – TR (published by the Brazilian Central Bank – BACEN) plus three percent (3%) annual interest.

10.2.  The amount corresponding to one hundred percent (100%) of the face value of each Micro and Small Business Claim will be amortized using funds resulting from the operation of the UPIs, pursuant to the provisions in the sections above.

10.3.  If the funds raised during the 12-month period proposed in this Court-Supervised Reorganization Plan with the operation of the UPIs are not enough to settle the debts to claim holders in full, starting from the 13th month the remaining balance will be paid by the company in 80 equal monthly installments, adjusted monthly using the Reference Rate – TR (published by the Brazilian Central Bank – BACEN) plus three percent (3%) annual interest.

10.3.1.  Even after the first twelve (12) months following the approval of the Court-Supervised Reorganization Plan, the Companies under Court-Supervised Reorganization will continue raising funds by disposing of the UPI LINES and PROPERTIES to enable payment to their claim holders.

10.4.  Any payments made pursuant to the provisions in this Section will result in the full, irrevocable and inalienable release of the Micro and Small Business Claims.

10.5.  All payments made as advances must be deducted from the amounts to be actually paid to the claim holders.

## 11.  PARTNER CLAIM HOLDERS

11.1  Partner Claim Holders are any Claim Holders who collaborate with the Itapemirim Group Court-Supervised Reorganization by: *(i)* granting financing, providing new credit operations and/or opening credit facilities during the court-supervised reorganization proceeding for the minimum share of 30% of the value of the claim listed in the general table of claim holders, in other words, to be included in this condition, each partner claim holder must provide an amount corresponding to at least 30% of the value of its claim subject to the effects of the court-supervised reorganization and limited to ten million reais (R$ 10,000,000.00) per claim holder; *(ii)* maintaining and/or renewing agreements signed with the Companies under Court-Supervised Reorganization under the same conditions as those currently in effect or conditions that are more advantageous to the Companies under Court-Supervised Reorganization, for the minimum period of five (5) years; or *(iii)* releasing security interest or personal guarantees on personal and real estate properties belonging to Itapemirim Group.

11.2  Any Partner Claim Holders who encourage the business activities of Itapemirim Group, pursuant to the section above, may have negotiations with the Companies under Court-Supervised

**REPÚBLICA FEDERATIVA DO BRASIL**
**IRACEMA ANNA NERY**
Tradutora Pública Juramentada e Intérprete Comercial
Rua Aimberé, 1928/21 – São Paulo/SP – Brasil – CEP 01258-020
Telefone: 3865-2790 / Fax: 3868-4842 / e-mail: annanery@uol.com.br
**IDIOMA INGLÊS**
Matriculada na Junta Comercial do Estado de São Paulo sob nº 1033
RG nº 4.454.113-2 – CPF/MF nº 053.575.518-04 – CCM nº 2.341.023-0



**Translation No. 11314**          **Book No. 161**          **Page No. 253**

Reorganization, which must observe the limitations below for purposes of payment of their Claims subject to the court-supervised reorganization:

(i)  <u>Discount</u>: Partial or full payment of the Partner Claim, as agreed upon with each Partner Claim Holder, to be signed in a specific instrument;

(i)  <u>Grace Period</u>: Up to twenty-four (24) months, from the date of Approval of the New Plan or the release of the funds as collaborating claim holder, in terms to be agreed upon by and between the parties in a specific instrument.

(ii)  <u>Payment</u>: Payment within fifteen (15) years following the grace period.

11.2.1  Any payments for operations subject to the court-supervised reorganization made pursuant to the provisions in this Section will result in the full, irrevocable and inalienable release of the Partner Claims.

11.2.2  Any claim holders who, after filing of the court-supervised reorganization request, which occurred on March 07, 2016, provided new funds to the Companies under Court-Supervised Reorganization, or maintained the supply of services and agreements, or else provided guarantees on behalf of the companies and observed the provisions in item 11.1 of this plan, keep their conditions unchanged and are ratified as partner claim holders in the court-supervised reorganization, including maintaining the payment terms of their claims subject to the court-supervised reorganization.

11.2.3  In order to be considered partner claim holder, any interested claim holders must meet at least one of the provisions in items (i), (ii) and (iii) in section 11.1 above of this plan, which are not cumulative.

**11.2.4**  In the event of sale of assets by the companies, the partner claim holders will maintain the payment methods indicated in Section 11.2 above and as a complement will be entitled to their equivalent percentage on the division of funds obtained from the disposal of any and all assets for each class of claim holders, including UPIs.

## 12    COMMON PROVISIONS FOR PAYMENT TO CLAIM HOLDERS

**12.1**    **Payment Method.** Any amounts payable to Claim Holders, pursuant to this New Plan, will be paid by means of a direct transfer of funds using a credit order document (DOC) or an electronic transfer (TED) to the account of each claim holder, notified individually by claim holders via e-mail to pagamentosri@itapemirimcorp.com.br, indicating the name of the individual or legal entity and the corresponding bank account. Such e-mail may be sent by the lawyer indicated in the Court-Supervised Reorganization record.

**12.1.1**  If a Claim Holder does not send the e-mail described in Section 12.1 within fifteen (15) calendar days from the Court Approval, such claim holder will not be considered in the apportioning of the results of the disposals of UPIs described in sections 5.10 and 5.11 above.

**12.2**    The documents of the actual transfer of funds will serve as proof of settlement of the corresponding amounts effectively paid by the Companies under Court-Supervised Reorganization, and Claim Holders thus grant unrestricted, full and irrevocable release with regard to the amounts so paid.

**12.3**    Any payments that are not made because Claim Holders have not given their bank account details will not be deemed failure to comply with the New Plan. There will be no application of interest or late payment charges if payments are not made because Claim Holders have not given their bank account details.

**REPÚBLICA FEDERATIVA DO BRASIL**
**IRACEMA ANNA NERY**
Tradutora Pública Juramentada e Intérprete Comercial
Rua Aimberé, 1928/21 – São Paulo/SP – Brasil – CEP 01258-020
Telefone: 3865-2790 / Fax: 3868-4842 / e-mail: annanery@uol.com.br
**IDIOMA INGLÊS**
Matriculada na Junta Comercial do Estado de São Paulo sob nº 1033
RG nº 4.454.113-2 – CPF/MF nº 053.575.518-04 – CCM nº 2.341.023-0

Translation No. 11314          Book No. 161          Page No. 254

**12.4     Payment Flow Percentages.** In case of conflict or challenge by a Claim Holder whose judgment occurs after Approval of the New Plan and which may change the percentage payable to a specific Claim Holder, such conflict or challenge will only have effect for the purposes of this New Plan as of the date such decision becomes final and unappealable, and any payments made previously based on the old percentages will remain preserved and intact.

**12.5     Amounts.** The amounts considered for the payment of the claims, calculations of deductions and other novation rules are those indicated in the List of Claim Holders. Such amounts will not be subject to interest, adjustment for inflation, fines and contract penalties, other than the charges indicated in this New Plan.

**12.6     Allocation of Amounts.** The payment forecasts included herein were based on the Claims indicated in the List of Claim Holders included in this Court-Supervised Reorganization record by the Companies under Court-Supervised Reorganization. Any difference between the List of Claim Holders and the final general table of claim holders pursuant to Article 18 of the LRF will result in a change of the payment percentages of the full amount to be allocated among the Claim Holders of each class. In case of conflict or challenge by a Claim Holder whose judgment occurs after the Approval of the New Plan and which changes the percentage payable to a specific Claim Holder, such new percentage will only have effect for the purposes of this New Plan as of the date such decision becomes final and unappealable, and any payments made previously based on the old percentages will remain preserved and intact. Under no circumstances will there be an increase *(i)* of the flow of payments, or *(ii)* of the full amount to be allocated among Claim Holders.

**12.7     Offsetting.** The Companies under Court-Supervised Reorganization may pay any Claims or Claim Holders, as applicable, and at their own discretion, by means of offsetting (i) claims of any nature that it has against the Claim Holders, and (ii) claims payable by the Claim Holders, as applicable, as modified by this New Plan. In this case, the offset will extinguish both obligations up to the limit of the amount effectively offset. If the Companies under Court-Supervised Reorganization do not perform the offset indicated herein, this will not result in a waiver or release of any claims that the Companies under Court-Supervised Reorganization may have against such Claim Holders.

**12.8     Release.** The payments and allocations made pursuant to the provisions in this New Plan will result in the full, irrevocable and inalienable release of all Claims novated in accordance with the New Plan of any kind or nature against the Companies under Court-Supervised Reorganization, including interest, adjustment for inflation, penalties, fines and offsets, as applicable. When the release occurs, the Claim Holders will be considered as having released, freed and/or waived any and all Claims, and they will have no further claims on the Companies under Court-Supervised Reorganization.

**12.9     Up-Front Payment.** The Companies under Court-Supervised Reorganization will make an advance payment to all Claim Holders in an amount of up to one thousand and five hundred reais (R$1,500.00) per Claim Holder, respecting the balance of each Claim Holder. For such, the claim holders shall (sic) the terms of section 13.1, giving the bank account details.

**12.10     Payment of Tax Liabilities in Installments.** Following Approval of the New Plan, the Companies under Court-Supervised Reorganization may seek to obtain permission, either judicially or administratively means, to pay its tax liabilities in installments. In the event it is not possible for the Companies under Court-Supervised Reorganization to join programs for payment in installments available administratively, they may resort to judicial measures to obtain a better installment plan due to the court-supervised reorganization regime to which they are subject.

## CHAPTER V – POST-APPROVAL

## 13     EFFECTS OF THE NEW PLAN

**REPÚBLICA FEDERATIVA DO BRASIL**
**IRACEMA ANNA NERY**
Tradutora Pública Juramentada e Intérprete Comercial
Rua Aimberê, 1928/21 – São Paulo/SP – Brasil – CEP 01258-020
Telefone: 3865-2790 / Fax: 3868-4842 / e-mail: annanery@uol.com.br
**IDIOMA INGLÊS**
Matriculada na Junta Comercial do Estado de São Paulo sob nº 1033
RG nº 4.454.113-2 – CPF/MF nº 053.575.518-04 – CCM nº 2.341.023-0



**Translation No. 11314**          **Book No. 161**          **Page No. 255**

**13.1    Binding Effect of the New Plan.** Upon Approval of the New Plan, its provisions are binding on the Companies under Court-Supervised Reorganization and the Claim Holders, as well as on their respective assignees and successors.

**13.2    Conflict with Contractual Provisions.** In the event of any conflict between the provisions of this New Plan and those set forth in the agreements entered into with any Claim Holders, regarding any obligations of the Companies under Court-Supervised Reorganization, whether to give, to do, or to refrain from doing, the provisions contained in this New Plan shall prevail.

**13.3    Prevalence of the Provisions of the Plan.** In the event any term or provision of the Plan is considered totally or partially invalid, void or ineffective by the Reorganization Court, the validity and effectiveness of the other provisions shall not be affected, nor shall that of any payment made based on the term or provision that may be considered wholly or partially invalid, void or ineffective by the Reorganization Court, as well as any perfect and finished legal business performed in compliance with the PRJ, such as the sale of UPI lines and real estate properties.

**14       AMENDMENT TO THE NEW PLAN**

**14.1    Amendment to the New Plan at the AGC.** Amendments, modifications, changes or alterations to the New Plan may be proposed by the Companies under Court-Supervised Reorganization at any time after its Approval, provided that *(i)* such amendments, modifications, changes or alterations are submitted to the vote of the AGC convened for such purpose, and *(ii)* they are approved by the Companies under Court-Supervised Reorganization and approved by the minimum quorum of the LRF.

**CHAPTER VI - MISCELLANEOUS PROVISIONS**

**15       GENERAL PROVISIONS**

**15.1    Exhibits.** All exhibits to this New Plan are incorporated into and form an integral part of it. In the event of any inconsistency between this New Plan and any exhibit, the New Plan shall prevail.

**15.2    Release of Guarantees.** Any security interests and personal guarantees provided by third parties in relation to the Claims, under the terms of article 49, paragraph 1, of the LRF, will be released with the respective payment in full of the relevant Claim, under the terms of this New Plan.

**16       ASSIGNMENT**

**16.1    Assignment of Claims.** The Claim Holders may assign their Claims to other Claim Holders or to third parties, and the assignment shall be effective provided that *(i)* the Companies under Court-Supervised Reorganization and the Reorganization Court are informed; and *(ii)* the assignees receive and confirm receipt of a copy of this New Plan, acknowledging that the assigned claim will be subject to its provisions upon Approval of the New Plan.

**16.2    Assignment of the Obligations.** Except for the cases expressly set out in this New Plan, Companies under Court-Supervised Reorganization may not assign any obligations arising from this Plan without the prior consent of the simple majority of the Claims attending the AGC.

**17       LAW AND JURISDICTION**

**17.1    Applicable Law.** The rights, duties and obligations arising from this New Plan shall be governed, construed, and enforced in accordance with the laws in effect in the Federative Republic of Brazil, even if there are Claims originated under the jurisdiction of laws of another jurisdiction and without any rules or principles of private international law being applied.

**REPÚBLICA FEDERATIVA DO BRASIL**
**IRACEMA ANNA NERY**
Tradutora Pública Juramentada e Intérprete Comercial
Rua Aimberé, 1928/21 – São Paulo/SP – Brasil – CEP 01258-020
Telefone: 3865-2790 / Fax: 3868-4842 / e-mail: annanery@uol.com.br
**IDIOMA INGLÊS**
Matriculada na Junta Comercial do Estado de São Paulo sob nº 1033
RG nº 4.454.113-2 – CPF/MF nº 053.575.518-04 – CCM nº 2.341.023-0

| Translation No. 11314 | Book No. 161 | Page No. 256 |
|---|---|---|

**17.2    Jurisdiction.** All disputes or conflicts arising out of or relating to this New Plan shall be resolved by the Reorganization Court.

São Paulo, State of São Paulo, April 16, 2019.

(sgd)

Name: Camila de Souza Valdivia

CPF: 322.730.208-05

(sgd)

Name: Sidnei Piva de Jesus

CPF: 15.979.333-6

**AMENDMENT TO THE COURT-SUPERVISED REORGANIZATION PLAN SUBMITTED BY THE COMPANIES VIAÇÃO ITAPEMIRIM S.A; TRANSPORTADORA ITAPEMIRIM S/A; ITA - ITAPEMIRIM TRANSPORTES S/A; IMOBILIÁRIA BIANCA LTDA.; COLA COMERCIAL E DISTRIBUIDORA LTDA.;** FLECHA S/A - TURISMO COMÉRCIO E INDÚSTRIA; AND VIAÇÃO CAIÇARA LTDA.

List of Exhibits

**Exhibit 01:** Economic Feasibility Report;

**Exhibit 02:** Economic-Financial Report and Appraisal of Goods and Assets;

*(Page of the Amendment to the Court-Supervised Reorganization Plan of Itapemirim Group submitted on March 16, 2019)*

This document is a copy of the original, digitally signed by JULIANA LEITE PEDIGONE and the Court of Appeals of the State of São Paulo, filed on April 22, 2019, at 11:27 p.m., under number WJMJ19405559362.

To check the original version, please go to https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, and enter case number 0060326-87.2018.8.26.0100 and code 6CAB0D0.

All pages are initialed.

*NOTHING ELSE. In witness whereof, I set hereunto my hand and seal.*
*São Paulo, December 19, 2019.*
*Receipt No.: 04565*
*Fees: R$4,813.87*

# EXHIBIT 2-A

**MPSP** | MINISTÉRIO PÚBLICO
DO ESTADO DE SÃO PAULO

Promotoria    de    Falências

---

# EXMO. SR. DR. JUIZ DE DIREITO DA 1ª VARA DE RECUPERAÇÕES E FALÊNCIAS– SP.

Registro n. 0088488-92.2018
*(Incidente para Apuração de Atos de Gestão)*
*Ref. Recuperação de Itapemirim S/A e outros*

                                      **O REPRESENTANTE DO MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO** infra-assinado, no uso de suas atribuições legais (art.129, incisos I e IX, da Constituição Federal, art. 178, do Código de Processo Civil, artigos 52, inciso V, e 187, ambos da Lei Federal n.11101/05-LRF), vem, respeitosamente, *nos autos do incidente em epígrafe referente a recuperação de VIAÇÃO ITAPEMIRIM S/A ('Grupo Itapemirim'), expor e requerer o seguinte:*

                                 De início vale pontuar as nuances de intervenção deste órgão no feito a justificar a postulação ora veiculada, não só na qualidade de fiscal da ordem jurídica, mas também como destinatário da investigação criminal e, por fim, como propulsor primaz da ação penal pública. Nesse sentido, o valoroso ensinamento, aplicável por analogia ao presente:

> *"Realce-se que a atuação do Ministério Público não se restringe ao papel de custos legis. Com fundamento no art. 127 da Constituição da República, o Código de Processo Civil de 2015 bem destacou a promoção da ordem jurídica e de seus valores, conforme se observa em seu art.176: "o Ministério Público atuará na defesa da ordem jurídica, do regime democrático e dos interesses e direitos sociais e individuais indisponíveis". Atuando como promovente da ordem jurídica, o Ministério Público, a teor do art. 179, terá vista dos autos depois das partes, será intimado de todos os atos do processo, poderá produzir provas e requerer as medidas processuais pertinentes e recorrer.*

---

Este documento é cópia do original, assinado digitalmente por NILTON BELLI FILHO, protocolado em 29/10/2019 às 17:36 , sob o número WJMJ19416898759 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0088488-92.2018.8.26.0100 e código 81A5A62.

*É manifesta a atribuição ministerial em questões societárias, ambientais, econômicas – enfim, de relevância social (...). Nesses casos, o bem jurídico tutelado não é essencialmente econômico, mas sim a adequada atuação dos centros de imputação em consonância com normas, valores e princípios da ordem jurídica.*

*Ainda que possível a pluralidade de massas patrimoniais, deve-se coibir a sua confusão em detrimento de credores. Igualmente, são vedados comportamentos fraudulentos"* (cf. **MARCELO DE OLIVEIRA MILAGRES -** Incidente de Desconsideração da Personalidade Jurídica e o Ministério Público *in Repercussões do Novo CPC, volume 6, coord. Fredie Didier Jr., 2ª. edição, JusPodivm*, pág.275/276, grifei).

Posta essa premissa sobre a participação ministerial no incidente, do contexto se infere panorama de considerável gravidade, permeado pela suposta prática de fraudes e delitos de natureza falencial, deflagrados, em princípio, a partir da aquisição do controle acionário do *Grupo Itapemirim* pelas sociedades CSV Incorporação e Assessoria Empresarial e SSG Incorporação e Assessoria. Da narrativa, acompanhada de documentos, se constata que a aquisição teria sido eivada de vícios, inclusive de índole criminosa, tanto que questionada perante a jurisdição arbitral.

*Para subsidiar a cognição judicial, pese sumária, encarta este órgão alguns dados recebidos, oriundos do persecutório instaurado no âmbito da 1ª. Vara Criminal da Justiça Federal em Vitória-ES, dos quais é possível inferir as várias e intrincadas questões postas em debate, principalmente acerca da transferência do controle acionário do Grupo Itapemirim, além de outros aspectos que demandam maiores esclarecimentos, os quais serão encaminhados para melhor análise da Polícia Judiciária local.*

*Consigne-se também que há outro incidente instaurado neste juízo com finalidade similar, embora colete subsídios para verificação da licitude na condução dos negócios do Grupo antes da cessão do controle às sociedades CSV e SSG, à época da gestão realizada pela família COLA - CAMILO COLA e CAMILO COLA FILHO – registrado sob n.0088485-40.2018.*

Aliás, só a título ilustrativo, quando em curso a recuperação da I*tapemirim* perante o juízo da 13ª. Vara Cível e Empresarial de Vitória-ES - posteriormente reconhecida a competência desta especializada – houve até o afastamento do juiz responsável por ordem da Corregedoria-Geral de Justiça daquela unidade federativa, tal a

Este documento é cópia do original, assinado digitalmente por NILTON BELLI FILHO, protocolado em 29/10/2019 às 17:36 , sob o número WJMJ1941698759
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0088488-92.2018.8.26.0100 e código 81A5A62.

gravidade do tema posto à baila e a necessidade da máxima prudência na condução do feito e seus correlatos.

Neste campo versando controle acionário – questionado pelos antigos administradores do *Grupo Itapemirim* - os atuais adquirentes estariam agindo em dissonância do previsto no plano de reestruturação, a ponto de comprometer seu cumprimento, atuando em prejuízo dos credores e visando dissipar o patrimônio social. Como exemplo, veja-se o negócio entabulado para aquisição de aeronaves, enquanto o principal ramo de atividade do *Grupo Itapemirim* é o transporte rodoviário de passageiros; além de vultoso do ponto de vista econômico, não se coaduna com os objetivos sociais da recuperanda, a corroborar a tese de desvio de finalidades na reestruturação da sociedade.

De se notar que os mesmos adquirentes estiveram à frente das operações do Grupo Viação Transbrasiliana, também em recuperação perante a 4ª. Vara Cível de Goiânia-GO (Registro n.5273538.67.2017.8.09.0051) e, agindo identicamente ao aqui narrado, ou seja, com práticas nocivas à boa-fé empresarial e infringindo os ditames da legislação de regência, foram afastados da gestão do aludido *Grupo,* inclusive com determinação para instauração de persecução penal em detrimento deles, haja vista os ilícitos perpetrados.

Salta aos olhos, nesse particular, que os adquirentes titulares das sociedades ora mencionadas – CSV e SSG – se valeram do auxílio da pessoa de Milton Rodrigues Junior que, sem integrar formalmente os quadros societários dessas empresas, comanda-as com totais poderes de gerência, ocultando-se e, mesmo assim, beneficiando-se com o recebimento de proventos.

Doutro lado, como ainda não houve decisão na esfera arbitral, há notícia de que alienações judiciais em detrimento do *Grupo Itapemirim* estão na iminência de consolidação, corolário de outras demandas envolvendo a recuperanda; ademais, a realização desses atos de alienação de patrimônio acabariam por frustrar o cumprimento da recuperação, inclusive porque em tramitação discussão arbitral acerca da validade da transferência do controle acionário do *Grupo Itapemirim* – a repercutir decisivamente no deslinde da recuperação e seus consectários - , além do que há objeções até do ponto de vista avaliatório dos bens imóveis a serem leiloados.

Este documento é cópia do original, assinado digitalmente por NILTON BELLI FILHO, protocolado em 29/10/2019 às 17:36 , sob o número WJMJ19416898759
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0088488-92.2018.8.26.0100 e código 81A5A62.

**MPSP** MINISTÉRIO PÚBLICO
DO ESTADO DE SÃO PAULO

Promotoria    de    Falências

Na mesma esteira, como pende discussão arbitral sobre a aquisição do controle acionário do *Grupo* em recuperação, aliado ao fato de que exsurge dos dados até então trazidos considerável conflituosidade entre os envolvidos, com veiculação de práticas fraudulentas e, quiçá, delituosas em detrimento das empresas em reestruturação e da comunidade de credores, descortina-se panorama previsto no art.64, incisos II, III e IV, da LRF.

Ponha-se o conteúdo do decisório de fls.34398/34402 ao recepcionar o presente incidente, enunciando as práticas que merecem apuração pelos atores do processo, inclusive o órgão ministerial na qualidade de titular da ação penal, a evidenciar panorama de extrema litigiosidade a recomendar medidas a serem adotadas pelo juízo universal a fim de que os princípios insculpidos no art.47 da Lei Federal n.11101/05 sejam preservados sem maiores sobressaltos.

Em abono a esse panorama litigioso no seio das sociedades em recuperação, encarta-se ao presente a petição recebida recentemente neste órgão - encaminhada por associação de ex-funcionários da Itapemirim - contendo matéria jornalística veiculada na região originária da sociedade, no Espírito Santo, noticiando o cometimento de fraudes no âmbito da recuperação; sem comunicação ao juízo da recuperação, pagamentos vultosos estariam sendo feitos a Adib Aldorghan, o marido da atual sócia CAMILA VALDÍVIA, sem que tenham lastro na condução da reestruturação ou se refiram aos objetivos desta.

Além disso, escritórios de advocacia que não laboram e não possuem liame com a causa, também estariam sendo remunerados com valores extraídos das sociedades em recuperação, mas os serviços prestados se dirigem às pessoas físicas dos atuais sócios; referidos pagamentos não encontram guarida no bojo da recuperação e não constam dos relatórios mensais enviados ao juízo pelo administrador judicial.

Outro aspecto a demonstrar a conflituosa gestão do Grupo até o momento, é a informação de que os atuais sócios – SIDNEI PIVA e CAMILA VALDÍVIA – estariam tendo dissensões no concernente à gestão hodierna das sociedades.

Este documento é cópia do original, assinado digitalmente por NILTON BELLI FILHO, protocolado em 29/10/2019 às 17:36 , sob o número WJMJ19416898759 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0088488-92.2018.8.26.0100 e código 81A5A62.

Os motivos aqui aludidos ensejam medidas prudentes do juízo no sentido da manutenção do Grupo em atividade, mas pode haver sensível comprometimento se mantido referida conjuntura e, portanto, emerge palco para a excepcional retirada dos atuais administradores, com a nomeação de gestor idôneo, isento e alheio aos quadros sociais – inclusive de natureza mediata - do *Grupo Itapemirim*. Sobre isso, de bom alvitre a lição abaixo:

*"Como o objetivo da recuperação judicial de empresas consiste em preservar empresas viáveis, <u>caso os administradores da empresa pratiquem atos que possam comprometer esse objetivo, haverá a excepcional possibilidade de afastá-los. Vale dizer, as hipóteses legais de afastamento dos administradores de empresa em recuperação judicial radicam seu fundamento no princípio da preservação da empresa, encontrado no art.64 da LRF</u>. Os administradores da empresa em recuperação devem agir em prol da recuperação da empresa. Aliás, é isso que se presume quanto à atuação dos administradores. <u>Nos casos em que restar comprovado que a administração da empresa está a praticar atos que coloquem em risco o sucesso da recuperação judicial – a exemplo da recusa em prestar informações quando solicitadas – poderá o magistrado afastar os administradores da empresa</u>"* (cf. **LUIZ ROBERTO AYOUB e CASSIO CAVALLI** *in* A Construção Jurisprudencial da Recuperação Judicial de Empresas, 2ª. edição, Forense, pág.105/106, grifei).

Os tribunais não desviam dessa postura:

**"Nos termos do artigo 64 da Lei 11101/05, espera-se que o empresário devedor, seja pessoalmente, seja em colaboração com o administrador judicial, envide esforços para cumprir da melhor forma o plano de recuperação apresentado, visando tanto à continuidade das atividades empresariais quanto à satisfação dos credores"** (TJDF, AI 2009.002015714-1, 1ª. Turma Cível, rel. Des. Flavio Rostirola, j.16.12.2009, v.u.).

Ainda, segundo o periódico, o próprio sócio SIDNEI PIVA postulou a destituição do administrador judicial e do CEO nomeado pelo juízo, Helio Oliveira Siqueira, apontando manobra indevida praticada pelo CEO ao realizar contratação de seguro em prol da sociedade por intermédio de sua própria corretora, em cifras astronômicas, sem a devida prestação de contas.

Deflui-se disso e de outros subsídios existentes no feito que a administradora judicial, pese tenha quadro de advogados próprio, teve liame profissional recente com o mesmo patrono

Este documento é cópia do original, assinado digitalmente por NILTON BELLI FILHO, protocolado em 29/10/2019 às 17:36 , sob o número WJMU1941698B759 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0088488-92.2018.8.26.0100 e código 81A5A62.

contratado pelas sociedades em recuperação; aliás, o próprio sócio responsável pela EXM Partners, Eduardo Scarpellini, constituiu o advogado Elias Mubarak Junior como patrono na recuperação de sociedade que leva seu patronímico, a Transportes Especiais Scarpelini-EIRELI, inferindo-se daí o entrelaçamento profissional entre os citados.

Apesar da hipótese não configurar, *prima facie*, motivo para destituição do administrador judicial nomeado, forçoso reconhecer que referidos indícios trazem dúvida acerca da lisura e imparcialidade na condução dos trabalhos fiscalizatórios, conquanto potencial surgimento de conflito de interesses entre as partes envolvidas.

Disto há decisões pretorianas recomendando a substituição do administrador judicial em analogia ao que se verifica quando o envolvido é magistrado:

**Recuperação judicial. Decisão que, indeferindo impugnação de recuperandas, manteve nomeação de administradora judicial, dita impedida. Agravo de instrumento da recuperanda. <u>O rol do art. 30 da Lei 11.101/05 não é taxativo, cabendo ao juiz analisar, caso a caso, a imparcialidade do administrador judicial. Para auxiliar tal análise, podem ser aplicadas as regras de suspeição e impedimento do CPC (arts. 144 e 145 do CPC), respeitada, no entanto, a função híbrida do administrador que, em determinadas situações, poderá ter que atuar com parcialidade em prol da recuperanda.</u> No caso concreto, são fundados os motivos a por em dúvida a imparcialidade da administradora judicial nomeada. De fato, em primeiro lugar, empresa de seu grupo empresarial é credora de sócia das recuperandas. Em segundo lugar, os grupos econômicos de que fazem parte as recuperandas e a administradora judicial concorrem no mercado internacional de BPO ("business process solutions"). Decisão reformada. Impedimento reconhecido, afastada a administradora, incumbido o Juízo de origem da nomeação de substituto. Agravo de instrumento provido**. (TJSP – AI 2198190-45.2018.8.26.0000, rel. Des.Cesar Ciampolini, 1ª Câmara Reservada de Direito Empresarial, Data do julgamento: 06/02/2019, Data de publicação: 15/02/2019).

<u>E a tese de alteração na administração da recuperação se fortalece na medida em que o próprio sócio se mostra infenso à manutenção desse *status*, apontando irregularidades cometidas pelo administrador judicial e pelo CEO designado. Tais aspectos recomendam prudência do juízo e merecem cabal apuração; contudo, não se mostra razoável que esse panorama de constante litigiosidade se mantenha, havendo propensão de resultado nefasto em detrimento do êxito da reestruturação.</u>

Este documento é cópia do original, assinado digitalmente por NILTON BELLI FILHO, protocolado em 29/10/2019 as 17:36 , sob o número WJMJ1941698759 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0088488-92.2018.8.26.0100 e código 81A5A62.

**MPSP**  MINISTÉRIO PÚBLICO
DO ESTADO DE SÃO PAULO

Promotoria   de   Falências

Impende consignar que a medida ora profligada tem esteio no art.300 e 301 do CPC, constatando-se a presença dos requisitos ensejadores da tutela de urgência, de natureza cautelar, notadamente a probabilidade do direito e o perigo de dano com reflexos ao resultado útil do processo de recuperação.

Destaque-se que o juízo determinou a citação dos envolvidos no presente e, até o momento, não vieram respostas, dado a corroborar a outorga da cautela liminar em favor da manutenção da atividade do Grupo.

Não se olvide que *"toda e qualquer tutela idônea para conservação do direito pode ser requerida pela parte a título de tutela cautelar (art.301, CPC)...É possível obter atipicamente tutela cautelar no direito brasileiro – isto é, embora empregando terminologia diversa, o novo Código reconhece o poder cautelar geral do juiz"* (cf. **LUIZ GUILHERME MARINONI** e outros *in* Código de Processo Civil Comentado, 1ª. edição, RT, pág.314).

Pondera a doutrina que é despiciendo o ajuizamento de ação principal para obtenção da cautela, quando existe situação de perigo para a consecução dos objetivos visados na demanda de fundo:

*"Embora o novo CPC tenha modificado a natureza jurídica da tutela provisória cautelar, que deixou de ser ação, para ser pedido, que pode ser formulado em qualquer ação, ou de modo antecedente, eliminando, assim, as ações cautelares típicas ou nominadas, lista exemplos de providências que podem ser adotadas como consequência da concessão desse tipo de tutela, como o arresto, o sequestro e as demais medidas previstas na norma. Não obstante a referência a elas, é importante destacar que, em qualquer caso, o que fundamenta a concessão da tutela provisória que analisamos é o poder geral de cautela, não mais se exigindo o preenchimento de requisitos específicos (...)"* (cf. **MISAEL MONTENEGRO FILHO** *in* Novo CPC Comentado, 2ª. edição, Atlas, pág.289, grifei).

Insta salientar que o perigo na demora na concessão da cautela decorre do risco de serem praticados atos de constrição e/ou dissipação patrimonial capazes de interferir na atividade empresarial, até porque em tramitação o processo de reestruturação do *Grupo Itapemirim*.

Diante do exposto, **requer o Ministério Público a concessão da medida liminar, com urgência, para o seguinte:**

Este documento é cópia do original, assinado digitalmente por NILTON BELLI FILHO, protocolado em 29/10/2019 às 17:36 , sob o número WJMJ1941698759.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0088488-92.2018.8.26.0100 e código 81A5A62.

**1-** *sejam suspensas, incontinenti, quaisquer iniciativas visando alienação de bens e/ou direitos relativos ao Grupo Itapemirim que estejam em tramitação;*

**2-** *seja empreendida a substituição do administrador judicial nomeado, em face dos subsídios coletados que evidenciam suspeição e parcialidade;*

**3-** *seja convocada de assembleia de credores, com urgência, nos termos do art.65 da Lei Federal n.11101/05, visando a nomeação de gestor judicial.*

     *Porém, se o juízo reputar necessária perquirição mais acurada acerca do noticiado, com lastro no art.5º. da Lei de Introdução às Normas do Direito Brasileiro (Decreto-lei n.4657/42), art.139, inciso V c.c. art.334, ambos do CPC, <u>este órgão propõe, alternativamente, à cautela ora pugnada, a imediata designação de audiência de tentativa de conciliação, nos moldes previstos para a 'audiência de gestão democrática'.</u>*

     Referido expediente, comumente difundido nos juízos especializados da Capital, constitui-se interessante instrumento para o acertamento de controvérsias semelhantes a esta, como obtempera um de seus defensores:

     *"Quanto à gestão democrática, trata-se de denominação atribuída a uma audiência concentrada, em que são ouvidos os interessados e decididas várias questões que, no mais das vezes, poderiam ter sido enfrentadas previamente pelo juízo falimentar, sem maiores delongas. <u>A realização da audiência dessa natureza não se justifica em todos os casos, mas apenas naqueles de maior complexidade que recomendem uma atuação mais incisiva do juiz, de acordo com o seu discernimento.</u>*

     *Nos processos falimentares e de recuperação judicial o juiz conta com o administrador judicial, auxiliar que deve atuar para a consecução dos objetivos da lei 11.101/2005. Por exemplo, a falência é um processo que exige muitas providências materiais, como arrecadação, avaliação e alienação de bens, que devem ser realizadas com agilidade pelo administrador judicial, dispensando audiências presididas pelo juiz. <u>Na recuperação judicial, por sua vez, o devedor e os credores têm papel relevante para a solução da crise, cabendo ao Juiz intervir em situações excepcionais, quando perceber o retardamento indevido desta solução. A mediação poderá entrar aí, como instrumento adicional para auxiliar devedor e credores a melhor a superarem os obstáculos que surgirem na negociação.</u> Exemplos de mediação temos nos casos da recuperação judicial da Saraiva e da EDB.*

Este documento é cópia do original, assinado digitalmente por NILTON BELLI FILHO, protocolado em 29/10/2019 às 17:36 , sob o número WJMJ1941698B759. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0088488-92.2018.8.26.0100 e código 81A5A62.

**MINISTÉRIO PÚBLICO**
DO ESTADO DE SÃO PAULO

Promotoria   de   Falências

*Casos especialíssimos podem exigir uma audiência, como recentemente se deu no processo da Avianca, em que o magistrado buscou uma composição entre os arrendadores das aeronaves e a companhia aérea em recuperação, ou no caso da Libra Santos, em que se foram exigidas explicações a respeito da notícia de encerramento das atividades da devedora. <u>Enfim, o sistema processual confia no discernimento do juiz para a realização de audiência, nos casos em que ele reputá-la adequada o bom êxito do processo de falência ou de recuperação judicial</u>, não havendo necessidade de imposição, como regra, de um ato processual muitas vezes desnecessário".(cf.* **PAULO FURTADO DE OLIVEIRA FILHO**, juiz titular da 2ª. Vara de Recuperações e Falências da Capital-SP, Insolvência em Foco, Migalhas, texto de 24 de abril de 2019, grifei).*

*Com a convocação de todos os envolvidos no litígio e demais interessados, os temas mais candentes aqui pinçados poderão ser ajustados de forma consensual, inclusive as questões do controle acionário e a administração, até que perdure a fiscalização judicial da sociedade em recuperação. Sanadas essas perlengas e – sedimentada a conflituosidade que exsurge do contexto – pode o biênio recuperacional tramitar sem maiores percalços e, talvez, com larga e exitosa propensão ao cumprimento do plano de recuperação e satisfação dos credores.*

*Termos em que,*
*Pede deferimento.*

São Paulo, 29 de outubro de 2019

**NILTON BELLI FILHO**
*5º. Promotor de Justiça de Falências*

Este documento é cópia do original, assinado digitalmente por NILTON BELLI FILHO, protocolado em 29/10/2019 às 17:36 , sob o número WJMJ1941698759 .
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 0088488-92.2018.8.26.0100 e código 81A5A62.

# EXHIBIT 2-B

 **MP**<span style="color:red">**SP**</span> | PUBLIC MINISTRY
FROM THE STATE OF SAO PAULO | Bankruptcy Affairs Tribunal

# HONORABLE 1ˢᵗ.  RECOVERY AND BANKRUPTCY
# COURT JUDGE – SP

Registration no. 0088488-92.2018

(*Pursuant to Determination of Administration Actions*)
*Ref. Itapemirim S/A Recovery and Others*

**THE REPRESENTATIVE OF THE OFFICE OF THE DISTRICT ATTORNEY OF THE STATE OF SAO PAULO**, undersigned and in the use of his legal attributions (art.129, items I and IX, of the Federal Constitution, art. 178, of the Code of Civil Procedure, articles 52, item V, and 187, both of Federal Law n.11101/05-LRF), in the case above regarding the recovery of VIAÇÃO ITAPEMIRIM S/A ('Grupo Itapemirim '), respectfully states and requires the following:

First, it is worth pointing out the nuances of intervention of this body to justify the position exposed here, not only as a legal inspector, but also as a recipient of the criminal investigation and, finally, as the primary driver of public prosecution. In this sense, the valuable lessons, applicable by analogy to the current case:

*"It is emphasized that the action of the Public Prosecution Service is not restricted to the role of mere legislation.  Based on art. 127 of the Constitution, the 2015 Code of Civil Procedure highlighted the promotion of the legal order and its values, as seen in its art.176: "the Public Prosecution Service will act in defense of the legal order, the democratic regime and the inaccessible social and individual interests and rights". Acting as promoter of the legal order, the District Attorney's Office, according to art. 179, shall have a record of the proceedings after the parties have them, shall be informed regarding all of the acts of the proceedings, gather evidences, and request the relevant procedural measures and appeal to follow.*



**MPSP** | PUBLIC MINISTRY
FROM THE STATE OF SAO PAULO | Bankruptcy Affairs Tribunal

---

*Ministerial assignment is prevalent in corporate, environmental and economic matters - in other words, in matters of social relevance (...). In these cases, legal protection is not essentially economic, but the proper performance of attribution in accordance with the norms, values and principles of the legal order.*

*Whenever possible, the plurality of corporate assets, the confusion to the detriment of lenders should be inhibited, also, fraudulent behavior is not acceptable*" (cf. **MARCELO DE OLIVEIRA MILAGRES** – Disregarding case of Legal Individual and the Public Ministry *in Repercussions of the New CPC, Volume 6, coord. Fredie Didier Jr., 2a. edicao, JusPodivm, p.275 / 276, underlined*).

This premise was sited concerning the Ministry's participation in the case, the context shows a landscape seriously permeated by the alleged practice of fraud and bankruptcy misconduct, triggered mostly by the acquisition of the control of the *Itapemirim Group* by the companies CSV Incorporação and Assessoria Empresarial and SSG Incorporacao e Assessoria. From the narrative, accompanied by documents, it appears that the acquisition was filled with improprieties, including criminal ones, so much so that it has been under scrutiny by the arbitral tribunal.

*In order to support judicial cognition, there is some information included which was received from the persecutory section of the 1st. Criminal Court of the Federal Justice in Vitoria-ES, where it is possible to infer the various and intricate questions placed in debate, especially concerning the transfer of the shareholding control of the Itapemirim Group, as well as other aspects that require further clarification, which will be forwarded for better analysis to the local Judicial Police.*

*Also note that there is another case filed in this court for a similar purpose, although it gathers data in order to prove the verification of the legality of the Group's business conduct prior to the assignment of control to the companies CSV and SSG during the administration by the COLA family - CAMILO COLA and CAMILO COLA FILHO - registered under n.0088485- 40,2018.*

For illustrative purposes only, during the course of Itapemirim's recovery before the 13th. Civil and Business Court of Vitória-ES - the competence of this specialized court later acknowledged - the removal of the judge in charge by order of the General Secretariat of Justice of that federative unit took place, such was

---



| | |
|---|---|
| **MPSP** PUBLIC MINISTRY FROM THE STATE OF SAO PAULO | Bankruptcy Affairs Tribunal |

The seriousness of the issue raised and the need for the utmost prudence in conduct of the case and its connections.

Concerning share control - mistrusted by former *Itapemirim Group* administrators - the current managers would be acting in conflict with the plan, causing damage to creditors and aiming to dissipate the equity. For example, acquiring aircraft, the Itapemirim Group's main activity is the transportation of passenger by buses; besides being a huge expenditure from the economic point of view, is not in line with the corporate objectives of the company under recovery, corroborating the misuse of assets in the restructuring of the company.

Note that the same purchasers led the Viação Transbrasiliana Group operations, also under recovery at the 4th. Civil Court of Goiânia-GO (Registration n.5273538.67.2017.8.09.0051) and, acting identically to what is narrated here, that is, with practices that are harmful to good business and violate the dictates of governing law, these individuals were removed from the recovery management of the aforementioned including with a motion to file a criminal law suit against them, in light of the perpetrated offenses.

It is striking in this regard that the officers of the companies mentioned above - CSV and SSG –were assisted by Mr. Milton Rodrigues Junior who, without formally integrating the corporate structure of these companies, directs those companies with full management powers, behind the scenes, but yet benefiting from the receipt of proceeds.

On the other hand, since there has been no decision in the arbitral sphere, there are reports that judicial disposals to the detriment of Itapemirim Group are on the verge of consolidation as a result of other claims involving the company under recovery; in addition, the performance of these actions of disposal of assets would ultimately frustrate compliance with an arbitral debate which is underway regarding the transfer of the controlling interest of the *Itapemirim Group* – and will furthermore have a decisive impact on the recovery plus anything additionally- furthermore, there are objections about the evaluation of properties to be auctioned.

**MPSP** | PUBLIC MINISTRY
FROM THE STATE OF SAO PAULO | Bankruptcy Affairs Tribunal

In the same scope, there is a pending deliberation about the acquisition of the controlling interest of the recovering *Group*, coupled with the fact that the data brought forth so far has shown considerable conflict between those involved, with the dissemination of fraudulent practices and perhaps criminal offenses to the detriment of the restructuring and to the group of creditors, the outlook is evident as predicted in article 64, items II, III and IV, of the LRF.

The content of the decision on Pages 34398/34402 regarding this case are relevant, articulating the practices that merit investigation by the acting process agents, including the ministerial body in its capacity as the main legislator of criminal action, since a panorama of extreme litigation is in evidence, and to recommend measures to be adopted during the ruling so that the principles inscribed in art. 47 of Federal Law no. 11101/05 are preserved without further problems.

In support of this contentious scenario within companies in recovery, the petition received recently by this body - referred by an association of former Itapemirim employees - containing journalistic material published in the region where the company was founded, the state of Espírito Santo, reporting the committing of fraud in the recovery; without communication to the judge in charge of the recovery, large payments that are being made to Adib Aldorghan, the husband of current partner CAMILA VALDIVIA, without any purpose towards the restructuring of the company or in reference to those objectives .

In addition, law firms that are not involved and have no link with the case, are also be being remunerated with monies from the recovering companies for services provided to the physical individuals of the current partners; These payments are not found in the recovery journal and are not included in the monthly reports sent to the court by the judicial trustee.

Another aspect exposing the Group's conflicting management, is the information that the current partners - SIDNEI PIVA and CAMILA VALDIVIA - are having disagreements concerning the day to day management of the companies.



| **MPSP** | PUBLIC MINISTRY<br>FROM THE STATE OF SAO PAULO | | Bankruptcy Affairs Tribunal |

The reasons mentioned here yield measures prudent to maintain the Group's business, but there may be profound impairment if the current conjuncture is maintained, therefore a situation arises giving way for the withdrawal of the current administrators, with the the appointment of a suitable unbiased manager to the corporate structure - including one of an arbitral nature - of the *Itapemirim Group*. About this, see the example below:

"The goal of judicial reorganization of companies is to preserve the viability of those companies. If company managers perform acts that might compromise that goal, there are means to withdraw them. That is to say, the legal hypotheses of the dismissal of company administrators during judicial reorganization roots its foundation in the principle of the preservation of the company, as stated in art.64 of the LRF.

Recovering company administrators should act for the recovery of the company. In fact, this is what is presumed to be the execution of the administrators. In cases where there is evidence that the company's management is Acting to jeopardize the success of judicial recovery - such as refusal to provide information when requested - the judge may remove the administrators from the company" (cf. **LUIZ ROBERTO AYOUB and CASSIO CAVALLI** in A the Jurisprudential Construction of Judicial Reorganization of Companies, 2a. edicao, Forense, p.age 05/106, underlined).

The courts do not deviate from this stance:

"**Under Article 64 of Law 11101/05, the debtor entrepreneur is expected either in person or in collaboration with the court administrator, to make efforts to comply with the recovery plan presented, aiming at both the continuity of business activities and the payment of creditors** "(TJDF, AI 2009.002015714-1, 1st Class Civil, Rel. Des Flavio Rostirola, j.16.12.2009, v.u.).

Still, according to the journal, the partner; SIDNEI PIVA, suggested the dismissal of the trustee and CEO Helio Oliveira Siqueira appointed by the court, indicating a maneuver improperly practiced by the CEO when contracting insurance for company through his own brokerage firm, in astronomical amounts, without due accountability.

It is ascertained from this and other information the fact that the judicial administrator, despite having his own lawyers, had recent professional relationships with the same attorney

Page 34437

 **MPSP** | PUBLIC MINISTRY
FROM THE STATE OF SAO PAULO | Bankruptcy Affairs Tribunal

hired by the recovering companies; indeed, the partner responsible for EXM Partners, Eduardo Scarpellini, hired the attorney Elias Mubarak Junior as the attorney for the recovery of the company that is named, Transportes Especiais Scarpelini- EIRELI, inferring from this the professional intertwining between those mentioned.

Although the hypothesis does not configure, *prima facie*, motive for the dismissal of the appointed court administrator, it is hard not to acknowledge that such evidence conveys doubts about the honesty and impartiality of the supervisory task regarding a potential scenario of conflict of interest between the parties involved.

There are past decisions recommending the replacement of the court administrator when the person involved is a judge:

**Judicial recovery. A decision rejecting the opposition by the companies under recovery, maintained the appointment of the judicial administrator. <u>Interlocutory appeal. The directive of art. 30 of Law 11.101 05 is not thorough enough and it is for the judge to examine on a case by case basis, the impartiality of the court administrator. To assist in such analysis, the rules of suspicion and impediment of the CPC can apply (articles 144 and 145 of the CPC), however, recognizing the hybrid role of the administrator, who in certain situations, may have to act in favor of the company under recovery</u>. In the current case, the motives for casting doubt on the impartiality of the appointed trustee. In fact, in the first place, a company in his business group is a creditor of the partner of the companies under recovery. Secondly, the economic groups which are part of the companies under recovery and the court administrator compete in the international BPO market. ("business process solutions"). Altered decision. Impediment acknowledged, the administrator was removed, the original judge withdrawn and a substitute was appointed. Interlocutory appeal provided.** (TJSP - AI 2198190-45.2018.8.26.0000, rel. Des.Cesar Ciampolini, 1st Chamber of Business Law, Date of judgment: 02/06/2019, Date of publication: 15/02/2019).

The thesis of the administration alteration of THE recovery strengthens as the partner shows his adversity to maintain that *status*, pointing out irregularities committed by the trustee and by the designated CEO. Such aspects merit prudence of judgment and deserve thorough investigation; however, It does not seem reasonable that this panorama of constant litigation is maintained, with the propensity of a harmful result to the successful restructuring.

34438



|  | |
|---|---|
| PUBLIC MINISTRY<br>FROM THE STATE OF SAO PAULO | Bankruptcy Affairs Tribunal |

It should be noted that the motion which is now moot is rooted in the articles 300 and 301 of the CPC, with the existence of the requirements entailing precautionary urgent relief, notably the likelihood of entitlement and the danger of impairment resulting in damage to the positive outcome of the recovery process.

Also, it is of importance to note that the court summoned those currently involved and, so far, no answers have been provided, detail to deliberate in favor of the injunction for maintaining the Group's activity.

Do not forget that *"any suitable guardianship for the preservation of the right may be requested by the party as a interlocutory relief (art.301, CPC) ... It is possible to obtain injunctive relief under Brazilian law - that is, although employing different terminology, the new Code recognizes the general precautionary power of the judge"*(cf.LUIZ GUILHERME MARINONI and Others in Code of Civil Procedure Commented, 1st. edition, RT, p.314).

The doctrine that the main lawsuit can be dismissed in order to obtain the interlocutory relief when there is a situation which places in danger the achievement of the objectives sought in the demand is taken into consideration.

*"Although the new CPC has changed the legal nature of the interlocutory relief, <u>which is no longer an action, but is now a request which may be a part of any action, thereby eliminating typical precautionary actions</u>, it lists examples of steps that can be taken as a consequence of the granting of this type of guardianship, such as arrest, custody and other measures provided for in the standard. <u>Notwithstanding when referring to them, it is important to highlight that in any case, what centers the granting of the interlocutory relief we have analyzed is the general authority of the interlocutory relief itself</u> which is no longer required to fulfill specific requirements (...)"*(cf. MISAEL MONTENEGRO FILHO in New CPC Posted, 2a. edition, atlas, p.289, underlined).

It is critical to point out that the danger in delaying the granting of the interlocutory relief, creates the risk of acts of constriction and/or dissipation of assets capable of interfering with corporate activity, more so here because the Itapemirim Group is undergoing a recovery process

Given the above, **the Office of the District Attorney requests the granting of the interlocutory relief as a matter of urgency for the following motives:**

34439

 PUBLIC MINISTRY
FROM THE STATE OF SAO PAULO

Bankruptcy Affairs Tribunal

---

1-      *to suspend any initiatives aimed at disposal of assets and/or rights relating to the Itapemirim Group that are in progress;*

2-      *to bring about the replacement of the court administrator is undertaken in the light of the information gathered that show suspicion and partiality;*

3-      *to set a meeting of creditors as a matter of urgency, pursuant to 65 of Federal Law no. 11101/05, aiming at the appointment of a judicial manager.*

*Nevertheless if the court judges necessary to have a more accurate inquiry concerning the news, based on art.5. of law of Introduction to the Rules of Brazilian Law (Decree-Law no. 4657/42), art.139, item V c.c. art.334, both of the CPC, this body proposes, alternatively, the interlocutory relief now called for, and the immediate appointment of a conciliation attempt hearing, as provided for in 'democratic management hearing'.*

The process referred to, is commonly disseminated in the specialized judgments of the Capital is an interesting *instrument for settling disputes similar to this one, as promoted by one of its defenders:*

*"As for democratic management, this is a designation attributed to a concentrated audience in which interested parties are heard including several issues that, more often than not, could have been previously addressed by the bankruptcy court without further ado. <u>Holding such a hearing is not justified in all cases, but only in those of greater complexity that recommend a most incisive action from the judge, according to his discernment.</u>*

*In bankruptcy and judicial reorganization proceedings the Judge counts on the court administrator, who must act to achieve the objectives of Law 11.10 /2005. For example, bankruptcy is a process that requires many material measures, such as collection, valuation and disposal of assets, which must be conducted by the court administrator, thus dismissing hearings presided over by the judge. However in judicial recovery, the debtor and the creditors play a relevant role in the solution of the crisis, and it is up to the Judge to intervene in exceptional situations when there is undue delay of this solution. Mediation may enter as an instrument to help the debtor and creditors better overcome obstacles that arise in the negotiation. Examples of mediation are seen in the cases of Saraiva's judicial recovery and from EDB.*

---

34440

**MP**SP | PUBLIC MINISTRY
FROM THE STATE OF SAO PAULO | Bankruptcy Affairs Tribunal

---

       *Very special cases may require an audience, such as recently occurred in the Avianca process, in which the magistrate sought a between the lessors of the aircraft and the recovering airline, or in the case of Libra Santos, where explanations were required regarding the news of the closure of the debtor's activities. <u>Finally, the procedural system relies on the judge's judgment to hearing, if he considers it appropriate, the success of the bankruptcy or judicial reorganization</u> and there is no need to impose, as a rule, an often unnecessary procedural act "* (cf. PAULO FURTA DE OLIVEIRA FILHO, Head Judge of the 2nd. Bankruptcy and Recovery Stick Capital-SP, Insolvency in Focus, Crumbs, text of April 24, 2019, underlined).

       *With the convening of all those involved in the litigation and other interested parties, the most crucial issues raised here may be consensually adjusted, including shareholder control issues until the judicial review of the recovering company persists. These issues are remedied and – resolving the conflicts from the context - the recovery can proceed smoothly and perhaps with a large and successful propensity to comply with the recovery and the creditors' fulfilment.*

       Respectfully submitted.

       Sao Paulo, October 29, 2019

**NILTON BELLI FILHO**

5th Bankruptcy Court Prosecutor

*[Sidebar on every page]*

This document is a copy of the original, digitally signed by NILTON BELLI FILHO, filed on 10/29/2019 at 17:36, under number WJMJ19416898759.To check the original, go to https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do. Enter the case 0088488-92.2018.8.26.0100 and code 81A5A62.

---

Metro Translators, Inc.● 20907 Leeward CT 253 ● Aventura, FL 33180 ● (954) 228-3123 Fax: 727 350-9451 ● info@metrotranslators.com

## TRANSLATION FROM PORTUGUESE TO ENGLISH

REQUEST FOR INTERLOCUTORY RELIEF

ITAPEMIRIM COMPANIES

# CERTIFICATE OF ACCURACY

I, Gabriel O'Meara, President of Metro Translators, Inc., a professional translation company duly registered in the State of Florida, certify that the translation of this document from Portuguese into English, was performed by a professional translator in the above language pair and that the forgoing document is a true and accurate translation of the original document in the Portuguese language, consisting of 9 page(s).

_____        _____

**Gabriel O'Meara**                                          11/01/2019
President-CEO                                                  **Date**
Metro Translators, Inc.
gabe@metrotranslators.com
(954) 228-3123